STATE OF MISSISSIPPI

COUNTY OF JACKSON


I, TERRY MILLER, Clerk of the Chancery Court in and for said County and State, the same being a court of Record, having a Seal, do hereby certify that I am a proper custodian of all the books, papers, records, files and documents of said Court and of the Seal thereof, and that the foregoing is a full, true and complete copy of the entire file in the Cause styled:

CAUSE NO:   2009-1821-JB

STYLED:     Dr. Jay T. Segarra vs. Bottrell Insurance Agency, Inc. The Doctors Company


as the same now appears of record in the records of Chancery Court of Jackson County, Mississippi in my said office.


(See attached Docket Entries)


In TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of said Court at my office in Pascagoula, in said county on this the 19th day of October ,A.D. 2009 .


TERRY MILLER
Clerk of Chancery Court
Jackson County, Mississippi

BY: Shelley Wade         D.C.


EXHIBIT "A"

# CERTIFICATE OF CHANCELLOR

**THE STATE OF MISSISSIPPI**

**JACKSON COUNTY**                    **CHANCERY COURT**

I, ___Jaye Bradley_____ presiding Chancellor of the 16th Chancery District of the State of Mississippi (said District including the County of Jackson), do hereby certify that ___Terry Miller_____ whose genuine signature appears to the foregoing Certificate of ___Clerk_____ is now, and was at the date of said Certificate, the Clerk of the Chancery Court of said County, duly elected and qualified according to law; and that all his official acts as such are entitled to full faith and credit; that his said certificate is in due form of law; that the seal thereto attached is the genuine seal of said Chancery Court, and that said Court is a Court of Record.

Given under my hand and seal at, Pascagoula this __19th_day of_October_____, _2009_____

_Jaye A. Bradley_
Chancellor

# CERTIFICATE OF CLERK TO CHANCELLOR

**THE STATE OF MISSISSIPPI**

**JACKSON COUNTY**                    **CHANCERY COURT**

I, ___Terry Miller_____ , Clerk of said Court, do hereby certify that ___Jaye Bradley_____ whose genuine signature appears to the annexed and last above Certificate of Attestation, is now, and was at the date of said Certificate the sole presiding Chancellor of the 16th Chancery District of said State, including said County of Jackson as therein stated, duly appointed by lawful authority and legally qualified, and that all his acts as such are entitled to full faith and credit, in judicature and thereout; that his said Certificate and Attestation are in due form of law, and that said Chancery Court is a Court of Record.

IN TESTIMONY WHEREOF, I have hereunto set my hand and the seal of office, in the City of Pascagoula. This __19th_day of_October_____, _2009___

_____ , Clerk

**COVER SHEET**
**Civil Case Filing Form**
*(To be completed by Attorney/Party*
*Prior to Filing of Pleading)*

**Court Identification**
Docket Number

| 3 | 0 | 1 | C | H |

County #   Judicial   Court ID
District (CH, CI, CO)

**Case Year**

| 2 | 0 | 0 | 9 |

**Docket Number**

| 1 | 8 | 2 | 1 | |

Local Docket ID

Mississippi Supreme Court
Administrative Office of Courts

Form AOC/01
(Revised 1/1/2001)

| 0 | 8 | 0 | 5 | 0 | 9 |

Month    Date    Year
This area to be completed by clerk

Case Number if filed prior to 1/1/94

IN THE __CHANCERY__ COURT OF __JACKSON__ COUNTY

Short Style of Case: Dr. Jay Segarra v Botrell Insurance Agency, Inc., and The Doctors Company
Party Filing Initial Pleading: Type/Print Name __Matthew G. Mestayer__    MS Bar No. __9646__
____ Check (✓) if Not an Attorney    ____ Check (✓) if *Pro Hac Vice*    Signature _____
Compensatory Damages Sought: $ _____    Punitive Damages Sought: $ _____
*Is Child Support contemplated as an issue in this suit?* ____ Yes __✓__ No    If "yes" is checked, please submit a completed Child Support
Information Sheet with Final Decree/Judgment

PLAINTIFF - PARTY(IES) INITIALLY BRINGING SUIT SHOULD BE ENTERED FIRST (FIRST NAME IN SHORT STYLE) - ENTER ADDITIONAL PLAINTIFFS ON SEPARATE FORM

Individual __Segarra_____ __Jay_____ ( _____ ) __T.__
        Last Name        First Name    Maiden Name, if Applicable    Middle Init.    Jr/Sr/II/IV
Address of Plaintiff 2123 Government Street, Ocean Springs, MS 39564
____ Check (✓) if Individual Plaintiff is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
    Estate of _____
____ Check (✓) if Individual Plaintiff is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity:
    D/B/A / Agency _____
Business _____
        Enter legal name of business, corporation, partnership, agency - If Corporation, indicate state where incorporated
____ Check (✓) if Business Plaintiff is filing suit in the name of an entity other than the above, and enter below:
    D/B/A: _____

DEFENDANT - NAME OF DEFENDANT (FIRST NAME IN SHORT STYLE) - ENTER ADDITIONAL DEFENDANTS ON SEPARATE FORM

Individual _____ _____ ( _____ ) _____
        Last Name        First Name    Maiden Name, if Applicable    Middle Init.    Jr/Sr/II/IV
____ Check (✓) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
    Estate of _____
__✓__ Check (✓) if Individual Defendant is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity:
    D/B/A / Agency __Bottrell Insurance Agency, Inc.__
Business __Registered Agent T. Harris Collier, III, at 248 E. Capitol Street, Jackson, MS 39201__
        Enter legal name of business, corporation, partnership, agency - If Corporation, indicate state where incorporated
____ Check (✓) if Business Defendant is being sued in the name of an entity other than the above, and enter below:
    D/B/A: _____
ATTORNEY FOR THIS DEFENDANT: _____ Bar No. __ or __ Name: _____    *Pro Hac Vice* (✓)___
    (If known)

In left hand column, check one (1) box that best describes
the nature of this suit. In right hand column check all
boxes which indicate secondary claims.

**Business/Commercial**
- Accounting (Business)
- Bankruptcy
- Business Dissolution - Corporation
- Business Dissolution - Partnership
- Debt Collection
- Employment
- Examination of Debtor
- Execution
- Foreign Judgment
- Garnishment
- Pension
- Receivership
- Replevin
- Stockholder Suit
- Other _____

**Domestic Relations**
- Child Custody/Visitation
- Child Support
- Contempt
- Divorce: Fault
- Divorce: Irreconcilable Differences
- Domestic Abuse
- Emancipation
- Modification
- Paternity
- Property Division
- Separate Maintenance
- Termination of Parental Rights
- UIFSA (formerly URESA)
- Other _____

**Contract**
- Breach of Contract
- Installment Contract
- Insurance
- Product Liability under Contract
- Specific Performance
- Other _____

**Probate**
- Accounting (Probate)
- Birth Certificate Correction
- Commitment
- Conservatorship
- Guardianship
- Heirship
- Intestate Estate
- Minor's Settlement
- Muniment of Title
- Name Change
- Power of Attorney
- Testate Estate
- Will Contest
- Other _____

**Statutes/Rules**
- Bond Validation
- Civil Forfeiture
- Declaratory Judgment
- ERISA
- Eminent Domain
- Extraordinary Writ
- Federal Statutes
- ✓ Injunction or Restraining Order
- Municipal Annexation
- Racketeering (RICO)
- Railroad
- Seaman
- Other _____

**Appeals**
- Administrative Agency
- County Court
- Hardship Petition (Driver License)
- Justice Court
- MS Employment Security Comm'n
- Municipal Court
- Oil & Gas Board
- Workers' Compensation
- Other _____

**Children and Minors - Non-Domestic**
- Adoption - Noncontested
- Consent to Abortion for Minor
- Removal of Minority
- Other _____

**Torts-Personal Injury**
- Bad Faith
- Fraud
- Loss of Consortium
- Malpractice - Legal
- Malpractice - Medical
- Negligence - General
- Negligence - Motor Vehicle
- Products Liability
- Wrongful Death
- Other _____

**Mass Tort**
- Asbestos
- Chemical Spill
- Dioxin
- Hand/Arm Vibration
- Hearing Loss
- Radioactive Materials
- Other _____

**Real Property**
- Adverse Possession
- Ejectment
- Eminent Domain
- Judicial Foreclosure
- Lien Assertion
- Partition
- Receiver Appointment
- Tax Sale: Confirmation/Cancellation
- Title, Boundary &/or Easement
- Other _____

**Civil Rights**
- Elections
- Habeas Corpus
- Post Conviction Relief
- Prisoner
- Other _____

IN THE <u>CHANCERY</u> COURT OF <u>JACKSON</u> COUNTY, MISSISSIPPI

~~FIRST~~ 16th JUDICIAL DISTRICT, CITY OF ~~GULFPORT~~ Pascagoula

Docket No. <u>2009</u> - <u>1821</u> <u>CH</u>    Docket No. If Filed
              File Yr      Chronological No.    Clerk's Local ID    Prior to 1/1/94 _____

## DEFENDANTS IN REFERENCED CAUSE - Page 1 of 2 Defendants Pages
## IN ADDITION TO DEFENDANT SHOWN ON CIVIL CASE FILING FORM COVER SHEET

**Defendant #2:**

**Individual**: <u>Grimes</u>          <u>Susan</u>          ( _____ )  _____  _____
                Last Name              First Name          Maiden Name, if Applicable   Middle Init.   Jr/Sr/III/IV

___Check (✓) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:

Estate of _____

✓ Check (✓) if Individual Defendant is acting in capacity as Business Owner/Operator (D/B/A) or State Agency, and enter that name below:

D/B/A _____

**Business** <u>The Doctors Company</u>
              Enter legal name of business, corporation, partnership, agency - If Corporation, indicate state where incorporated

___Check (✓) if Business Defendant is being sued in the name of an entity other than the name above, and enter below:

D/B/A <u>185 Greenwood Road, Napa, CA 94558</u>

**ATTORNEY FOR THIS DEFENDANT:** _____ Bar # or Name: _____ *Pro Hac Vice* (✓)___ Not an Attorney(✓)___

**Defendant #3:**

**Individual**: _____  _____  ( _____ )  _____  _____
                Last Name              First Name          Maiden Name, if Applicable   Middle Init.   Jr/Sr/III/IV

___Check (✓) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:

Estate of _____

___Check (✓) if Individual Defendant is acting in capacity as Business Owner/Operator (D/B/A) or State Agency, and enter that name below:

D/B/A _____

**Business** _____
              Enter legal name of business, corporation, partnership, agency - If Corporation, indicate state where incorporated

___Check (✓) if Business Defendant is being sued in the name of an entity other than the name above, and enter below:

D/B/A _____

**ATTORNEY FOR THIS DEFENDANT:** _____ Bar # or Name: _____ *Pro Hac Vice* (✓)___ Not an Attorney(✓)___

**Defendant #4:**

**Individual**: _____  _____  ( _____ )  _____  _____
                Last Name              First Name          Maiden Name, if Applicable   Middle Init.   Jr/Sr/III/IV

___Check (✓) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:

Estate of _____

___Check (✓) if Individual Defendant is acting in capacity as Business Owner/Operator (D/B/A) or State Agency, and enter that name below:

D/B/A _____

**Business** _____
              Enter legal name of business, corporation, partnership, agency - If Corporation, indicate state where incorporated

___Check (✓) if Business Defendant is being sued in the name of an entity other than the above, and enter below:

D/B/A _____

**ATTORNEY FOR THIS DEFENDANT:** _____ Bar # or Name: _____ *Pro Hac Vice* (✓)___ Not an Attorney(✓)___

9B.00

## IN THE CHANCERY COURT OF JACKSON COUNTY, MISSISSIPPI

DR. JAY T. SEGARRA                                                   **PLAINTIFF**

VS.                                                            NO. 2009-1821-JB

BOTTRELL INSURANCE AGENCY, INC. **FILED**
THE DOCTORS COMPANY                                          **DEFENDANTS**

· AUG 0.5 2009

TERRY MILLER, CLERK
By _Theresa C. Liddell_

## COMPLAINT FOR DECLARATORY RELIEF,
## DAMAGES, AND TEMPORARY RESTRAINING ORDER

**COMES NOW,** Dr. Jay T. Segarra, ("Segarra") Plaintiff in the above styled

numbered cause, and would respectfully show unto the Court this his good claim for

relief and in support thereof would show unto the Court the following, to-wit:

### JURISDICTION AND VENUE

1.      Both jurisdiction and venue are proper in Jackson County, Mississippi.

Jurisdiction of this action is based upon equity jurisdiction of the Chancery Court as set

in Article 6, Section 159 of the Constitution of the State of Mississippi, Mississippi Code

Annotated Section 9-5-81(Supp. 204), and Mississippi Code Annotated Section 79-29-

101 *et seq.*

2.      This Court has jurisdiction of the parties pursuant to the Laws of the State

of Mississippi.  The Defendant Bottrell Insurance Agency, Inc. is a corporation formed,

organized and existing under the laws of the State of Mississippi. The Defendants have

committed a tort in whole or in part within the State of Mississippi within the meaning of

Miss. Code Ann. Section 13-3-57, and have entered into a contract to be performed in

whole or in part in the State of Mississippi.  The Defendants also have been doing

business in Mississippi and are licensed to sell insurance in the state of Mississippi by

the Mississippi Department of Insurance.

3.      Venue is proper in this county because the liability insurance at issue was

issued to the Plaintiff in this county to cover his professional work which was based in

part in this county.

    4.    The Federal Courts lack subject matter jurisdiction over this action, as there is no federal question and incomplete diversity of citizenship due to the presence of a Mississippi plaintiff and Mississippi defendant. Removal is improper. Every claim arising under the Constitution, treaties, or laws of the United States is expressly disclaimed (including any claim arising from an act or omission on a federal enclave, or of any office of the U.S. or any agency or person acting under him occurring under color of such office). No claim of admiralty or maritime law is raised. Plaintiffs sue no foreign state or agency.

**PARTIES**

    5.    At all times hereinafter mentioned, the Plaintiff, Dr. Jay T. Segarra, was and still is an adult resident citizen Jackson County, Mississippi.

    6.    The Defendant, Bottrell Insurance Agency, Inc. is a corporation formed, organized and existing under the laws of the State of Mississippi with its principal place of business located in Jackson, Mississippi which may be served by service upon its registered agent, T. HARRIS COLLIER, III, at 248 E Capitol Street, Jackson MS 39201 or by service upon any duly authorized officer or agent wherever they may be found pursuant to Rule 4 Miss. R. Civ. P. A copy of the corporate application is attached hereto as Exhibit "A".

    7.    The Defendant, The Doctors Company is located at 185 Greenwood Road, Napa, CA 94558 which was previously authorized to sell insurance in the State of Mississippi and may be served with process by service upon Commissioner Mike Chaney of the Mississippi Insurance Department at 1001 Woolfolk State Office Building, 501 N. West St., Jackson, MS 39201 or any officer or authorized agent wherever they may be found pursuant to Rule 4 Miss.R.Civ.P.

2

## INTRODUCTION, FACTS AND BACKGROUND
## APPLICABLE TO ALL COUNTS AND ALL CLAIMS

8.      Dr. Jay T. Segarra is a physician practicing medicine and is duly licensed under the laws of the State of Mississippi.

9.      Dr. Segarra has purchased a contract of insurance through the Bottrell Insurance Agency, Inc. of Jackson, Mississippi. The insurance contract recommended by the Bottrell Insurance Agency, Inc. of Jackson, Mississippi was a policy with The Doctor's Company. This was the recommendation by the Bottrell Insurance Agency, Inc. after Dr. Segarra specified the type of practice he maintains, which included practicing medicine, as well as providing expert witness services. The Bottrell Insurance Agency, Inc. agents and employees specifically represented that this professional liability insurance policy would cover claims arising from his medical practice and his providing expert witness services.

10.     Dr. Jay T. Segarra has maintained a policy of professional liability insurance coverage with The Doctors Company as recommended by the Bottrell Insurance Agency, Inc., Furthermore, Dr. Segarra has unfailingly paid his insurance premiums on a yearly basis. The insurance premium Dr. Segarra paid for 2009 was in excess of $15,000.00. A copy of the policy is attached hereto as Exhibit "B" and is incorporated herein by reference.

11.     In particular, the policy between Dr. Segarra and The Doctors Company provides as follows:

**Section II: What Liability Is Covered**

    **a.      Coverage A-Individual Professional Liability**

We will pay on behalf of each Individual Named Insured those sums that he or she becomes legally obligated to pay as damages for Claims covered by this Policy:

1.      Less any applicable Deductible or excess of any applicable Insured's Retention; and

3

2.    up to the Limits of Liability for Coverage A shown in the Coverage Summary, or applicable Endorsement.

**Section III:  When This Policy Will Respond**

Claims are covered under this Policy only if and when:

1.    The Claim arises from a Professional Services Incident or Review Incident that takes place . . .

**Section VII: Definitions**

a.    Claim means a demand for payment of damages or for services arising from a Professional Services Incident or Review Incident that is not other wise excluded by the terms and conditions of this Policy.

12.    On or about June 9, 2009 , Segarra was served with a Complaint filed In The United States District Court For The Southern District Of Mississippi, Jackson Division, styled as follows: "National Service Industries, Inc., F/D/B/A North Brothers, Inc., Plaintiff, versus Jay T. Segarra, M.D.; Respiratory Testing Services, Inc., Charles E. Foster; J. Michael Fitzgerald, Esq.; Christopher Linn Taylor; James W. Ballard, M.D.; Phillip H. Lucas, M.D.; John Doe Defendants 1-20, bearing Civil Action Number 3:09cv83HTW-LRA."  A copy of the Complaint is attached hereto as Exhibit "C", and is incorporated herein by reference.

13.    While Dr. Segarra denies he has any liability under the Complaint, it is clear the allegations in the Complaint trigger at the very least a defense and quite possibly indemnity in the above referenced matter.

In particular the Complaint alleges generally concerning Dr. Segarra, that he . . .

. . . systematically, intentionally and/or recklessly deviated from medical sound and universally established standards for medical testing (sic), evaluation and diagnosis (sic) of asbestos-related disease.

(Complaint Paragraph 9) and the Complaint alleged specifically as concerns that Dr. Segarra:

Dr. Segarra knew or recklessly disregarded, that the methods employed did not meet accepted medical practices and were unreliable resulting in False Medical Reports and Diagnoses.

4

(Complaint at Paragraph 66)

Then, in Counts III through V, Plaintiff alleges:

The individuals who were the subject[s] of the false records and reports relied upon the results of the records and reports in pursuing personal injury claims against Plaintiff

(Complaint at Paragraph 219)

. . . Defendants . . . violated applicable and well-established standards governing the evaluation and diagnosing of asbestos-related disease.

(Complaint at Paragraph 225)

Defendants knew and intended that these false records and reports would be provided to . . . the individuals who were the subjects of the records and reports. As such Defendants undertook and were under a duty to provide true and accurate medical information, including medical and smoking histories, x-ray reports including B read reports, PFT reports and diagnostic reports, to . . . the individuals who were the subjects of those records and reports.

(Complaint at Paragraph 226) and alleges:

Defendants knew and intended that . . . the individuals who were the subjects of the False Medical Reports and Diagnoses would rely and act on those False Medical Reports and Diagnoses.

(Complaint at Paragraph 227) and alleges:

. . . [T]he individual subjects of the False Medical Reports and Diagnoses reasonably relied on these False Medical Reports and Diagnoses. . .

(Complaint at Paragraph 228)

Once again, Dr. Segarra clearly denies any and all liability under any theory under the Complaint. However the allegations under the complaint are sufficient to trigger coverage under his policy, requiring a defense.

14.    Prior to being served, Dr. Segarra was provided with a copy of the Complaint. On or about May 15, 2009, Dr. Segarra notified Bottrell Insurance Agency, Inc., and The Doctors Company of the filed Complaint. A copy of the cover letter of Dr. Segarra notifying the insurance company and his insurance agent of the above referenced complaint is attached hereto as Exhibit "D", and is incorporated herein by

5

reference.

15.    Dr. Segarra was notified that he was being tendered a defense and indemnity under the subject policy under reservation of rights.

16.    As a result the Law Firm of Bryan, Nelson, Schroeder, Castigliola & Banahan was hired to defend Dr. Segarra in the above referenced litigation.

17.    On July 7, 2009, Dr. Segarra received notice from The Doctors Company by and through their Associate General Counsel, Patricia Shuler Schimbor, that The Doctors Company decided that it had no duty to defend or indemnify Dr. Segarra in the above referenced litigation.  A copy of The Doctors Company is attached hereto as Exhibit "E", and is incorporated herein by reference.

18.    That counsel for Dr. Segarra wrote to The Doctors Company on or about July 10, 2009, requesting them to reconsider their decision concerning denial of indemnity and defense to Dr. Segarra.  A copy of Dr. Segarra's attorney letter is attached hereto as Exhibit "F", and is incorporated herein by reference.

19.    On or about July 14, 2009, The Doctors Company responded that they would not reconsider their position and that they would be no longer defending Dr. Segarra on or about August 7, 2009.  A copy of the this letter is attached hereto as Exhibit "G" and is incorporated herein by reference.

## COUNT I
## DECLARATORY JUDGMENT AS TO THE DOCTORS COMPANY

20.    Plaintiff incorporates herein by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

21.    The Plaintiff is entitled to a declaratory judgment under Rule 57 Miss.R.Civ.P.:

1.    That the policy of insurance issued by the Defendant requires it to defend Dr. Segarra in the underlying litigation;

2.    That the policy of insurance issued by the Defendant requires it to pay for

*Moeller* counsel to defend Dr. *Segarra* in the underlying litigation; and

3.     That the policy of insurance issued by the Defendant requires it to indemnify Dr. Segarra in the underlying litigation.

## COUNT II
## INJUNCTIVE RELIEF AS TO THE DOCTORS COMPANY

22.     Plaintiff incorporates herein by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

23.  The Plaintiff is entitled to a Temporary Restraining Order, preliminary and permanent injunction that the Doctors Company cannot discontinue the defense of Dr. Segarra in the underlying litigation.

24.  The Plaintiff is entitled to a Temporary Restraining Order, preliminary and permanent injunction because Dr. Segarra has a strong likelihood of success on his claim for coverage of one or more claims in the underlying litigation and he will suffer irreparable harm if The Doctors Company withdraws its defense of Dr. Segarra.

## COUNT III

## NEGLIGENT FAILURE TO PROCURE

## INSURANCE - BOTTRELL INSURANCE AGENCY, INC.

25.     Plaintiff incorporates herein by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

26.  In the alternative, if the Doctor's Company Policy is found not to provide a defense or indemnity to Dr. Segarra, then and only then would he have a claim for failure to procure insurance against his agent.  As such, this claim is being tendered in the alternative.

27.     Dr. Segarra sought to purchase professional liability insurance from Bottrell Insurance Agency, Inc. of Jackson, Mississippi.  Dr. Segarra spoke with employees and agents of Bottrell Insurance Agency, Inc. and specified the type of practice he maintains, which included practicing medicine, as well as providing expert

7

witness services. Dr. Segarra informed the employees and agents of Bottrell Insurance Agency, Inc. That he sought to purchase liability insurance that would cover any claims that might arise under either his medical practice or his expert witness services. The employees and agents of Bottrell Insurance Agency, Inc. recommended a liability insurance policy be purchased from The Doctor's Company.

28.    If the policy attached as Exhibit "B" is found to fail to cover the claims in the underlying lawsuit, then Bottrell Insurance Agency, Inc. breached its duty of care owed to Dr. Segarra to obtain coverage for claims arising out of his expert witness practice. The Defendant's negligent failure to procure the appropriate insurance coverage caused the Plaintiff's damages as more fully set out herein.

**COUNT IV**

**BREACH OF CONTRACT AND ANTICIPATORY
BREACH OF CONTRACT BY THE DOCTORS COMPANY**

29.    Plaintiff incorporates herein by reference all preceding allegations and paragraphs as if fully set forth herein and further alleges as follows:

30.    The Defendant, The Doctors Company, breached the insurance contract by:

1.    Notifying Dr. Segarra on or about July 7, 2009, by and through their Associate General Counsel, Patricia Shuler Schimbor, that The Doctors Company had no duty to defend Dr. Segarra in the above referenced litigation;

2.    Notifying Dr. Segarra on or about July 7, 2009, by and through their Associate General Counsel, Patricia Shuler Schimbor, that The Doctors Company had no duty to indemnify Dr. Segarra in the above referenced litigation.

31.    The Doctors Company does have a duty to defend the above-referenced litigation. Under Mississippi law, if a liability insurance policy arguably covers any claim

8

as alleged in the underlying complaint, the duty to defend attaches. The Doctors Company's decision to withdraw defense of the Plaintiff is a clear breach of the duty to defend under the insurance contract. Moreover, The Doctors Company's decision to refuse to indemnify the Plaintiff is a clear breach of the duty to indemnify defend under the insurance contract. This Defendant's breach of the insurance contract caused and will cause the Plaintiff's damages as more fully set out herein.

### COUNT V
### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - BAD FAITH TORTIOUS BREACH OF CONTRACT - THE DOCTORS COMPANY

32.    Plaintiff incorporates herein by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

33.    The Defendant's breach of contract was done so in bad faith constituting the independent tort of bad faith of breach of contract. The Defendant breached the covenant of good faith and fair dealing that accompanies all contracts.

34.    The Defendants' bad faith breach of contract was committed by them when they:

1.    Wrongfully notified Dr. Segarra on or about July 7, 2009, by and through their Associate General Counsel, Patricia Shuler Schimbor, that The Doctors Company had no duty to defend Dr. Segarra in the above referenced litigation;

2.    Wrongfully notified Dr. Segarra on or about July 7, 2009, by and through their Associate General Counsel, Patricia Shuler Schimbor, that The Doctors Company had no duty to indemnify Dr. Segarra in the above referenced litigation;

3.    Wrongfully refused to continue to defend Dr. Segarra under a reservation of rights;

4.    Wrongfully refused to seek a declaratory judgment on the issue of

9

whether a duty to defend was owed Dr. Segarra before withdrawing his defense; and

5.　　Wrongfully refused to seek a declaratory judgment on the issue of whether a duty to indemnify was owed Dr. Segarra.

35.　　The Defendants' bad faith breach of contract caused the Plaintiff's damages as more fully set out herein and was done so with such malicious intent and recklessness as to entitle the Plaintiff to an award of punitive damages as well.

## COUNT VI
## NEGLIGENT MISREPRESENTATIONS
## -BOTTRELL INSURANCE AGENCY, INC.

36.　　Plaintiff incorporates herein by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

37.　　Alternatively, the Defendant, Bottrell Insurance Agency, Inc. by and through their agents, and employees made false representations of material facts negligently and without reasonable care which the Plaintiff reasonably relied upon to his detriment causing him injuries and damages.

38.　　The Defendant's negligent misrepresentations included: .

1.　　Wrongfully misrepresented The Doctor's Company would sell him a professional liability insurance policy that would cover claims arising from his medical practice and claims arising from his providing expert witness services; and

2.　　Wrongfully misrepresented that The Doctor's Company's professional liability insurance policy covered claims arising from his medical practice and claims arising from his providing expert witness services.

39.　　The Defendant's negligent misrepresentations caused the Plaintiff's damages as more fully set out herein.

10

## COUNT VII
## GROSS NEGLIGENCE

40.     Plaintiff incorporates herein by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

41.     The Defendant's negligence and negligent misrepresentations were made recklessly, wantonly and without regard to the rights of the Plaintiff entitling the Plaintiff to an award of punitive damages.

## COUNT VIII
## CONTINUING TORT AND BREACH OF CONTRACT

42.     Plaintiff incorporates herein by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

43.  The Defendant continues to breach the contract and commit the torts set forth herein for any time period it does not defend Dr. Segarra.  The Plaintiff sues for all amounts expended to defend the underlying litigation up to the time of the trial in this matter.

## CONDITIONS PRECEDENT

44.     All conditions precedent to the right of the Plaintiff to bring or maintain the claim asserted herein have been performed, have occurred, or have been waived.

## ACTS OF AGENTS/EMPLOYERS/RATIFICATION

45.     Each act or omission by each Defendant was committed by officers, managers, superintendents, supervisors, agents, servants, authorized representatives, or employees acting in their capacities as a principal or vice-principal while in the course and scope of their employment and/or with full authority of Defendants and/or such act was later ratified, approved, or adopted by each Defendant.

46.     The Plaintiff's damages include all amounts required to be paid to defend or indemnify the underlying litigation, pre-judgment interest, post-judgment interest, court costs and attorneys fees. The Plaintiff is also entitled to punitive damages for the

11

Defendants' acts constituting bad faith breach of contract, and gross negligence.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that the Defendants be caused to appear and answer herein as the law directs and that Plaintiff recovers a judgment of, from, and against Defendants, jointly and severally, for a sum of money for actual and compensatory damages and for punitive damages in an amount to be determined by a jury as the evidence may show proper at the time of trial, together with lawful pre-judgment and post-judgment interest thereon, all attorneys' fees, and together with all costs which have accrued and which will accrue in this civil action and for such other and further relief, both general and special, at law and equity to which Plaintiffs may be justly entitled including but not limited to declaratory and injunctive relief.

Respectfully submitted,

**DR. JAY T. SEGARRA**

MATTHEW G. MESTAYER, PLLC

MATTHEW G. MESTAYER

JAY T. SEGARRA, M.D.

12

STATE OF MISSISSIPPI

COUNTY OF HARRISON


PERSONALLY CAME AND APPEARED BEFORE ME, the undersigned authority, a

Notary in and for the county and state aforesaid, the within named, Jay T. Segarra, who

first being duly sworn, did depose and say that the matters and facts contained in the

above and foregoing Complaint are true and correct.


_____
JAY T. SEGARRA


SWORN TO AND SUBSCRIBED BEFORE ME on this the 5th day of August,

2009.


_____
NOTARY PUBLIC


My Commission Expires:

_____

**MATTHEW G. MESTAYER, PLLC**
**160 MAIN STREET**
**PO DRAWER 1388**
**BILOXI, MS 39533**
**(228) 374-5151 PHONE**
**(228) 374-6630 FAX**


13



**Search Results Include Filings Through 07/30/2009 12:00 AM**

Search
* By Business Name
* By Business ID
* By Officer Name
* By Registered Agent
* New Corporations
    Annual Report
* File Online
    Verification
* Verify Certification
    Online Orders
* Register for Online Orders
* Order Good Standing
    Fee Schedules
* Corporations
* Limited Partnerships
* Limited Liability
  Partnerships
* Limited Liability
  Companies
    Miscellaneous
* Registered Agents
* Download Corporate
  Forms and Instructions
* Look Up an SIC
    Contact
* Corporations Unit

**Date:** 8/4/2009    **View Filed Documents**
Name History

| Name | Name Type |
|------|-----------|
| THE BOTTRELL INSURANCE AGENCY, INC. | Legal |

**Business Corporation - Domestic - Information**

| | |
|---|---|
| **Business ID:** | 710440 |
| **Status:** | Good Standing |
| **Creation Date:** | 5/2/1997 |
| **State of Incorporation:** | MS |
| **Principal Office Address:** | 248 E Capitol St Jackson MS 39201-2502 |
| **Listing Address:** | No Address |
| **Last Annual Report Filed Date:** | 4/29/2009 |
| **Last Annual Report Filed:** | 2009 |
| **Annual Report Month:** | January |

**Registered Agent**

| | |
|---|---|
| **Agent Name:** | T. HARRIS COLLIER, III |
| **Office Address:** | 248 E Capitol Street Jackson MS 39201 |
| **Mailing Address:** | |

Officers & Directors



Home | Accessibility Policy | Contact Us | E-mail Us | Links | Search

Copyright © 2009 Mississippi Secretary of State. All rights reserved.
Due to the use of DHTML and Java, this Web site is optimized for Microsoft Internet Explorer 5+ or Netscape 6+.

A

# THE**DOCTORS**COMPANY

**02/06/2009**

Jay T Segarra MD
2123 Government Street
Ocean Springs, MS 39564

Dear Dr. Segarra,

On behalf of The Doctors Company, I would like to thank you for renewing your professional liability insurance with us. We will continue to earn your trust every day as we deliver excellent service and superior value. As a member of The Doctors Company, you can expect:

**The industry's most aggressive claims defense.** If a claim is leveled against you, our dedicated claims professionals and experienced defense counsel will be with you each step of the way, marshaling every resource necessary to resolve it. Our unmatched combination of local knowledge backed by broad national experience gives us unparalleled insight into a wide range of claims in all specialties. Our experts translate that knowledge into the industry's most aggressive claims defense.

**The strength and integrity to protect you.** As a company owned and led by physicians, our primary responsibility is to our members. Our unique medical expertise is backed by 30 years of experience and considerable financial strength. This gives us a superior capacity to protect and defend our member physicians—and it means that we'll be there when you need us the most.

**Industry-leading patient safety.** Our practical solutions for improving patient safety can help protect you from the stress and disruption of potential lawsuits. As the first medical malpractice insurer to establish a patient safety department, we pride ourselves on providing you with the industry's most innovative patient safety services.

**Exceptional service from our expert staff.** As a member of The Doctors Company, you will receive outstanding customer service. For immediate personal attention from our policyholder Customer Service unit, call (800) 421-2368, and select option 7 at the prompt. We also invite you to connect with us at *www.thedoctors.com* to explore our extensive online services—including on-demand Certificates of Insurance, credentialing reports, and the industry's only online informed-consent resource center.

We place a high value on our relationships with our insured physicians, and we appreciate your continued membership with The Doctors Company. Be assured that you have made the best choice for professional liability protection. The Doctors Company remains your safest and most secure choice for the future.

Sincerely,

*Richard E Anderson MD*

Richard E. Anderson, M.D., F.A.C.P.
Chairman and Chief Executive Officer

B





THEDOCTORSCOMPANY

www.thedoctors.com

# HEALTHCARE PROFESSIONAL LIABILITY POLICY

A Claims-made Policy

**A CLAIMS-MADE PROFESSIONAL LIABILITY POLICY**

**THE DOCTORS COMPANY**

## COVERAGE SUMMARY

| Policy Number | | Effective Date | | Expiration Date |
|---|---|---|---|---|
| **0049163** | Policy Period from | **04/08/2009** | to | **04/08/2010** |
| | (12:01 A.M. Standard Time at the Principal Address of the First Named Insured) | | | |

First Named Insured
**Jay T Segarra MD**

| Principal Address | Mailing Address |
|---|---|
| **2123 Government Street**<br>**Ocean Springs, MS 39564** | **2123 Government Street**<br>**Ocean Springs, MS 39564** |

| First Named Insured's Coverage | LIMITS OF LIABILITY | |
|---|---|---|
| | Claim Limit | Aggregate Limit |
| Coverage A-Individual Professional Liability | **$1,000,000** | **$3,000,000** |
| Coverage B-Entity Professional Liability (optional) | --- | --- |
| Policy Aggregate (if any) | --- | --- |

Specialty  **PUL01    Pulmonary Disease**

Retroactive Date  **02/02/1991**          Rating Territory  **Mississippi**

**Rating and Coverage information for any other Protected Party is shown in the Endorsements.**

Coverage under your policy is subject to the terms and conditions of the Endorsements listed below:

| **MPL100 11/04** | Business Associate Agreement (HIPAA) | **MPL203 11/04** | Exclusion of Outside Practices |
|---|---|---|---|
| **MPL101MS 11/04** | Mississippi Changes | **MPL219 11/04** | MediGuard Coverage |

| Policy Premium | **$15,943.37** |
|---|---|
| Total | **$15,943.37** |

| AGENCY | COMPANY |
|---|---|
| **Bottrell Insurance Agency, Inc.**<br>**Post Office Box 1490**<br>**Jackson, MS 39215**<br>**(601)960-8200** | **The Doctors Company,**<br>**an Interinsurance Exchange**<br>**185 Greenwood Road**<br>**P.O. Box 2900**<br>**Napa, CA 94558-0900**<br>**(707)226-0100, (800)421-2368** |

DATE:  **02/06/2009**

THIS IS A CLAIMS-MADE POLICY - READ YOUR POLICY CAREFULLY

---

**This is a nonassessable CLAIMS-MADE insurance Policy.**

---

**CLAIMS-MADE COVERAGE NOTICE:** Except to such extent as may otherwise be provided in the policy and its endorsements, the coverage of this policy is limited generally to liability for only those claims that are first reported in writing to the Company while the policy is in force.



---

**PLEASE REVIEW THIS POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR LEGAL OR INSURANCE ADVISOR.**

608621

**TABLE OF CONTENTS**

INTRODUCTION..............................................................................................1

Section I:     Who Is a Protected Party.................................................2

Section II:    What Liability Is Covered................................................2

Section III:   When This Policy Will Respond .....................................3

Section IV:    Limits of Liability ...........................................................3

Section V:     Defense and Settlement.................................................4

Section VI:    Exclusions......................................................................5

Section VII:   Definitions.......................................................................7

Section VIII:  General Rules..................................................................9

Section IX:    Optional Extended Reporting Period Endorsement...............12

## INTRODUCTION

This Policy protects against liability *Claims* that arise from **your** healthcare practice, but also contains restrictions and limitations. Please read this Policy and all Endorsements carefully to determine what is and what is not covered, as well as the rights and duties of the parties under this Policy.

This Policy consists of a Coverage Summary, Insuring Agreement, Exclusions, Definitions, and General Rules, and may also contain one or more *Endorsements*. Endorsements change the Policy, and may be added or removed from time to time.

Terms that are printed in italics are defined in Section VII, Definitions. Terms that begin with capital letters or are printed in bold type have meanings referenced, in whole or in part, elsewhere in this Policy.

The words "**we**," "**us**," and "**our**" refer to the insurance company shown in the Coverage Summary.

Unless specified otherwise, the words "**you**" and "**your**" refer to each applicable Protected Party under this Policy.

The *First Named Insured* has special rights and duties that pertain to the entire Policy and to all Protected Parties covered by this Policy. Whenever this Policy makes reference to the *First Named Insured*, the *First Named Insured* has these rights and duties.

**We** provide this insurance Policy in consideration of the full payment of all premiums when *due and in* reliance on the truthfulness of all of the statements in **your** Application, including any Renewal Application, and any other documents submitted to **us** for purposes of obtaining, retaining, or modifying this insurance.

## Section I: Who Is a Protected Party

Each of the following is a *Protected Party* under this Policy:

**a.** The *First Named Insured*.

**b.** Each *Named Insured*.

**c.** A *Healthcare Professional*, if designated as a Protected Party in an Endorsement issued as part of this Policy.

**d.** A *Locum Tenens*, but only when:

    **1.** acting within the scope of duties as designated by the *Healthcare Professional* for which he or she is substituting; and

    **2.** such *Locum Tenens'* specialty, training, licensing, and certification are equivalent to that of the *Healthcare Professional* for which he or she is substituting; and

    **3.** the total time of substitution for any one *Healthcare Professional*, by all of his or her *Locum Tenens*, does not exceed 30 days during this *Policy Period*; and

    **4.** the total time of substitution by any one *Healthcare Professional* as a *Locum Tenens*, for all Protected Parties combined, does not exceed 30 days during this *Policy Period*; and

    **5.** we do not, in writing, prohibit the use of such *Locum Tenens*.

A *Locum Tenens* is not a Protected Party for any *Claim* for which he or she has Other Insurance.

**e.** A *Named Insured's Employee* or Volunteer:

    **1.** who is not a *Healthcare Professional*;

    **2.** while acting within the course and scope of duties assigned by a *Named Insured*; and

    **3.** for whose acts a *Named Insured* is legally responsible.

**f.** Any other person or organization named as a Protected Party in an Endorsement issued as part of this Policy.

## Section II: What Liability Is Covered

**a.** **Coverage A–Individual Professional Liability**

**We** will pay on behalf of each Individual *Named Insured* those sums that he or she becomes legally obligated to pay as damages for *Claims* covered by this Policy:

    **1.** less any applicable Deductible or excess of any applicable Insured's Retention; and

    **2.** up to the Limits of Liability for Coverage A shown in the Coverage Summary, or applicable Endorsement.

**b.** **Coverage B–Entity Professional Liability**

If Limits of Liability are shown in the Coverage Summary for Coverage B, this provision b. Coverage B–Entity Professional Liability applies.

**We** will pay on behalf of the *First Named Insured* shown in the Coverage Summary those sums that it becomes legally obligated to pay as damages for *Claims* covered by this Policy resulting from *Review Incidents* or from *Professional Services* rendered by a Protected Party for whose acts or omissions the *First Named Insured* is legally responsible:

    **1.** less any applicable Deductible or excess of any applicable Insured's Retention; and

    **2.** up to the Limits of Liability for Coverage B shown in the Coverage Summary.

For Protected Parties other than *Named Insureds*, **we** will pay on behalf of such a Protected Party all sums that he, she, or it becomes legally obligated to pay as damages for *Claims* covered by this Policy:

    **1.** less any applicable Deductible or excess of any applicable Insured's Retention; and

    **2.** up to the Limits of Liability of the *Named Insured* applicable to the *Claim*, as set forth in Section IV, Limits of Liability.



## Section III: When This Policy Will Respond

*Claims* are covered under this Policy only if and when:

1. the *Claim* arises from a *Professional Services Incident* or *Review Incident* that takes place:

   i. in the *Covered Territory*; and

   ii. entirely on or after the *Retroactive Date*; and

   iii. prior to the termination date of this Policy; and

2. **we** receive a *Claim Report* from **you** during this *Policy Period*.

This Policy will respond only once to a *Claim* or *Probable Claim Event* on behalf of each Protected Party. If **we** receive a *Claim Report* during this *Policy Period*, then all subsequent related *Claims*, at any time, of any nature, by anyone, are related back to and deemed part of the first *Claim* reported to **us**.

If **we** receive a *Claim Report* during this *Policy Period* from one Protected Party, this Policy will not respond on behalf of any other Protected Party unless **we** also receive a *Claim Report* from such other Protected Party during this *Policy Period*.

## Section IV:  Limits of Liability

The Limits of Liability shown in the Coverage Summary or applicable Endorsement for each *Named Insured* are the maximum amounts **we** will pay for damages for liability covered by this Policy for that *Named Insured*, less any applicable Deductible amount or excess of any applicable Insured's Retention paid or payable by **you**. **We** pay Defense Costs and Supplemental Benefits, as described in Section V, in addition to the Limits of Liability.

The *Claim* Limit and Aggregate Limit apply separately to each *Named Insured*. A separate Limit does not apply to any Protected Party who is not a *Named Insured*. Instead, any Protected Party who is not a *Named Insured* shares in the Limit of Liability of a *Named Insured*, as set forth below:

1. if Limits of Liability for Coverage B are shown in the Coverage Summary, then

sums payable on behalf of any Protected Party who is not a *Named Insured* will be shared with and paid from the Limits of Liability for Coverage B; or

2. if Limits of Liability for Coverage B are not shown in the Coverage Summary, then sums payable on behalf of any Protected Party who is not a *Named Insured* will be shared with and paid from the Limits of Liability for Coverage A of the Individual *Named Insured* applicable to such *Claim*, as determined by **us** in **our** sole judgment.

However, a Protected Party will share in the *Claim* Limit of only one *Named Insured*.

No matter how many persons or entities allege damages arising from a *Professional Services Incident* or *Review Incident*, only one applicable Limit applies for each *Named Insured*. For example, parents and their child or children shall be deemed for all purposes to be one patient for all *Claims* relating to conception, pregnancy, birth, and postpartum care.

The applicable Limit applies regardless of how many conditions affect a patient, when or how many times a patient has received diagnosis or treatment, when or how many *Claims* or causes of action have been asserted against any Protected Party by or on behalf of a patient or any other party, how many persons or entities allege damages, or how many *Suits* have been brought.

a.  ***Claim* Limit**

One *Claim* Limit is the maximum **we** will pay for each *Named Insured* for all injury or loss arising from any or all of the following:

1. *Professional Services Incidents* resulting from *Professional Services* for the same patient;

2. all family members, including domestic partners, whether or not recognized at law;

3. substantially the same course of conduct;

4. any one *Review Incident*.

b.  **Aggregate Limit**

The Aggregate Limit is the maximum amount **we** will pay for all liability arising from all *Claims* covered by this Policy. A separate Aggregate Limit applies to

each *Named Insured*. If Limits of Liability are shown in the Coverage Summary for Coverage B, a separate Aggregate Limit also applies to the *First Named Insured*. The applicable Aggregate Limit applies regardless of how many persons or entities are protected by this Policy, how many *Claims* or causes of action have been asserted against any Protected Party, how many persons or entities have alleged damages, or how many *Suits* have been brought.

The Aggregate Limit of each *Named Insured* is reduced by all amounts **we** pay for liability covered with respect to that *Named Insured*.

**c.  Policy Aggregate**

If a Policy Aggregate amount is shown in the Coverage Summary, this provision c. Policy Aggregate applies.

The Policy Aggregate is the most **we** will pay for the sum of:

1. Liability under Coverage A–Individual Professional Liability.

2. Liability under Coverage B–Entity Professional Liability.

3. *Legal Expense* under any MediGuard Endorsement attached to this Policy.

4. Liability under any Optional Extended Reporting Period Endorsement attached to this Policy.

The Policy Aggregate is the maximum amount **we** will pay for all liability incurred by all Protected Parties arising from all *Claims* covered by this Policy. The Policy Aggregate Limit applies regardless of how many persons or entities are protected by this Policy, how many *Claims* or causes of action have been asserted against any Protected Party, how many persons or entities have alleged damages, or how many *Suits* have been brought.

The Policy Aggregate is reduced by all amounts **we** pay for liability covered by this Policy.

**Section V:  Defense and Settlement**

**a.  Investigation and Defense**

**We** may, at **our** discretion, investigate any *Professional Services Incident* or *Review Incident*. **We** have the right and duty to defend a *Suit* brought against **you**. However, **we** have no duty to defend any *Suit* to which this insurance does not apply. In any *Suit* **we** defend, **we** will select the legal counsel to defend **you**. **You** may also choose to have **your** own legal counsel, but **we** will not pay any fees or costs related to such counsel.

**b.  Defense of Certain Noncovered *Suits***

If one or more of the following is alleged as part of a *Suit*, **we** will provide a defense, but **we** will not pay any damages, for:

1. liability arising in whole or in part from *Sexual Conduct*;

2. liability arising from **your** abuse of, or being under the influence of, alcohol, drugs, or any other substance;

3. liability for sanctions, fines, penalties, punitive, exemplary, or multiplied damages or attorneys fees imposed by statute or by contract; or

4. liability based upon **your** guarantee of the results of *Professional Services*.

**c.  Your Consent to Settle**

1. **We** will obtain written consent from the applicable *Named Insured* before **we** settle a *Claim* against that *Named Insured* arising from a *Professional Services Incident*. Once consent is obtained, **we** may, at **our** discretion, settle any *Claim*. Each *Named Insured* agrees to waive such right to consent under the following circumstances:

   i. Judgment is entered.

   ii. The *Named Insured* is deceased or adjudicated incompetent.

   iii. The *Named Insured's* license to practice medicine is suspended, revoked, or surrendered at any time during the pendency of a *Claim* or *Suit*.



iv. The *Named Insured*, after reasonable efforts by **us**, cannot be located.

v. The Protected Party is not a *Named Insured* on an active policy with **us** at the time of settlement.

2. **We** have the right, without **your** consent, to settle *Claims* arising from *Review Incidents* and any *Claims* against any Protected Party who is not a *Named Insured*. **We** may, at **our** discretion, investigate any such Incident and settle any *Claim* that may result.

### d. When We Stop Defending

Once the applicable *Claim* Limit, Aggregate Limit, or Policy Aggregate is exhausted by **our** payment of damages, **our** obligation to pay Supplemental Benefits or to defend any *Suit,* whether already reported to **us** or reported to **us** thereafter, will end.

### e. Supplemental Benefits

1. **Interest on Judgments. We** will pay any interest incurred after entry of judgment on that portion of any judgment covered under this Policy and within the applicable Limit of Liability.

2. **Court Costs. We** will pay all necessary court costs incurred in **your** defense, *but not* any sanctions, fines, penalties, or attorneys fees levied against **you,** such as for **your** contempt of court.

3. **Appeal Bonds. If we** elect, at **our** sole discretion, to appeal a judgment, **we** will pay the premium for any necessary appeal bonds or release of attachment bonds. This applies only to that portion of the judgment that is covered by this Policy and within the applicable *Claim* Limit.

4. **Expenses. If you** attend trial or arbitration at **our** request, **we** will reimburse **you,** upon **your** request, for lost wages or income, up to **our** Loss of Earnings Allowance Rates in effect at the time of the trial or arbitration. **We** will also reimburse **you** for reasonable expenses, other than lost wages or income, that **you** incur while participating at **our** request in **our** defense of a covered *Claim* or *Probable Claim Event.*

### Section VI: Exclusions

The following Exclusions apply even if the acts or subject matter described in the Exclusions are intertwined or inseparable from the rendering of *Professional Services.* Except as otherwise provided in this Policy, **we** will not pay any damages arising from, or defend against, any of the following:

a. Liability any Protected Party assumes under any contract. However, this Exclusion does not apply to:

1. Liability, if otherwise covered by this Policy, that such Protected Party would have had in the absence of the contract.

2. Liability for any Protected Party's own negligence arising out of *Professional Services* performed under a written contract with a:

i. Health Maintenance Organization (HMO);

ii. Preferred Provider Organization (PPO);

iii. Independent Practice Association (IPA); or

iv. other similar organization.

3. Written contracts that **we** have agreed to in writing, in which **you** assume the liability of others.

2 and 3 above apply only if the contract was entered into before the *Professional Services Incident* or *Review Incident* took place.

b. Liability for any:

1. *Claim* made against **you** prior to the Effective Date of this Policy; or

2. *Claim* or *Probable Claim Event* of which **we** or any other insurer was informed *prior to* the Effective Date of this Policy.

c. Liability for any *Claim* arising from a *Probable Claim Event* that took place, in whole or in part, before the Effective Date of this Policy.

639821

d. Liability for any *Claim* or *Probable Claim Event* reported to **us** after the termination of this Policy, even if related *Claims* against different Protected Parties were reported to **us** during the *Policy Period.*

e. Liability arising from any *Claim* that includes contentions or descriptions of *Sexual Conduct* by **you** or anyone for whom **you** may be legally responsible.

f. Liability arising out of any:

   1. fraudulent or malicious acts or acts intended to cause harm;

   2. criminal acts;

   3. violation of any statute, code, ordinance, or regulation;

   4. unfair business practice or the violation of any consumer protection law, including any law that prohibits the monopolization or unlawful restraint of trade, business, or profession;

   5. violation of any civil rights law;

   6. action taken by any state licensing agency or medical review board; or

   7. disputes about **your** fees, including collecting fees from third parties.

g. Liability arising from the design, manufacture, use, distribution, promotion, or sale of any non-FDA-approved medication, device, equipment, or protocols.

h. Liability arising from any design, manufacture, assembly, sale, trade, distribution, or promotion of any product.

   However, this Exclusion does not apply to the furnishing or dispensing of pharmaceuticals, medications or drugs, or medical, surgical, dental, or psychiatric supplies, equipment, or appliances to **your** patients while providing *Professional Services.*

i. Liability resulting from any *Professional Services* that a Protected Party renders outside of his or her specialty as listed on the Coverage Summary or applicable Endorsement and as limited by his or her representations in any

Application or Renewal Applications for insurance.

j. Liability for:

   1. sanctions, fines, or penalties;

   2. punitive, exemplary, or multiplied damages; or

   3. attorneys fees imposed by statute.

k. Liability arising from activities related to **your** employment by a federal, state, county, or other governmental entity.

   However, this Exclusion does not apply to acts on behalf of the *First Named Insured* if the *First Named Insured* is a governmental entity.

l. Liability arising from **your** activities as a medical director, proprietor, superintendent, executive officer, director, partner, trustee, agent, shareholder, manager, or employee of any enterprise not named as a Protected Party under this Policy.

m. Liability to **your** prospective, current, or former *Employees* or independent contractors, or their family members, including domestic partners, whether or not recognized at law, including but not limited to:

   1. Liability under any workers' compensation, unemployment compensation, or disability benefits law, or under any similar law; or for any injury to, or sickness, disease, or death of any *Employee* arising out of the course and scope of his or her employment by **you**.

   2. Liability based in whole or in part on, or arising out of: employment, failing to employ, employment demotion, termination, or discharge, or from discrimination by **you** on any basis, including but not limited to age, color, creed, gender, marital status, national origin, physical handicap, political affiliation, pregnancy, race, religious belief, sexual orientation, or union membership.

   3. Liability based on sexual harassment.

   4. Liability based on the Employee Retirement Income Security Act (ERISA) or any similar law.



**n.** Liability arising from **your** abuse of, or being under the influence of, alcohol, drugs, or any other substance.

**o.** Liability arising from *Professional Services* performed by or *Review Incidents* related to a Protected Party whose required license, certification, or license to dispense or prescribe controlled substances, is under suspension or has been restricted, revoked, surrendered, or otherwise terminated at the time *Professional Services* or *Review Incidents* take place.

**p.** *Claims* by a Protected Party against another Protected Party except when one party is receiving *Professional Services* as a patient.

**q.** Liability arising out of any Protected Party's guarantee of the results of *Professional Services*.

**r.** Liability arising out of the acts of any Protected Party that exceed the course or scope of his or her duties for the *First Named Insured*. This Exclusion does not apply to a *Named Insured* who is a Medical Doctor (MD) or Doctor of Osteopathy (DO).

**s.** Liability arising out of the acts of a *Healthcare Professional* who is not a Protected Party under this Policy.

**t.** Under Coverage B–Entity Professional Liability, liability arising out of the acts of a *Healthcare Professional* who was a *Named Insured* at the time of the *Professional Services Incident*, but is not a Protected Party under this Policy at the time we receive the applicable *Claim Report*. This Exclusion does not apply if:

    **1.** an Extended Reporting Period Endorsement has been issued to the applicable *Healthcare Professional*; or

    **2.** "Prior acts" or "nose" coverage has been procured by or on behalf of such *Healthcare Professional* with Limits of Liability identical to or greater than the Limits of Liability previously provided to such *Healthcare Professional* under this Policy.

**u.** Liability arising from *Professional Services Incidents* or *Review Incidents* that take place outside of the *Covered Territory*.

**v.** Liability for any *Claim* otherwise covered by this Policy if **you** fail to comply with any of **your** duties described in General Rules, f. Your Duties in the Event of a *Claim* or *Probable Claim Event*.

**w.** Liability arising from *Internet Medicine*.

## Section VII: Definitions

**a.** *Claim* means a demand for payment of damages or for services arising from a *Professional Services Incident* or *Review Incident* that is not otherwise excluded by the terms and conditions of this Policy.

**b.** *Claim Report* means **your** written communication received at **our** offices that notifies **us** of:

    **1.** **your** receipt of a *Claim;* or

    **2.** **your** awareness of a *Probable Claim Event,* and for which **you** provide all of the information described in General Rules, f.2.

**c.** *Covered Territory* means the state or territory of the United States for which:

    **1.** **you** are licensed to practice medicine; and

    **2.** **you** have advised **us** in writing that **you** practice medicine.

**d.** *Employee* means a person other than a *Volunteer:*

    **1.** whose service or labor is supervised by **you;** and

    **2.** who is on the payroll of the *First Named Insured* and subject to the withholding of taxes, whether working on a full- or part-time basis.

**e.** *First Named Insured* means the person or Entity designated as the *First Named Insured* on the Coverage Summary or in an Endorsement issued as part of this Policy.

**f.** *Healthcare Professional* means an individual who is duly licensed to practice under one or more of the following licenses: Medical Doctor (MD); Doctor of Osteopathy (DO); Doctor of Dental Surgery (DDS); Doctor of Dental

639621

Medicine (DMD); Doctor of Podiatric Medicine (DPM); Doctor of Chiropractic (DC); Certified Registered Nurse Anesthetist (CRNA); Certified Nurse Midwife (CNM); Nurse Practitioner (NP); Physician Assistant (PA); Surgeon Assistant (SA); Anesthesiologist Assistant (AA); or Doctor of Optometry (OD).

g.  *Internet Medicine* means the diagnosis, treatment, care, or consultation, regarding a patient's medical condition provided by **you** through the use of the Internet or other electronic media system to a patient at a distant site who was not seen by a *Healthcare Professional* covered by this Policy in a face-to-face, in-person visit that took place before the Internet or other electronic communication.

This does not include electronic communication or consultation with another *Healthcare Professional*, provided that such *Healthcare Professional*:

1.  is in the *Covered Territory*; and

2.  has seen the patient in the *Covered Territory* in a face-to-face, in-person visit that took place before the Internet or other electronic communication.

h.  *Locum Tenens* means a temporary, substitute *Healthcare Professional* who **you** have designated in advance to provide *Professional Services*, for specific dates of substitution, for a specific Protected Party.

*Locum Tenens* does not include a *Healthcare Professional* providing *Professional Services* concurrently with the Protected Party for whom such *Locum Tenens* is serving.

i.  *Named Insured* means each person or organization listed as a *Named Insured* in the Coverage Summary or in an Endorsement issued as part of this Policy. *Named Insured* also includes the *First Named Insured*.

j.  *Policy Period* means the period of time stated in the Coverage Summary, beginning with the Effective Date and ending with the Expiration Date, or any earlier date of actual termination. The *Policy Period* does not include any Extended Reporting Period. If **you** become a Protected Party under this Policy after the Effective Date shown in the Coverage Summary, then the *Policy Period* begins on the date **you** became a Protected Party.

k.  *Probable Claim Event* means a *Professional Services Incident or Review Incident* that **you** knew or believed, or by diligent inquiry had, or would have had, a reasonable basis to know or believe, may give rise to a *Claim*.

l.  *Professional Services* means the diagnosis, treatment, care, or consultation, regarding a patient's medical condition. *Professional Services* includes rendering or failing to render emergency medical treatment in good faith and without compensation or the expectation of compensation.

m.  *Professional Services Incident* means the performance of or failure to perform *Professional Services* in the *Covered Territory* to a patient in the *Covered Territory* by:

1.  a *Healthcare Professional,* when acting within the scope of his or her specialty and training; or

2.  an *Employee* or *Volunteer:*

    i.   who is not a *Healthcare Professional;*

    ii.  when acting within the scope of his or her training and licensing; and

    iii. within the course and scope of duties for a *Named Insured;* and

    iv.  for whose acts a *Named Insured* is legally responsible.

*Professional Services Incident* does not include expense or liability arising out of any actions taken by any state licensing agency or medical review board.

n.  *Retroactive Date* means the date stated in the Coverage Summary or in an Endorsement issued as part of this Policy.

o.  *Review Incident* means performance of any of the following in the *Covered Territory* by a *Named Insured* or by any Protected Party acting on behalf of a *Named Insured:*

1.  peer review or quality assurance;

2.  utilization review on behalf of the *Named Insured's* patients or patients of other members of the *First Named Insured;* or

3.  utilization review on behalf of a state or county medical society.



All damages arising from the same *Review Incident*, including the same general conditions or related set or series of circumstances, shall be deemed as caused by the same *Review Incident*.

*Review Incident* does not include expense or liability arising out of any actions taken by any state licensing agency or medical review board.

**p.  Sexual Conduct** means sexually suggestive contact or activity, engaging in or soliciting sexual relations, sexual abuse, sexual assault, sexual battery, sexual intimacy, sexual exploitation, sexual harassment, or any acts punishable as a sexually related crime, whether under the guise of *Professional Services* or not.

**q.  Suit** means a civil proceeding that seeks damages which, if awarded, would be covered by this Policy. *Suit* includes:

1. an arbitration proceeding in which such damages are claimed and to which **you** must submit or do submit with **our** written consent; or

2. any other alternative dispute resolution proceeding in which such damages are claimed and to which **you** must submit or do submit with **our** written consent; or

3. a pre-suit, screening panel, or similar proceeding mandated by the laws of **your** state.

**r.  Volunteer** means any person other than an *Employee*, whose services or labor are uncompensated from any source and is accepted or directed by the *First Named Insured*.

## Section VIII: General Rules

These rules apply to the entire Policy. The obligations described in the rules apply to each Protected Party, except where the rule specifies otherwise. If any Protected Party materially fails to comply with his, her, or its obligations under the Policy, **our** obligations to such Protected Party will terminate. Such obligations may include **our** duty to defend, indemnify, prosecute, or continue litigation. **Your** failure may also result in cancellation or nonrenewal of this Policy.

**a.  Your Premium**

The *First Named Insured* is responsible for paying all premiums for all Protected Parties and will be the one to whom **we** will send any return premium due **you**.

**Your** premium is due on or before the Effective Date. If payment is not received by **us** on or before the Effective Date, **your** Policy will lapse and no coverage will be in effect.

If there has been a substantial change in risk, and **we** have agreed in writing to accept such change, then **we** have the right to adjust **your** premium.

If **we** base **your** premium on estimated information, **we** have the right to adjust **your** premium once **we** review the actual information. If that final premium is higher than the estimated premium, **you** will owe **us** the difference; if lower, **we** will credit the difference to **you**.

**b.  Your Affirmative Duty to Report Changes**

If any *Named Insured's* scope of healthcare practice, locations, or business operations change, **you** must inform **us** in writing immediately of any such changes.

For example, **you** must inform **us** of any of the following:

1. if **you** change **your** specialty;

2. if **you** intend to perform any procedures other than those **you** indicated on **your** Application or latest Renewal Application;

3. if **you** add or change professional or business office locations;

4. if any *Healthcare Professional's* licensing status or privileges are restricted or limited in any way;

5. if **you** intend to add a *Healthcare Professional* to **your** practice;

6. if any Protected Party enters, leaves, or is discharged from a diversion or rehabilitation program;

7. if any Protected Party undergoes treatment, or is advised by a physician, peer review committee, hospital credentialling committee or licensing agency to undergo treatment for

alcohol, drug or other substance abuse, or
for psychiatric illness; or

8.  if any Protected Party is being investigated,
formally or informally, by any state licensing
agency or healthcare review board.

### c.  Policy Changes

Any Policy changes **you** request must be submitted
to **us** in writing in advance by the *First Named
Insured.* No changes are effective until **we** agree
and have issued an Endorsement or new Coverage
Summary reflecting such changes.

### d.  Our Right to Inspect and Audit

**You** agree to let **us** or **our** representatives inspect
**your** operations, books, records, office, and
equipment during normal business hours during this
*Policy Period* and up to three years after expiration
of this *Policy Period.* **We** are not required to make
inspections. If **we** do, such an inspection does not
constitute a guarantee that **your** offices, premises,
or operations are safe or that they are in compliance
with any applicable laws, rules, or regulations.

### e.  Assignments and Transfers

**You** may not assign or transfer any right or interest
in this Policy without **our** prior written consent. If a
*Named Insured* covered under this Policy dies
during the *Policy Period,* however, his or her estate
will be insured as described in Section IX, Optional
Extended Reporting Period Endorsement.

### f.  Your Duties in the Event of a *Claim* or *Probable Claim Event*

**You** have the following duties:

If a *Claim* is made against **you**, or a *Probable Claim
Event* has occurred, it is **your** duty to:

1.  Immediately notify **us** in writing and forward
to **us** every demand, notice of intent to sue,
*Suit,* or other document **you** or **your**
representative receive relating to the *Claim*
or *Probable Claim Event.*

2.  Promptly provide written details concerning
the *Claim* or *Probable Claim Event,*
including the date, time, place, parties
involved, identity of the injured party or
parties, and identities of all witnesses.

If the *Claim* or *Probable Claim Event* results
from a *Locum Tenens,* **you** must provide **us**
with the names and dates of substitution for
all *Locum Tenens* serving in **your** place
during this *Policy Period,* including **your**
records that document this information, such
as tax and financial records.

3.  Cooperate with **us** in the investigation,
defense, or settlement of any *Claim* or *Suit,*
or in the investigation of any *Probable Claim
Event.* This includes submitting to unsworn
statements and examinations under oath
and promptly producing all records in **your**
care, custody, or control relating to the
claimant or patient.

4.  Refrain from making any offer or payment,
assuming any obligation, or incurring any
expense relating to the *Claim* or *Probable
Claim Event* without **our** prior written
consent; and

5.  Refrain from:

    i.  omitting, misrepresenting, or concealing
    facts pertinent to any *Claim* or *Probable
    Claim Event;* and

    ii.  altering, or directing others to alter, any
    patient or business records pertinent to
    any *Claim* or *Probable Claim Event*
    (whether changing, clarifying, updating,
    completing, or destroying), except for
    bona fide corrections made in
    accordance with professional standards,
    such as maintaining the original entry
    and dating and initialing the correction.

A report to **us** of a *Claim* or *Probable Claim Event*
by or on behalf of one or more Protected Parties is
not a report by or on behalf of any other Protected
Party.

**Your** Deductible or Insured's Retention obligations,
if any, do not alter **your** obligations to report *Claims*
or *Probable Claim Events* to **us**.

### g.  Consent to Special Verdict

If *Suit* is brought on a *Claim,* it is **your** duty to
consent to the submission of special verdict forms or
other written inquiries to the trier of fact for the
purpose of determining the basis for **your** liability (if
any).



**h.  Allocation of Losses**

**We** have the right to allocate damages between Protected Parties, whether covered by this Policy or any other Policy issued by **us** or other insurers in **our** group.

**i.  Recovering from a Third Party**

If a *Claim* covered under this Policy involves an amount that **you** may legally recover from some other party, **we** have the right to seek recovery from that other party. Both before and after **we** make payment on any such *Claim*, **you** must do all that is reasonably possible to preserve any such right of recovery. Any such recovery **we** make will be distributed in the following order:

1.  to the expenses of making the recovery;

2.  to **you**, to the extent that **you** have paid any amount, other than **your** Deductible or Insured's Retention obligation;

3.  to **us**, to the extent that **we** have paid damages and Defense Costs;

4.  to **you**, to the extent that **you** have paid any Deductible or Insured's Retention obligation under this Policy.

**j.  Cancellation or Nonrenewal**

1.  **Cancellation By the *First Named Insured***

    The *First Named Insured* may cancel this Policy, or coverage for any Protected Party, at any time by sending advance written notice to **us** stating when thereafter such cancellation shall be effective. **We** will return any unearned premium to the *First Named Insured*, less a short rate fee. However, the Policy cancellation will still be effective even if **you** have not yet received any such return premium due **you**.

2.  **Cancellation By Us**

    **We** may cancel this Policy:

    i.   upon 10 days' written notice for nonpayment of premium or Deductible or Insured's Retention amount when due; or

    ii.  with notice as required by state law for any other reason.

3.  **Nonrenewal or Conditional Renewal**

    Neither the *First Named Insured* nor **we** have any obligation to renew this Policy. Any renewal will be on the policy forms and endorsements then in effect. If **we** elect not to renew this Policy or coverage of any Protected Party, or intend to offer renewal with reduced coverage, **we** will provide written notice as required by state law.

**Our** written notice will be mailed to the *First Named Insured* and shall be deemed as proper notice to all Protected Parties under this Policy. If **we** cancel, **we** will return any unearned premium to the *First Named Insured* on a pro rata basis.

**Your** insolvency or bankruptcy does not preclude **us** from asserting **our** rights to effect cancellation or nonrenewal.

**k.  Binding Arbitration**

Any dispute between **you** and **us** relating to this Policy will be resolved by binding arbitration in accordance with the rules and procedures established by the Commercial Arbitration Rules of the American Arbitration Association.

If such a dispute remains unresolved for 30 days, either party may notify the other of its desire to arbitrate. The party seeking arbitration shall notify the other party of the name of the arbitrator it has selected. Such other party must then *submit* the name of the arbitrator it chooses within 30 days after receiving the notification. The two selected arbitrators must then agree upon a third arbitrator within 30 days. If the two arbitrators fail to agree upon a third arbitrator within 30 days, then either **you** or **we** can request that the third arbitrator be appointed by a court with jurisdiction. The majority decision of the arbitrators will be binding on both **you** and **us**.

Each party will pay its own arbitration expenses, including expenses associated with the arbitrator each party selects, and will share the expenses of the third arbitrator equally. Unless otherwise agreed, the arbitration will take place in the county where the *First Named Insured's* primary practice was located as of the Effective Date of this Policy.

**l.  Other Insurance**

If **you** have any Other Insurance, whether primary, excess, umbrella, or otherwise, that provides

coverage, in whole or in part, for damages or expenses that are also covered by this Policy, the following will apply: **You** agree that the Other Insurance must pay first and that this Policy will apply only as excess. This Policy will not contribute with such Other Insurance toward payment of such damages or expenses on a pro rata or any other basis. This provision, however, does not apply to Other Insurance, of which **you** have notified **us** in writing, that specifically schedules this Policy to be underlying insurance.

Other Insurance includes any valid and collectible insurance, self-insurance, self-insured retention, self-insured trust, or risk transfer instrument of any kind, other than this Policy, that provides defense or indemnity to any.Protected Party for any *Claim, Suit*, loss, liability, or damages covered, in full or in part, by this Policy.

### m. Bankruptcy/Insolvency

The insolvency or bankruptcy of a Protected Party will not release **us** from **our** obligation to pay damages under the terms of this Policy.

### Section IX: Optional Extended Reporting Period Endorsement

If **you** or **we** terminate this Policy or **your** coverage under this Policy, each *Named Insured* will have the right to purchase an Extended Reporting Period Endorsement for an additional premium. Such an Endorsement provides an additional reporting period during which **we** will accept *Claim Reports* that arise from Incidents that take place entirely on or after the *Retroactive Date* and prior to the termination date of this Policy.

However, **you** are not eligible to purchase an Extended Reporting Period Endorsement unless all premiums have been paid for this Policy and all Deductible and Insured's Retention amounts have been paid.

**Your** right to purchase this Optional Extended Reporting Period Endorsement will terminate unless **you** give **us** written notice of **your** intent to purchase it and pay all premiums required for the Endorsement within 30 days after the termination date of this Policy.

With respect to any *Claim* or *Probable Claim Event* reported under an Extended Reporting Period Endorsement, **we** may, at **our** discretion, investigate any Incident and settle any *Claim* that may result. **Your** consent is not required.

If an Individual *Named Insured* permanently retires from the practice of medicine at age 55 or older, or becomes totally and permanently disabled during this *Policy Period*, **we** will, in accordance with **our** rules at the time of the retirement or disability, waive the premium for the Extended Reporting Period Endorsement. If such retirement or disability later ends, the premium for the Extended Reporting Period Endorsement is reinstated and due in full. If a *Named Insured* dies during this *Policy Period*, **we** will issue an Extended Reporting Period Endorsement to his or her estate without charge.

---

**In witness whereof, we have caused this Policy to be signed by our Chairman at our Home Office.**

*Richard E. Anderson  MD*

·Richard E. Anderson, M.D.
Chairman of the Board

**THE DOCTORS COMPANY**

---

| THIS ENDORSEMENT CHANGES YOUR POLICY—PLEASE READ IT CAREFULLY. |
|---|

First Named Insured: **Jay T Segarra MD**

Policy Number: **0049163**

Additional Premium:                                        Return Premium:

Endorsement Effective Date: **04/08/2009**           Date Issued: **02/06/2009**

---

### BUSINESS ASSOCIATE AGREEMENT (HIPAA)

In consideration of the premium charged, **your** Policy is amended to include the following:

**We** are committed to comply with the Standards for Privacy of Individually Identifiable Health Information (the "Privacy Regulations") under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Under the Privacy Regulations, **you** are a "covered entity", and as required by 45 C.F.R. Section 164.502(e) and 45 C.F.R. Section 164.504(e), **we** acknowledge that **we** are **your** "business associate". **We** must use and disclose information that identifies an individual, relates to health, health treatment, or health care payment; and is maintained in any form (e.g. electronic, paper, oral) ("Protected Health Information") in **our** performance of services under this Policy, and **we** agree to abide by the assurances, terms, and conditions contained herein in the performance of **our** obligations.

This Endorsement sets forth the terms, conditions, and obligations pursuant to which Protected Health Information that is provided, created, or received by **us** from **you** or on **your** behalf, will be handled. **We** agree as follows:

**A. Permitted Uses and Disclosures of Protected Health Information.** Pursuant to this Endorsement, **we** provide services ("Services") for **your** operations that involve the use and disclosure of Protected Health Information as defined by the Privacy Regulation. These Services may include, among others, quality assessment, quality improvement, outcomes evaluation, protocol and clinical guidelines development, reviewing the competence or qualifications of health care professionals, evaluating practitioner and provider performance, conducting training programs to improve the skills of health care practitioners and providers, credentialing, conducting or arranging for medical review, arranging for legal services, conducting or arranging for audits to improve compliance, resolution of internal grievances, placing stop-loss and excess of loss insurance, and other functions necessary to perform these Services. Except as otherwise specified herein, **we** may make any uses of Protected Health Information necessary to perform **our** obligations under this Endorsement. All other uses not authorized by this Endorsement are prohibited. Moreover, **we** may disclose Protected Health Information for the purposes authorized by this Endorsement: (i) to **our** employees, subcontractors, and agents, in accordance with Section B(5) below; (ii) as directed by **you**; or (iii) as otherwise permitted by the terms of this Endorsement. Additionally, unless otherwise limited herein, **we** are permitted to make the following uses and disclosures:



**(1) Our Business Activities. We** may:

(a) Use the Protected Health Information in **our** possession for **our** proper management and administration and to fulfill any of **our** present or future legal responsibilities provided that such uses are permitted under state and federal confidentiality laws, and

(b) Disclose the Protected Health Information in **our** possession to third parties for the purpose of **our** proper management and administration or to fulfill any of **our** present or future legal responsibilities provided that (i) the disclosures are required by law; or (ii) **we** have received from the third party written assurances regarding its confidential handling of such Protected Health Information as required under 45 C.F.R. Section 164.504(e)(4).

**(2) Our Additional Activities.** In addition to using the Protected Health Information to perform the services set forth above, **we** may:

(a) Aggregate the Protected Health Information in **our** possession with the Protected Health Information of other covered entities that **we** have in **our** possession through **our** capacity as a business associate to said other covered entities provided that the purpose of such aggregation is to provide **you** with data analyses relating to **your** health care operations. Under no circumstances may **we** disclose Protected Health Information of one covered entity as defined by 45 C.F.R. Parts 160 and 164 to another covered entity absent **your** explicit authorization; and

(b) De-identify any and all Protected Health Information provided that the de-identification conforms to the requirements of 45 C.F.R. Section 164.514(b), and further provided that **you** are sent the documentation required by 45 C.F.R. Section 164.15(b), which shall be in the form of a written assurance from **us**. Pursuant to 45 C.F.R. 164.502(d)(2), de-identified information does not constitute Protected Health Information and is not subject to the terms of this Endorsement.

**B. Our Responsibilities.** With regard to **our** use and/or disclosure of Protected Health Information, **we** agree to do the following:

(1) Use and/or disclose the Protected Health Information only as permitted or required by this Endorsement or as otherwise required by law;

(2) Report to **your** designated Privacy Officer, in writing, any use and/or disclosure of the Protected Health Information that is not permitted or required by this Endorsement of which **we** become aware within 10 business days of **our** discovery of such unauthorized use and/or disclosure;

(3) Use commercially reasonable efforts to maintain the security of the Protected Health Information and appropriate safeguards to prevent unauthorized use and/or disclosure of such Protected Health Information;

(4) Require all of **our** subcontractors and agents that undertake to perform the services that **we** perform under this Endorsement and that receive or use, or have access to Protected Health Information under this Endorsement, to agree, in writing, to adhere to the same restrictions and conditions on the use and/or disclosure of Protected Health Information that apply to us pursuant to this Endorsement;

(5) Unless prohibited by attorney-client and other applicable legal privileges or unless it would violate **our** contractual and other legal obligation to **you**, make available all records, books, agreements, policies, and procedures relating to the use and/or disclosure of Protected Health Information to the Secretary of U.S. Department of Health and Human Services for purposes of determining **your** compliance with the Privacy Regulations;

(6) Upon prior written request, make available during normal business hours at **our** offices all records, books, agreements, policies, and procedures relating to the use and/or disclosure of Protected Health Information to **you** within five (5) business days for purposes of enabling **you** to determine **our** compliance under the terms of this Endorsement;

(7) **We** shall honor any request from **you** for information to assist in responding to an individual's request for an accounting of disclosures of Protected Health Information to **us**. However, should **you** be asked for an accounting of the disclosures of an individual's Protected Health Information in accordance with 45 C.F.R. Section 164.528, such accounting should not include any disclosures to **us** which are to carry out **your** health care operations. See 45 C.F.R. Section 164.528(a)(1)(i);

(8) Upon termination of this Policy, the protections of this Endorsement will remain in force and **we** shall make no further uses and disclosures of Protected Health Information except for the proper management and administration of **our** business or as required by law;

(9) In those rare instances when **you** would be required to honor an individual's request for access and/or amendment of protected health information disclosed to **us**, **we** will assist **you** to comply with **your** duties under 45 C.F.R. Sections 154.524 and 164.526. However, usually **you** will not be required to honor such requests because protected health information in **our** possession is not part of a designated record set as that term is defined by 45 C.F.R. 164.501; and/or because the information is exempt from access and amendment under 45 C.F.R. Sections 164.524(a) and 164.526(a)(2); and/or because access would violate **your** superceding contractual and other legal rights; and/or because any amendment could be tampering with evidence in a civil or administrative matter;

(10) **You** may terminate this Endorsement by canceling this Policy if **we** violate a material term of this Endorsement.

## ALL OTHER TERMS, CONDITIONS, AND LIMITATIONS
## CONTAINED IN YOUR POLICY REMAIN THE SAME.



# THE**DOCTORS**COMPANY

| |
|---|
| **THIS ENDORSEMENT CHANGES YOUR POLICY—PLEASE READ IT CAREFULLY.** |

First Named Insured: **Jay T Segarra MD**

Policy Number: **0049163**

Additional Premium:    Return Premium:

Endorsement Effective Date: **04/08/2009**    Date Issued: **02/06/2009**

### MISSISSIPPI CHANGES (WITH PUNITIVE DAMAGES COVERAGE)

In compliance with the insurance laws and regulations of the State of Mississippi, the following changes are made to **your** Policy:

Policy **Section V: Defense and Settlement, item b. 3**, is deleted in its entirety.

Policy **Section VI: Exclusions, item j**, is deleted and replaced with the following:

Liability for sanctions, fines, penalties, or attorneys fees imposed by statute, except liability for punitive or exemplary damages.

Policy **Section VIII: General Rules, item j. Cancellation or Nonrenewal**, is deleted and replaced with the following:

**j.   Cancellation or Nonrenewal**

**1.   Cancellation By the *First Named Insured***

The *First Named Insured* may cancel this Policy, or coverage for any Protected Party, at any time by sending advance written notice to **us** stating when thereafter such cancellation shall be effective. **We** will return any unearned premium to the *First Named Insured*, less a short rate fee. However, the Policy cancellation will still be effective even if **you** have not yet received any such return premium due **you**.

**2.   Cancellation By Us**

**We** may cancel this Policy:

i.   upon 10 days' written notice for nonpayment of premium or Deductible or Insured's Retention amount when due; or

ii.  upon 30 days' written notice for any other reason.



### 3. Nonrenewal or Conditional Renewal

Neither the *First Named Insured* nor **we** have any obligation to renew this Policy. Any renewal will be on the policy forms and endorsements then in effect. If **we** elect not to renew this Policy, or coverage of any Protected Party, or intend to offer renewal with reduced coverage, **we** will provide 30 days written notice.

**Our** written notice will be mailed to the *First Named Insured* and shall be deemed as proper notice to all Protected Parties under this Policy. If **we** cancel, **we** will return any unearned premium to the *First Named Insured* on a pro rata basis.

**Your** insolvency or bankruptcy does not preclude **us** from asserting **our** rights to effect cancellation or nonrenewal.

**ALL OTHER TERMS, CONDITIONS, AND LIMITATIONS**
**CONTAINED IN YOUR POLICY REMAIN THE SAME.**

# THE**DOCTORS**COMPANY

| **THIS ENDORSEMENT CHANGES YOUR POLICY—PLEASE READ IT CAREFULLY.** |
|---|

| First Named Insured: | **Jay T Segarra MD** | | |
|---|---|---|---|
| Policy Number: | **0049163** | | |
| Additional Premium: | | Return Premium: | |
| Endorsement Effective Date: | **04/08/2009** | Date Issued: | **02/06/2009** |

## MEDIGUARD COVERAGE

In consideration of the premium charged, **your** Policy is amended as follows:

**Section I: MediGuard Summary**

The Protected Parties described below are provided *Legal Expense* coverage as described in this Endorsement.

**a. Description of Protected Parties Eligible for this Coverage:** The coverage provided by this Endorsement automatically applies to each *Named Insured* listed on the Coverage Summary or applicable Endorsement.

Coverage may also be extended to other Protected Parties if:

1. The Protected Party is *Employed* or contracted by the *Named Insured* requesting coverage;
2. The Protected Party is a *Healthcare Professional* or other person licensed, certified, or otherwise authorized to deliver health care;
3. He or she is a Protected Party both:
    i. on the date the *Disciplinary Proceeding* is first *Instituted*; and
    ii. on the date the *Disciplinary Proceeding* is first reported in writing to **us**; and
4. The *Named Insured* who *employs* or contracts with the Protected Party sends **us** a written request to extend coverage to such Protected Party for the *Disciplinary Proceeding*.

Any amount **we** pay on behalf of such Protected Party will reduce the *Maximum Legal Expense* For All *Disciplinary Proceedings* of the *Named Insured* that requested the extension of coverage.

Coverage may not be extended to any *Locum Tenens* or from one *Named Insured* to another *Named Insured*.

**b. Coverage Limits:**

| | |
|---|---|
| *Per Disciplinary Proceeding:* | $25,000 |
| *Maximum Legal Expense* For All *Disciplinary Proceedings:* | $25,000 |
| Deductible Per *Disciplinary Proceeding:* | $1,000 |

The Coverage Limits and Deductible apply to each *Named Insured*.

**c. Maximum Limit For Medicare/Medicaid Disciplinary Proceedings:** A *Maximum Legal Expense* Limit of $25,000 for all *Named Insureds* combined applies to all *Disciplinary Proceedings* described in Section V: Definitions, item 2. iv, of this Endorsement.

---

## Section II:  Insuring Agreement

**We** will pay, on behalf of each *Named Insured*, *Legal Expenses* incurred by that *Named Insured*, provided:

1. The circumstances giving rise to the *Disciplinary Proceeding* took place entirely on or after the *Named Insured's Retroactive Date* and prior to the end of the *Policy Period*;

2. The *Disciplinary Proceeding* was first *Instituted* against the *Named Insured* during this *Policy Period;* and

3. The *Named Insured* first reported the *Disciplinary Proceeding* to **us** during this *Policy Period.*

The most **we** will pay for one *Disciplinary Proceeding* is the *Per Disciplinary Proceeding* amount shown in Section I: b, of this Endorsement. The most **we** will pay for each *Named Insured* for all *Disciplinary Proceedings* is the *Maximum Legal Expense* Limit shown in Section I: b, of this Endorsement. *Legal Expenses* for each *Disciplinary Proceeding* are subject to the Deductible amount shown in Section I: b, of this Endorsement and are paid in excess of, and only after **you** have paid, such Deductible amount.

The most **we** will pay for all *Disciplinary Proceedings* described in Section V: Definitions, item 2. iv, of this Endorsement for all *Named Insureds* combined is the Maximum Limit For Medicare/Medicaid Disciplinary Proceedings shown in Section I: c, of this Endorsement.

---

## Section III:  Conditions

1. All related proceedings, regardless of the number of entities, investigations, or venues involved, are treated as a part of the same single *Disciplinary Proceeding* with respect to each *Named Insured*.

2. All appeals are considered part of the underlying proceeding, and treated as a single *Disciplinary Proceeding.*

3. Coverage is subject to the condition that, on the initial Effective Date of this Endorsement, the *Named Insured* requesting coverage has no knowledge of any event or circumstances which that *Named Insured* knows, or would reasonably believe, may result in *Legal Expenses* covered by this Endorsement.

4. **You** must not assume any financial obligation or pay out any money without **our** prior consent. If **you** do, it will be at **your** own expense.

5. **You** must notify **us** in writing and forward to **us** every document **you**, or **your** representative, receive relating to a *Disciplinary Proceeding.*

## Section IV: Legal Representation

**We** will appoint, in our sole discretion, an *Attorney* who will provide the legal services that are payable *Legal Expenses* under this Endorsement. **We** will pay all *Legal Expenses* in excess of the deductible, up to the *Maximum Legal Expense* available, without further contribution from the *Named Insured.*

## Section V: Definitions

With respect to the coverage provided by this Endorsement, certain words are defined as follows:

1. *Attorney:* an individual or group duly licensed to practice law at the time and place the legal services are rendered.

2. *Disciplinary Proceeding:* notice, inquiry, investigation, or request for information pertaining to the following:

    i. A professional review action against a *Named Insured* by the professional review body of a health care entity with which that *Named Insured* has full, unrestricted, and unproctored clinical privileges or membership, which action is taken for the purpose of adversely affecting said clinical privileges or membership. The terms used in this paragraph shall be as defined in 42 United States Code 11151. Definitions. *Disciplinary Proceeding* does not include a review action by any *Protected Party*.

    ii. Proceedings *Instituted* by a state health care licensing board against a *Named Insured* for unprofessional conduct.

    iii. Proceedings *Instituted* by a Professional Review Organization pursuant to Parts 1004 and 1005 of Title 42, Code of Federal Regulations, Chapter V, to impose sanctions on a *Named Insured.*

    iv. Proceedings *Instituted* by a state Department of Health Services or similar state agency, or the federal *Department of Health and Human Services*, alleging Medicare/Medicaid fraud and abuse by a *Named Insured*, or performance of medical services in excess of, or in violation of, guidelines for appropriate utilization of such services. This paragraph does not apply to a routine audit by any such agency.

    v. Proceedings *Instituted* by a federal governmental agency alleging one or more violations of the privacy regulations of the Health Insurance Portability and Accountability Act (HIPAA).

    vi. Proceedings *Instituted* by a state or federal governmental agency alleging one or more violations of the Emergency Medical Treatment and Active Labor Act (EMTALA).

    vii. Proceedings *Instituted* by the Drug Enforcement Agency of the U.S. Government alleging improper use of prescription authority.

3. *Instituted:* when referring to the commencement of any *Disciplinary Proceeding*, the term *Instituted* means the date written notice of said proceeding is received by the *Named Insured.*



4. *Legal Expense:* the Attorney's fees and related costs for legal services rendered in the defense of any claim or allegation associated with a *Disciplinary Proceeding.* Legal services must have been actually rendered and expenses actually incurred. Judgments, fines, penalties, damages, or other like expenses are not covered under this Endorsement.

5. *Maximum Legal Expense:* the total dollar amount of covered *Legal Expense* that will be paid for all *Disciplinary Proceedings* during the *Policy Period.*

## Section VI: Exclusions

We will not pay for *Legal Expenses:*

a. Incurred in disputes with respect to this coverage, including questions as to whether *Legal Expenses* are payable under this coverage.

b. That arise out of any matter that any *Named Insured* has conspired with another to Institute or have *Instituted.*

c. Incurred in the defense of any criminal prosecution. Criminal prosecution means any governmental actions for enforcement of criminal laws, including offenses for which conviction could result in imprisonment.

d. Incurred with respect to any *Disciplinary Proceeding* reported to **us** or any other insurer prior to the Effective Date of this Policy.

e. Incurred with respect to any circumstance or event of which a *Named Insured* was aware prior to the Effective Date of the initial *Policy Period* that results in *Legal Expense.* This includes notice, inquiry, investigation, or request for information or records by any entity described in Section V: Definitions, item 2.

f. Incurred in any matter other than a *Disciplinary Proceeding.*

g. Incurred in any application for initial placement on a medical staff.

h. Involving disputes over timely completion of medical records.

i. Incurred on behalf of any Protected Party other than those described in Section I: MediGuard Summary, item a, of this Endorsement.

j. Incurred in a *Disciplinary Proceeding* in which the entity bringing the action is a Protected Party under the Policy to which this Endorsement is attached.

**Section VII:  Extended Reporting Period**

If an Extended Reporting Period Endorsement is issued for a *Named Insured*, then the period for reporting covered *Disciplinary Proceedings* under this Endorsement shall be automatically extended for the duration of the Extended Reporting Period as specified in the Extended Reporting Period Endorsement. Cancellation or termination, for any reason, of the Extended Reporting Period Endorsement automatically terminates the period for reporting *Disciplinary Proceedings* under this Endorsement. If an Extended Reporting Period Endorsement is not issued for a *Named Insured*, then coverage under this Endorsement terminates at the end of the *Policy Period.*

All terms and conditions of this Endorsement, including the Coverage Limits and any Deductibles, will continue to apply during any Extended Reporting Period. **We** will reinstate **your** *Maximum Legal Expense* For All *Disciplinary Proceedings* when the Extended Reporting Period Endorsement is first issued to **you. Your** *Maximum Legal Expense* For All *Disciplinary Proceedings* shall be available for the entire Extended Reporting Period and shall be reduced by any and all amounts **we** pay for *Disciplinary Proceedings* reported during the Extended Reporting Period.

## ALL OTHER TERMS, CONDITIONS, AND LIMITATIONS CONTAINED IN YOUR POLICY REMAIN THE SAME.



# THE**DOCTORS**COMPANY

| **THIS ENDORSEMENT CHANGES YOUR POLICY—PLEASE READ IT CAREFULLY.** |
| --- |

First Named Insured: **Jay T Segarra MD**
Policy Number: **0049163**
Additional Premium:                       Return Premium:
Endorsement Effective Date: **04/08/2009**        Date Issued: **02/06/2009**

### EXCLUSION OF OUTSIDE PRACTICES

In consideration of the premium charged, the following Exclusion is added to Policy **Section VI: Exclusions**:

Liability arising out of *Professional Services* performed by **you**, or on **your** behalf, and pertaining to or in the course of **your** employment by, association or contract with, the organizations indicated below:

**Name of Organizations:**

**Keesler Medical Center**

This Endorsement applies to:   **Jay T Segarra MD**

### ALL OTHER TERMS, CONDITIONS, AND LIMITATIONS CONTAINED IN YOUR POLICY REMAIN THE SAME.



MPL203 (11/04)          902                  Page 1 of 1        ME203      191908300 - 00                Insured

# THE**DOCTORS**COMPANY

| CERTIFICATE OF INSURANCE | Issue Date: 02/06/2009 |
|---|---|
| First Named Insured: | **A Claims-Made Professional Liability Policy** |
| **Jay T Segarra MD**<br>**2123 Government Street**<br>**Ocean Springs, MS 39564** | **IMPORTANT NOTICE:** This document demonstrates coverage in force on the Issue Date above with Limits of Liability of at least the amounts set forth below. It is issued as a matter of information and does not confer rights to any recipient. This document is not binding, is not part of the Policy described below, and does not change or extend the coverage provided by that Policy. |

Protected Party: **Jay T Segarra MD**

Specialty: **PUL01 Pulmonary Disease**

| Policy Number: | Policy Period: | | Retroactive Date: |
|---|---|---|---|
| **0049163** | **From: 04/08/2009** | **To: 04/08/2010** | **02/02/1991** |

| The Protected Party above is:<br>[X] A Named Insured<br>[ ] A Locum Tenens<br>[ ] An Additional Protected Party | Agency and Address:<br>**Bottrell Insurance Agency, Inc.**<br>**Post Office Box 1490**<br>**Jackson, MS 39215**<br>**(601)960-8200** |
|---|---|

## LIMITS OF LIABILITY

| Claim Limit: | **$1,000,000** |
|---|---|
| Aggregate Limit: | **$3,000,000** |

I. Locum Tenens and Additional Protected Parties share Limits of Liability with the applicable Named Insured.

II. Individuals who occupy a "slot" share Limits of Liability with all others who occupy the same "slot" during the Policy Period.

III. Photocopies of this document are deemed as valid as the original.

IV. The policy, including endorsements, determines the coverage provided. Some claims may not be covered by the terms of the policy, or may be subject to restrictions such as lower Limits of Liability.

V. If the policy, or coverage for any person, is canceled for any reason or if the terms of the policy are changed, we will notify the First Named Insured only. Coverage is not in effect unless and until all payments are received when due.





# DOCPAC—
## Fighting for Medical Liability Reform

## What You Can Do

The Doctors Company champions tort reform in national political and legislative arenas, and our state and federal political action committees (DOCPACs) fight to enact and defend medical liability reforms in the respective states and in Congress.

To support these efforts, we request contributions for Federal DOCPAC and for the state DOCPACs in California, Colorado, Florida, Montana, Nevada, Ohio, Oregon, Texas, Virginia, and Washington.

DOCPAC funds go to political candidates, coalitions, and associations that support reasonable medical liability reforms. We also use DOCPAC funds to help our members get involved in grassroots political activity and to publish educational bulletins, reports, and alerts about critical political issues and developments. For more information, visit www.thedoctors.com or call our Government Relations Department at (800) 421-2368, extension 1143.

We direct contributions from subscribers in states with an active DOCPAC to their state DOCPAC. When we receive contributions from individuals in a state without an active DOCPAC, we direct the funds to Federal DOCPAC. Contributions from corporate subscribers with no active state DOCPAC and from states that prohibit use of corporate funds for political contributions are directed to California DOCPAC. Contributions are not tax deductible.

There are many worthwhile causes, but your cause—enacting effective medical liability reform—is our cause as well.

We have fought for the adoption of effective medical liability reform in Colorado, Florida, Montana, Nevada, Ohio, Texas, Washington, Wyoming, and the District of Columbia. Our fight continues to preserve reform in numerous states.

In California, we fought for and helped preserve the Medical Injury Compensation Reform Act (MICRA) laws that provide protection against the excesses of jackpot justice. MICRA, with its no-exceptions $250,000 cap on noneconomic damages, is not an experiment—it is a proven solution to the medical liability crisis. MICRA has allowed California to avoid the health care crisis facing many other states. We know that the solution to rising malpractice insurance rates is tort reform.

The Doctors Company was founded on the principles of physician advocacy, and we have successfully engaged in many battles to enact and preserve effective medical liability laws. Join us at the front as we continue the fight to protect the practice of good medicine.

*Protecting the practice of medicine is a great cause. Our chances of success have never been greater.*

Richard E. Anderson, MD, FACP,
Chairman and CEO of The Doctors Company

**THE DOCTORS COMPANY**

## Help us win this fight—add a DOCPAC contribution to your premium payment.

© 2008 J7212 11/08

▲ THE DOCTORS COMPANY

**Patient Safety/Risk Management**

# Taking the Lead in Patient Safety

**Providing leadership in the national movement to improve the health care delivery system and reduce medical errors is a key component of The Doctors Company's overall mission to advance and protect the practice of good medicine.**

*The Department of Patient Safety at The Doctors Company believes that:*

- Patient safety is a major health policy issue that deeply affects every physician.

- The medical malpractice industry plays a vital role in the health care delivery system.

- Even "good" doctors practice in unsafe environments, a scenario that compromises patient care and puts the physician at greater risk of a lawsuit.

- There are many opportunities to identify risk in the delivery of patient care.

- Current risk management programs, such as practice surveys, claims analyses, and educational presentations are—and will continue to be—a valuable part of the patient safety program.

- Analysis of patient care systems within the practice environment is essential to identifying the high-risk activities that are opportunities for errors.

- Process analysis is valuable as a means to evaluate the needs of individual physicians and to design an action plan to assist the physician in reducing risk.

*The Doctors Company is dedicated to assisting you in improving the quality of care and safety for your patients. Our Patient Safety/Risk Management Department provides a multitude of services and publications to assist the physician and office staff:*

- A dedicated regional patient safety/risk manager is available to answer your questions and assist you in identifying and reducing risk exposure.

- Site visits can be scheduled to assist you in identifying areas to improve patient safety in your practice. These surveys include a review of the following: office policies and procedures, systems for follow up with patients, communication among the staff and with patients, safety and security in the office, and clinical procedures. Our site survey

> **"The Doctors Company is dedicated to assisting you in improving the quality of care and safety for your patients."**

reports offer suggestions on how to develop and improve office procedures and processes.

- Information and practical tips will be provided for improving the safety and quality of patient care through effective team communication, effective medical record management, and patient education.

- Timely publications, such as our *Patient Safety/Loss Prevention Strategies* books and our quarterly publication, *The Doctor's Advocate,* examine important patient safety and risk issues and offer practical advice on ways to lower risk and improve patient satisfaction.

Individual physicians may wish to call us for our Office Self-Assessment tool. This is a comprehensive review

*over, please*



**GOOD MEDICINE. COVERED.**

63621

of office systems that can be conducted by the physician and office manager. When completed, it is returned to the appropriate regional patient safety/risk manager for review and recommendations.

**A Team Approach**
The Patient Safety Department works closely with the company's claims specialists and underwriters to assist physicians in identifying and mitigating potential liability exposures in their practices.

**Availability of Our Staff**
The Doctors Company's regional patient safety/risk managers are located throughout the country to assist physicians in a timely manner. Our main office in Napa, California, can be accessed at (800) 421-2368, extension 1243, if you have questions or need immediate assistance. We will connect you to your regional patient safety/risk manager. ■

# Other Resources Available to You

We provide a wide range of innovative services to help you reduce risk in your practice.

Visit us online at *www.thedoctors.com* for:

- A comprehensive reference library of general and specialty-specific informed-consent documents.

- Articles and case studies:

  - Specialty-specific articles related to anesthesiology, internal medicine, neurology, OB/GYN, plastic surgery, and general surgery.

  - General topics, such as communication, informed consent, litigation and claims, practice guidelines, professional conduct, and record keeping.

- Our patient safety/risk management exam, which is available to all policyholders in our Member Area.

Call us at (800) 421-2368, extension 1243, for:

- Information packets regarding topics such as terminating the patient-physician relationship, closing a practice, and developing office policies and procedures.

- Patient education materials (including dealing with patient expectations).

- Self-assessment tools for high-risk processes.

- Our personalized education programs that are tailored to meet the needs of both physicians and office staff. Sample topics include "Record Keeping in the Office Practice," "Effective Physician-Patient Communication," "Disclosure of Unexpected Events and Offering an Apology," "Medication Management," "Treating High-Risk Populations" (such as pediatrics), and "Scope of Practice for Professionals and Paraprofessionals."

©2005 J6467 3/06

**THEDOCTORSCOMPANY**

*What You Should Know:* LITIGATION AND CLAIMS

# Notification of an Incident or a Claim

**It is essential that you notify your Regional Claims Office immediately if any incident occurs that may lead to action against you.**

The more familiar you are with the following information and guidelines, the better able we will be to provide you with expert claims handling.

## What Should You Report to Your Regional Claims Office of The Doctors Company?

- Demand for money
- Verbal or written threat of legal action
- Formal paper naming you as a defendant or witness
- Attorney's letter of intent or 90-day notice
- Request for arbitration
- Request for deposition or interview
- Subpoena, summons, complaint, notice of a lawsuit, or small claims court notice

## What Types of Incidents Lead to Claims and Should Be Reported to Your Regional Office?

Report any incident related to diagnosis or treatment that could be construed as a contributory factor to:

- Death
- Diminished life expectancy
- Loss of an extremity
- Injury to or impairment of a body organ
- Loss or impairment of any of the five senses
- Severe disfigurement
- Verbal or written threats
- Harassment by patient or family

## How to Report an Incident to The Doctors Company:

- Report an incident or claim in writing to the Claims Department of your regional office. (You can find contact information for your Regional Claims Office and a First Report of New Incident or Claim form at *www.thedoctors.com/claims*.)
- Reports may be faxed or mailed.
- Be ready to relate the facts of the event.
- Provide all relevant documents (including any demand, notice of intent to sue, complaint, or other document you receive that relates to the incident or claim).
- You may also wish to discuss the incident with your Regional Claims Office or patient safety/risk manager, but this would NOT constitute notice to the company.

## Additional Recommendations to Ensure Defensibility:

- Do not add to, delete from, or otherwise alter a medical record.
- Place the medical record in a safe place.
- After making a report to us, keep copies of your correspondence in a safe place—not in the patient's chart—for future consultation.
- Always require the patient's or the patient's representative's signature to release a copy of the medical record or any information within it.
- Do not discuss the event with anyone other than your claims representative or defense attorney.
- Do not make contact with anyone associated with the case except your claims representative or defense attorney.

When we receive your written report, we will send you an acknowledgment and will carefully review your report. If no action is required in the case of an incident, we will inform you that the report and medical records have been filed for reference in the event that a claim should develop. Depending on the facts and circumstances of the event, a claims representative may need more information from you. In the case of a lawsuit or a demand for arbitration, we will send you an acknowledgment along with specific instructions for future handling. Call your Regional Claims Office or speak with your claims representative at any time to ask questions or to receive an update on your case.

## Our Commitment to You

In the event that a suit is brought against you, remember that The Doctors Company's experienced, professional claims experts are with you every step of the way. We will provide vigorous defense against nuisance suits or work with you to pursue speedy and fair resolution for meritorious claims. Our Claims and Patient Safety/Risk Management Departments are dedicated to your protection.

*About the Authors*
*Paula A. Jenkins*, senior vice president of The Doctors Company Claims, oversees the company's national claims operations. Ms. Jenkins has been with The Doctors Company since 1987 and has more than 20 years of experience with health care liability claims. She holds a bachelor of arts degree from California State University, Los Angeles, and has a graduate degree in executive business management from the University of California, Los Angeles. *Joan Bristow* is former vice president of The Doctors Company's Risk Management Department. She retired in 2005 after 13 years of service to the company.

*The guidelines suggested in this article are not rules, and they do not ensure a successful outcome. They attempt to define principles of practice for providing appropriate care. The principles are not inclusive of all proper methods of care not exclusive of other methods reasonably directed at obtaining the same results. The ultimate decision regarding the appropriateness of any treatment must be made by each health care provider in light of all circumstances prevailing in the individual situation and in accordance with the laws of the jurisdiction in which the care is rendered.*

© 2007 by
The Doctors Company
All Rights Reserved

The Doctors Company
185 Greenwood Road
P.O. Box 2900
Napa, CA 94558-0900
(800) 421-2368

www.thedoctors.com
E-mail: info@thedoctors.com

J4230 1/07



UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

FEB 1 1 2009

J. T. NOBLIN, CLERK
BY_____DEPUTY

| | |
|---|---|
| NATIONAL SERVICE INDUSTRIES, INC., F/D/B/A NORTH BROTHERS, INC., | ) ) ) |
| Plaintiff | ) ) |
| v. | ) ) ) |
| JAY T. SEGARRA, M.D. RESPIRATORY TESTING SERVICES, INC. CHARLES E. FOSTER J. MICHAEL FITZGERALD, ESQ. CHRISTOPHER LINN TAYLOR JAMES W. BALLARD, M.D. PHILLIP H. LUCAS, M.D. JOHN DOE DEFENDANTS 1-20 | ) ) ) ) ) ) ) ) ) ) |
| Defendants | ) ) |

Civil Action No. 3:09Cv83HTW-LRA

## COMPLAINT AND REQUEST FOR JURY TRIAL

COMES NOW Plaintiff, National Service Industries, Inc., f/d/b/a North Brothers, Inc., by and through counsel, Forman Perry Watkins Krutz & Tardy LLP, and for its Complaint against Defendants states and alleges as follows and requests a trial by jury:

### Introduction

1.    This is a complex civil action asserting claims for fraud, misrepresentation and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") based upon and in response to a long-standing scheme by Defendants to defraud Plaintiff, **National Service Industries, Inc.,** (hereinafter "Plaintiff" or "NSI") **f/d/b/a North Brothers, Inc.,** out of millions of dollars. Plaintiff seeks remedies authorized by federal statute at 18 U.S.C. 1961 *et seq.* for actual, consequential and exemplary damages; treble damages and attorneys' fees and costs as authorized by statute and for all other relief which this Honorable Court deems just and proper

1

under all circumstances which have occasioned this Complaint. 18 U.S.C. §§ 1964(a) and (c) ("Civil RICO"). As used in this Complaint, and except as otherwise specified, "Defendants" refers to the named Defendants, Jay T. Segarra, M.D., Respiratory Testing Services, Inc., Charles E. Foster, J. Michael Fitzgerald, Esq., Christopher Linn Taylor, James W. Ballard, M.D., and Phillip H. Lucas, M.D., and the "John Doe Defendants" described below in Paragraphs 37 and 38. The primary cause of this action is a widespread unlawful enterprise engaged in a pattern of racketeering activity across state lines and a conspiracy to engage in racketeering activity involving numerous RICO predicate acts during the past ten (10) calendar years. The predicate acts alleged herein contain fraud and intentional misrepresentations and include mail fraud and wire fraud, 18 U.S.C. §§ 1341 and 1343 respectively, in furtherance of Defendants' scheme. This Complaint also alleges state claims of fraud, aiding and abetting fraud, and negligent misrepresentation.

## I.    Nature of the Action

2.      From approximately 1992 through the present day, Defendants, along with unknown co-conspirators, schemed to recruit asbestos personal injury claimants and generate false medical documentation to substantiate mass tort litigation involving allegations of asbestos-related disease for tens of thousands of such claimants against Plaintiff and other similarly situated companies. Defendants engaged in this unlawful scheme for the purpose of monetary gain by creating fraudulent medical documentation to make the recruited and "screened" individuals appear to suffer from asbestos-related disease to extract money from Plaintiff and others through the court system and/or out of court settlements.

3.      Defendants were in the business of recruiting individuals as potential claimants for personal injury law firms and attorneys and conducting mass assembly-line screenings of

persons suspected of work-related exposure to products containing asbestos, once distributed by Plaintiff, doing business as North Brothers, Inc.  These mass screenings principally involved the generation of asbestos exposure histories, chest x-rays (with accompanying interpretations referred to as "B reads" or "ILO Classifications"), physical examinations, pulmonary function tests ("PFTs") and diagnoses of asbestos-related disease by Defendants for various asbestos personal injury law firms and attorneys.  These law firms and attorneys then used the purported "medical evidence" to file and/or settle thousands of asbestos-related injury claims against NSI, other companies and/or bankruptcy trusts.

4.      Defendants' screenings were massive recruitment programs carried out for personal injury law firms and individual attorneys on targeted populations of current and former industrial and construction workers with the sole purpose of generating a phenomenal volume of potential claimants as clients for these law firms.  Defendants spent millions of dollars aggressively marketing the screening services to their personal injury law firm and attorney "customers" and on mass advertisements soliciting individual subjects for screenings.  The screenings were motivated by financial profit for Defendants and their law firm customers who paid for the screenings and were not for medical or healthcare purposes.  The individuals screened were not considered to be patients.  No treating physicians referred the individuals to Defendants.  There was no physician-patient privilege, and no rendering of medical treatment.  The purported "medical" records and diagnostic reports generated in the screenings were provided to the law firms and attorneys that "sponsored" and paid for the screenings and not to the individuals screened and diagnosed with disease.

5.      Defendants solicited personal injury law firms and individuals using mass mailings, local trade unions and organizations, and television, radio and newspaper

3

advertisements. Often, Defendants targeted local union members, operating with local union and former union officials to generate mass numbers of screening subjects to create mass tort litigation claimants for their law firm customers.

6.     Certain personal injury law firms and attorneys, including many John Doe Defendants, specialized in representing plaintiffs making asbestos-related personal injury claims based on the fraudulent medical evidence generated in these mass screenings. Some such firms and attorneys made a practice of inundating the judicial system and defendants with voluminous claims on behalf of large numbers of claimants, most of whom have little, if any, injury. These firms and attorneys asserted claims against scores of tort defendants. The selected defendants were determined by the particular asbestos personal injury firm filing the claims based not on the alleged exposures or injuries but on the likelihood of extracting settlements from such defendants. This scheme often had the effect of extracting mass nuisance-value settlements from asbestos litigation defendants, such as NSI, because the judicial system and defendants, including NSI, lacked the resources to examine the merits of each of the tens of thousands of individual claims as they would in "traditional" tort litigation.

7.     While an individual claimant may receive a relatively modest compensatory settlement, many asbestos personal injury law firms, which retained 30% - 40% or more of the settlement proceeds on a contingency fee basis (as well as expenses, including payments for the screenings), have become enormously wealthy, with many individual attorneys becoming multi-millionaires. Such immense financial reward provided incentive to inflate the numbers of potential asbestos claimants to amass settlements from NSI, other asbestos litigation defendants, and asbestos bankruptcy trusts.

4

8.    Defendants made millions of dollars by fabricating this bogus "medical evidence" for asbestos litigation claims in their assembly-line-style enterprise. In conjunction with their law firm and attorney customers, Defendants used common marketing ploys to recruit claimants and then fabricated medical records and reports for the prospective claimants with x-ray interpretations, exposure histories and lung impairment assessments to "substantiate" their false diagnoses. Defendants' personal injury law firm and attorney customers then packaged the cases into mass tort filings and, using the false medical records, overwhelmed the courts, NSI, other asbestos litigation defendants and asbestos bankruptcy trusts with voluminous claims supported by the false records, reports and diagnoses, resulting in massive settlements.

9.    In thousands of these cases, Defendants, with the intent to defraud and injure NSI, as well as other companies, systematically, intentionally and/or recklessly deviated from medically sound and universally established standards for medical testing, evaluation and diagnosis of asbestos-related disease to create false "positive" results, i.e., results which falsely indicate the presence of asbestos-related disease. Specifically, Defendants systematically, intentionally and/or recklessly disregarded well-established standards and regulations for interpreting chest x-rays, taking and recording asbestos exposure/work histories and medical and smoking histories, and administering x-rays, PFTs, and other medical tests, for diagnosing and assessing asbestos-related diseases. In doing so, Defendants generated false x-ray reads, false test results, false medical reports and false diagnoses (hereinafter "False Medical Reports and Diagnoses") which are not *bona fide* or accurate statements of the medical condition of the individuals recruited and screened by Defendants. Defendants delivered and submitted, or caused and reasonably could foresee the delivery and submission of the False Medical Reports and Diagnoses with the intent to extract payments from NSI, as well as other companies.

5

10.    Plaintiff, NSI, paid millions of dollars to defend and/or settle asbestos-related injury claims of malignant and nonmalignant lung disease which were supported by Defendants' False Medical Reports and Diagnoses.  Defendants fraudulently represented that these claims against NSI involving Defendants' False Medical Reports and Diagnoses were based on the claimants' physicians' legitimate x-ray reads, medical tests, medical reports and *bona fide* diagnoses of asbestos-related disease with the intent that NSI and other companies would rely on the False Medical Reports and Diagnoses and pay money to settle the bogus claims.  In reliance upon Defendants' False Medical Reports and Diagnoses, NSI defended and/or settled thousands of false asbestos-related disease claims.  Thus, Defendants' fraudulent scheme and reckless disregard for the truth caused direct injury to NSI.

11.    Defendants successfully concealed the nature and scope of their fraudulent activities in several ways, including but not limited to (a) refusing to comply with proper subpoenas and court orders for the production of documents about Defendants' litigation screening operations, (b) giving false and misleading testimony under oath about the validity of methods and means employed to generate medical reports and diagnoses, and (c) refusing to answer questions under oath about their mass litigation screening operations by invoking their rights under the Fifth Amendment of the U.S. Constitution against self-incrimination.  It was not until the landmark "Daubert" decision in the Federal Silica Multi-District Litigation MDL1553 (to which Plaintiff was not a party) and the production of documents through the enforcement of additional subpoenas issued in MDL1553 and thereafter in the Federal Asbestos Multi-District Litigation, MDL875, to which Plaintiff later obtained access, that Plaintiff ascertained facts sufficient to begin to discover Defendants' complex fraudulent scheme that caused Plaintiff's injuries.  Attached as Exhibit A is Judge Janis Graham Jack's June 30, 2005, ruling in *In re*

6

*Silica Products Liability Litigation*, No. MDL 1553, 398 F.Supp.2d 563 (S.D. Texas 2005) (hereinafter, the "MDL1553 Ruling"), which makes findings on the conduct of the Defendants Respiratory Testing Services, Inc., Charles Foster, and Dr. James. W. Ballard specifically and litigation screenings in general, of which this Honorable Court is requested to take judicial notice.

## II.    Jurisdiction and Venue

12.    Jurisdiction in this action is predicated upon Title 18, United States Code, Section 1964 and Title 28, United States Code, Sections 1331 and 1332.  Plaintiff is a corporation incorporated under the laws of Delaware with its principal place of business in Georgia. Defendants are citizens of Mississippi, Alabama and Virginia. The amount in controversy exceeds $75,000.

13.    This Court has jurisdiction of pendent state claims pursuant to *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966) and 28 U.S.C. § 1367(a), because those claims are so related to the claims arising under the laws of the United States that they form part of the same case or controversy.

14.    Venue for this action is predicated upon Title 18, United States Code, Section 1965 and Title 28, United States Code, Section 1391(b) (2) and (3), because a substantial part of the events giving rise to this action occurred in this District and because some of the Defendants reside, are found or transacted their affairs in this District and the ends of justice require that the other Defendants be brought before this Court.

15.    Plaintiff invokes the expanded service of process provisions of Title 18, United States Code, Section 1965(b).

7

### III.    Background

#### A.    Asbestos Personal Injury Litigation

16.    Asbestos is a generic name given to a group of natural, fibrous minerals. Because asbestos has several valuable properties, including resistance to heat and fibrous strength, it was used for a number of years in numerous commercial applications, including the production of high-temperature insulation and other similar products

17.    NSI's involvement in asbestos litigation, including the cases generated by Defendants, arose from its distribution and sales of asbestos products, under the company name North Brothers, Inc. from approximately 1966 through 1972.

18.    Asbestos personal injury litigation is premised upon the type of injury suffered: nonmalignant asbestos-related disease (asbestosis, pleural thickening or asbestos-related pleural plaques) and pulmonary impairment; and malignancies (lung cancer, mesothelioma and certain other cancers [primarily esophageal and laryngeal, hereinafter collectively referred to as "other cancers"]). The vast majority of the claims filed against NSI involved allegations of non-malignant asbestos-related disease.

19.    The effects of long-term exposure to asbestos products generally do not develop until after many (usually at least twenty) years after the initial exposure. Lung scarring or "interstitial fibrosis" (scarring of the parenchyma of the lung) generally will not be visible on a chest x-ray for decades following initial exposure. Bilateral pleural plaques, another common marker of asbestos exposure, also take years to manifest to be visible on a chest x-ray. Plaques are benign and generally have no effect on pulmonary function.

20.    In certain malignancy cases, findings on chest x-rays consistent with asbestosis or similar medical determinations that the malignancy (usually lung cancer or "other cancer") is

caused by exposure to asbestos, based on a reliable history, are used to support claims against Plaintiff and others, whether in the court system, in settlement or in bankruptcy trust claims.

**B.    Diagnostic Criteria for Asbestos-Related Disease**

21.    It is universally accepted that the diagnosis of asbestos-related disease requires: (a) evidence of structural pathology consistent with asbestos-related disease as documented by imaging (e.g., chest x-ray) or histology; (b) evidence of causation by asbestos as documented by the occupational and environmental history, markers of exposure (usually pleural plaques), recovery of asbestos bodies, or other means; and (c) exclusion of alternative plausible causes for the findings (through physical exam, including medical, smoking and exposure histories, and an assessment of lung function impairment).

22.    Evidence of structural pathology consistent with asbestos-related diseases as seen on a chest x-ray is generally reported in accordance with a classification system developed by the International Labour Office ("ILO") on a "B read" form based on a reading of the chest x-ray film by a "B reader" physician. B read reports are also used to classify x-rays as consistent with other dust-caused pneumoconiosis diseases, including silicosis and coal workers' pneumoconiosis.

23.    The National Institute for Occupational Safety and Health ("NIOSH") of the Centers for Disease Control and Prevention ("CDC") issues B reader certifications to physicians who meet a specified level of proficiency in classifying chest x-rays according to the ILO scale. NIOSH certifies these B readers as qualified physicians with expertise in classifying chest x-rays according to the ILO system. B readers must be re-certified at four-year intervals.

24.    A NIOSH B read uses the ILO scale developed to systematically record the radiographic abnormalities in the chest provoked by the inhalation of dusts. On the ILO scale,

9

chest x-rays are classified according to the number of abnormalities (termed "opacities") in a given area of the chest as seen on film. Small opacities are described by profusion (the concentration of opacities in the affected lung zone), affected zones of the lung (upper, middle and lower), shape and size (irregular [designated as "s" "t" or "u"] or rounded [designated as "p" "q" or "r"]).

25.    The ILO profusion of small opacities is based on comparisons with standard chest x-ray films (radiographs) provided by ILO. There are four (4) categories of profusion designated under the ILO system:

| Increasing profusion of small opacities ⟶ | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Categories** | | 0 | | | 1 | | | 2 | | | 3 | |
| **Subcategories** | 0/- | 0/0 | 0/1 | 1/0 | 1/1 | 1/2 | 2/1 | 2/2 | 2/3 | 3/0 | 3/3 | 3/4 |

Category 0 represents the absence of abnormalities or the presence of abnormalities (small opacities) that are less concentrated than category 1. The profusion category is recorded by writing the symbol (0, 1, 2, 3) followed by an oblique stroke (i.e. 0/, 1/, 2/, 3/). If no alternative profusion category was seriously considered, the x-ray is classified with an identical subcategory (i.e. 0/0, 1/1, 2/2, 3/3). However, a reported subcategory 2/1 refers to a radiograph depicting a profusion of small opacities evaluated similar in appearance to a subcategory 2/2 standard radiograph, but category 1 (less profuse/concentrated) was seriously considered as an alternative. Epidemiologically, an exposed population would be expected to have a broad spectrum of ILO profusion categories among the workers.

26.    The exclusion of other possible causes of the radiographic findings and/or symptoms is also critical in evaluating whether disease is related to asbestos exposure because

radiographic findings consistent with asbestos-related disease are also consistent with over 150 other disease processes. Well-established, medically sound and universally accepted methods for excluding other causes include reliable and accurate medical and exposure histories taken by a medically qualified professional; a physical examination conducted by a physician; and the assessment of lung function impairment through PFTs.

27. Evidence of causation in asbestos-related nonmalignant disease is based in large part on a reliable and accurate history of exposure to asbestos dust. The taking of a reliable and accurate exposure history is critical to the diagnosis of asbestos-related disease due to the latency of disease onset and alternative causation of symptoms. The diagnosing physician must be able to assess the nature, frequency, duration, and intensity of exposures. Thus, a simple job title is inadequate to attribute causation of radiographic findings and physical symptoms to asbestos exposure.

28. Asbestosis is a nonmalignant diffuse irregular interstitial pulmonary fibrosis caused by inhalation of asbestos fibers over long periods of time in concentrated doses. Abnormal lung function associated with asbestosis usually involves restrictive impairment, characterized by a reduction in lung volumes, as well as, at times, a decrease in diffusion capacity that is a measure of the lung's ability to transfer gases. PFTs, including spirometry, lung volume, and diffusion capacity tests, provide objective, quantifiable measurements of lung function to determine if an individual is impaired and the nature of any impairment (restrictive or obstructive), and are an important factor in valuing asbestos related personal injury claims. The American Thoracic Society ("ATS") has promulgated well-established, universally accepted, medical standards governing the administration of PFTs, designed to ensure the integrity of the testing process and the accuracy of PFT results. An individual diagnosed with asbestosis whose

11

test results demonstrate pulmonary (restrictive) and/or diffusion capacity ("DLco") impairment

can obtain greater compensation than one who has no evidence of lung impairment or is

unimpaired.

### IV.    The Parties

29.    Plaintiff, **NATIONAL SERVICE INDUSTRIES, INC.**, f/d/b/a **North Brothers, Inc.** is a Delaware Corporation with its principal place of business in Atlanta, Georgia. (Hereinafter, **"NSI"** or **"Plaintiff"**).

30.    Defendant **JAY T. SEGARRA, M.D.**, is a pulmonologist, certified B reader and resident of Ocean Springs, Mississippi. He was a former B reader and diagnosing physician for Pulmonary Function Laboratory ("PFL"), a now-defunct asbestos litigation screening entity, a former medical director of Defendant, Respiratory Testing Services, Inc., and a medical director of Holland Bieber & Associates ("Holland Bieber"), also an asbestos (and silica) litigation screening entity. He performed B reads, ordered x-rays, interpreted PFTs, conducted physical examinations and rendered diagnoses for several screening litigation companies, including PFT Services, Inc. ("PFT Services"), Workers Disease Detection Services, Inc. ("WDDS"), InnerVisions Medical, Inc. ("InnerVisions") and others, as well as directly for personal injury law firms and attorneys. (Hereinafter, **"DR. SEGARRA"**).

31.    Defendant **RESPIRATORY TESTING SERVICES, INC.** was an Alabama corporation engaged in asbestos (and silica) litigation screenings and recruitment of claimants for personal injury law firms and attorneys. It had its principal offices in Mobile, Alabama but operated and transacted business in several states, including Mississippi. **RESPIRATORY TESTING SERVICES, INC.** was administratively dissolved by the Alabama Secretary of State on or about October 18, 2008. (Hereinafter, **"RTS"**).

12

32.    Defendant **CHARLES E. FOSTER** is a resident of Alabama and was the owner of RTS and was a former employee of Pulmonary Testing Services, Inc. ("PTS"), an asbestos litigation screening company. (Hereinafter, **"FOSTER"**).

33.    Defendant **J. MICHAEL FITZGERALD, ESQ.** is a resident of Virginia and a personal injury plaintiffs' attorney engaged in asbestos litigation. He used RTS for screenings in several states, including Mississippi. (Hereinafter, **"FITZGERALD"**).

34.    Defendant **CHRISTOPHER LINN TAYLOR** is a resident of Alabama and was the screening organizer and road manager who marketed and set up screenings for RTS. He is also **FOSTER's** son-in-law. Upon information and belief, he attended screenings in Mississippi. In about 2001, he left RTS to work for another screening company, N&M, Inc., a Mississippi corporation. (Hereinafter, **"TAYLOR"**).

35.    Defendant **JAMES W. BALLARD, M.D.** is a radiologist and a resident of Alabama. He rendered B reads, issued blanket x-ray orders and provided diagnostic services for RTS and other litigation screening companies, including PFL and Healthscreen, Inc., as well as directly for personal injury plaintiffs' law firms and attorneys. (Hereinafter, **"DR. BALLARD"**).

36.    Defendant **PHILLIP LUCAS, M.D.,** is a radiologist and resident of Mississippi. He rendered B reads, issued blanket x-ray orders, and provided diagnostic services for RTS and other screening companies, including PFL, PTS, InnerVisions, and N&M, Inc., as well as direct for personal injury law firms and attorneys and/or other Defendants. (Hereinafter, **"DR. LUCAS"**).

## V.    John Doe Defendants

37.    In addition to the Defendants named herein, there are Defendants whose identities are presently unknown to Plaintiff, or whom Plaintiff is currently unable to identify without

13

further discovery about their participation, management or acts as part of their conduct in and/or their intent or reckless disregard with respect to Defendants' fraudulent scheme, but who caused injury to Plaintiff as set forth herein. Plaintiff names these unidentified Defendants as "John Doe" Defendants 1-20 pursuant to Federal Rule of Civil Procedure 9(h). Every allegation in the Complaint is an allegation and a filing as of this date against each "John Doe" Defendant and references to Defendants include the "John Doe" Defendants. Upon information and belief, Defendants conspired with these unknown "John Doe" Defendants to perpetrate the fraud described herein and these "John Doe" Defendants participated, directly or indirectly, in the operations of the illegal enterprise alleged in this Complaint ("John Doe Defendants").

38. John Doe Defendants knowingly and intentionally, or with reckless disregard, agreed to and assisted and actively participated in, conducted and/or directed the activities of an illegal enterprise, and include the following:

a. Personal injury law firms and attorneys that directly hired **DR. SEGARRA,** **RTS, DR. BALLARD, DR. LUCAS** and/or one or more other Defendants, including "broker firms" and attorneys, to generate False Medical Reports and Diagnoses to support asbestos-related personal injury claims against NSI, as well as other personal injury asbestos tort defendants and bankruptcy trusts. The participation of these John Doe Defendant law firms and individual attorneys included, but was not limited to, (i) hiring **DR. SEGARRA, RTS, DR. BALLARD, DR. LUCAS** and/or one or more other Defendants, (ii) knowing or recklessly disregarding that the enterprise achieved desired high positive rates and necessary exposure by using the "right doctors," (iii) providing financial support and supplying individuals for screenings, (iv) directing the types of tests to be administered, the exposure criteria to be created and the specific disease to be

14

diagnosed, and (v) concealing Defendants' fraudulent scheme, all for the purpose of generating personal injury cases to obtain lucrative fees based on settlements of the fraudulent cases.

b. Personal injury law firms and attorneys that indirectly hired **DR. SEGARRA, RTS, DR. BALLARD, DR. LUCAS** and/or one or more of the Defendants through the purchase of asbestos-related injury claims inventories from another personal injury law firm (a "broker firm") or attorney which directly hired **DR. SEGARRA, RTS, DR. BALLARD, DR. LUCAS** and/or one or more other Defendants. The participation of these John Doe Defendant law firms and individual attorneys included, but was not limited to, providing financial support by paying for Defendants' fraudulent scheme for the purpose of generating personal injury cases against NSI and other personal injury tort defendants and bankruptcy trusts to obtain lucrative fees based on settlements of such fraudulent cases.

c. One or more other asbestos (and silica) litigation screening companies that Defendants **DR. SEGARRA, FITZGERALD, TAYLOR, DR. BALLARD, DR. LUCAS** and/or other Defendants hired, or for whom they worked, for purposes of recruiting claimants and generating False Medical Reports and Diagnoses to support fraudulent asbestos-related personal injury claims. The participation of these John Doe Defendant screening companies and their owners included, but was not limited to, recruiting and screening claimants, generating false exposure history documentation, administering chest x-rays, providing false B reads, physical examinations and false diagnoses by hired physicians, administering and manipulating PFTs for Defendants for the purpose of generating personal injury cases against NSI and other personal injury tort

15

defendants and bankruptcy trusts and generating massive income for the John Doe Defendant litigation screening companies and owners.

d. One or more other medical doctors, including but not limited to B readers, contracted by personal injury law firms and attorneys, RTS and/or by one or more other of the Defendants, who fabricated False Medical Reports and Diagnoses to support asbestos personal injury claims against NSI and other personal injury tort defendants and asbestos bankruptcy trusts. The participation of the John Doe Defendant medical doctors included, but was not limited to, fabricating such False Medical Reports and Diagnoses in return for payment and the provision of future work from the illegal enterprise.

e. X-ray and PFT technicians, intake personnel, secretaries, local union contacts, facilitators and other personnel employed by or contracted with RTS and/or other Defendants. The participation of the John Doe Defendants contracted or employed personnel included, but was not limited to, recruiting claimants and supplying False Medical Reports and Diagnoses to the personal injury law firm and attorney customers of the illegal enterprise to support asbestos personal injury claims against NSI and other personal injury defendants and bankruptcy trusts in return for compensation and future employment.

## VI.  The Segarra Enterprise

### A.  Composition of the Enterprise

39.   At all times material to this Complaint, Defendants, together with John Doe Defendants, collectively have constituted an "enterprise" as that term is defined in Title 18, United States Code, Section 1961(4), which enterprise was engaged in, and the activities of which affected, interstate commerce. The enterprise continuously and systematically generated

16

some legitimate but mainly False Medical Reports and Diagnoses to serve as "evidence" of injuries caused by asbestos for asbestos personal injury claims made on behalf of thousands of individuals by Defendants' personal injury law firm and attorney customers against NSI, and other companies, in the manner and means described herein. Defendants knowingly, intentionally and/or recklessly, participated in and/or directed the affairs of this enterprise through a pattern of racketeering activity.

40. The enterprise through which Defendants operated is a continuing enterprise, whose members and participants and the methods and means of perpetrating its fraudulent scheme have, at times, varied and become more sophisticated, but whose purpose in generating and using False Medical Reports and Diagnoses for pecuniary gain through mass claims litigation has remained constant.

41. The enterprise through which Defendants operate and control is directed and managed by **DR. SEGARRA**. This enterprise used several different asbestos (and silica) mass screening companies, including **RTS** and/or other John Doe Defendant screening companies. Defendants operated these screening companies through a pattern of racketeering activity as assembly-line mass litigation screening operations to generate False Medical Reports and Diagnoses to produce asbestos personal injury claims for personal injury law firms or individual attorneys. Moreover, many of the screening companies used by the enterprise employed or contracted with some of the same doctors, testing technicians, secretaries, nurses and other personnel.

42. **DR. SEGARRA** is the putative "Godfather" of the enterprise, who in his role as medical director, B reader, examining physician, diagnosing physician, and one who shared in the profits, together with the other named Defendants and John Doe Defendants 1-20, are

17

hereinafter referred to as the "Segarra Enterprise." Exhibit B, **FOSTER** proposal for **DR. SEGARRA** to review medical charts of individuals at **RTS** for $200 per day up to $1,000 in gross sales and an additional 25% of gross sales over $1,000 per day. The Segarra Enterprise is illustrated as follows:



43.     The Segarra Enterprise used **RTS** and/or other John Doe Defendant screening companies, along with some of its personnel, including a small group of non-treating physicians that included defendants **DR. SEGARRA, DR. BALLARD, DR. LUCAS** and others, to provide some legitimate but mostly False Medical Reports and Diagnoses to asbestos personal injury law firms and individual attorneys to whom Defendants were financially beholden, such as Reaud, Morgan & Quinn; Morris, Sakalarios & Blackwell; Porter & Malouf, the John Doe Defendant law firms and attorneys, and others.

44.     Some of the law firms associated with the Segarra Enterprise by filing of asbestos personal injury claims supported by False Medical Reports and Diagnoses that resulted in payments by Plaintiff are shown in the following chart:

## Law Firms Associated With Segarra Enterprise With Over $200,000 Paid In Settlements by NSI



**Defendant DR. SEGARRA**

45.     **JAY T. SEGARRA, M.D.,** is a pulmonologist and certified B reader from Ocean Springs, Mississippi. **DR. SEGARRA** directed and participated, directly and/or indirectly, in the illegal activities of the Segarra Enterprise, including acting as medical director of **RTS** and other screening companies, supervising screening company personnel and operations, providing false B reads, conducting physical examinations, and providing false diagnoses of asbestos-related disease, and by concealing the Defendants' fraudulent scheme from NSI and others. **DR. SEGARRA** retired from the Air Force in 1993 and entered the Reserves, and has not had a full-

19

time clinical practice since. **DR. SEGARRA** is the epitome of a screening physician in the asbestos (and silica) litigation, who not only shared in the profits but even described himself as an "opportunist." **DR. SEGARRA** has read approximately 150,000 x-rays and rendered tens of thousands of diagnoses supporting asbestos-related (and silicosis) claims. **DR. SEGARRA** was the diagnosing physician for nearly 40,000 asbestos injury claims filed with Johns Manville (Asbestos) Personal Injury Trust ("JM Trust"). In each of the tens of thousands of diagnoses he rendered, **DR. SEGARRA** acted only as a litigation doctor and not as a treating physician providing healthcare.

46. While **DR. SEGARRA** claims that he kept a copy of his diagnosing reports in his files, which he refuses to produce, he mailed the original reports to the attorneys/firms hiring him and/or the screening companies. He did not mail copies of his reports to the claimants he diagnoses with asbestos-related disease.

47. **DR. SEGARRA** did not follow up with individuals on whom he conducts screenings, nor did he have any contact with the individuals' treating physicians and treating physicians do not refer their patients to **DR. SEGARRA** for screenings.

48. **DR. SEGARRA** began his career as an "expert" and litigation screening doctor in the early 1990s, working initially for the now-discredited screening company, PFL, where he met and worked with William Spence, a PFT technician and David Miller, a subcontractor administering chest x-rays. Mr. Spence and Mr. Miller subsequently started InnerVisions, which **DR. SEGARRA** worked with at least during some screenings in Ohio.

49. **DR. SEGARRA** has made at least $10 million issuing B reads and diagnoses, not for any valid medical reason, but solely for profit for asbestos (and silica) litigation. Furthermore, **DR. SEGARRA** conducted screenings including B reads, PFT interpretations,

20

physical examinations and rendered diagnoses, in over 20 different states without a medical license.    At least one state court has excluded him as a witness when "he performed examinations, rendered diagnoses, and recommended treatment without being licensed in Washington, a criminal offense.  He also relied for his diagnoses on radiology reports from unregistered and uncertified technicians or radiologists using unregistered and uncertified equipment." Exhibit C, King County Superior Court Order, October 15, 2002.

50.    DR. SEGARRA admitted that with the possible exception of Florida, where he also owns a home and Mississippi where he lives, the reason for obtaining medical licenses in multiple states was for the purpose of conducting screenings for law firms and attorneys.

51.    DR. SEGARRA provided services for and/or is associated with several asbestos (and silica) litigation screening companies and performed services for over 100 law firms or attorneys.  DR. SEGARRA was recruited in the asbestos (and silica) litigation screening business by a plaintiffs' personal injury attorney and began working for PFL, conducting on-site screenings, including, directly supervising and interpreting PFTs, and rendering diagnoses, frequently based on B reads by DR. BALLARD, DR. LUCAS and/or other B readers and physical examinations by Dr. Michael Conner and/or other examining doctors.  In 1992, DR. SEGARRA obtained his NIOSH B reader certification and also conducted B reads for PFL. DR. SEGARRA performed an estimated 10,000 B reads for PFL.  Despite his prior testimony that he always takes a claimant's work and exposure history himself, DR. SEGARRA in fact relied upon exposure histories generated by PFL personnel or attorneys who DR. SEGARRA assumed had pre-screened individuals for asbestos exposure.

52.    Personal injury law firms and attorneys associated with DR. SEGARRA in his work with PFL included Bill Lewis with Environmental Litigation Group, the Reaud Morgan

Law Firm, Gerald Dickerson, the Pritchard Law Firm, and others. Eventually, **DR. SEGARRA** started billing attorneys directly to conceal his association with PFL.

53.    In about 1997, Owens Corning sued PFL and others for racketeering alleging, *inter alia,* that defendants systematically and continuously generated false medical test results used to substantiate the filing and settlement of approximately 10,000 nonmalignant, asbestos-related cases against Owens Corning involving allegations of pulmonary impairment. In 1998, the JM Trust banned PFL reports.

54.    In approximately 1994, **DR. SEGARRA** started working with **RTS** and **FOSTER** as RTS' medical director, responsible for all aspects of "medical" screening services, including x-rays, B reads, physical examinations, PFTs, and diagnoses. **DR. SEGARRA** read at least 22,000 x-rays for **RTS**. **DR. SEGARRA** examined, on average, about fifty individuals per day when screening with **RTS**.    Exhibit D, 1999 contract with revisions for guarantee of 50 people per day. Despite his prior testimony that he always takes a claimant's work and exposure history himself, **DR. SEGARRA** in fact relied upon exposure histories generated by medically untrained **RTS** personnel or attorneys.

55.    The law firms and attorneys associated with **DR. SEGARRA's** work for **RTS** include: Anthony Bruscata; Barton & Williams; Bill Lewis; Brent Coon & Associates; Charles Blackwell; Campbell, Cherry, Harrison, Davis & Dove; Charles Gibson; David Nutt; Guy Fisher; John Deakle; Jon Swartzfager; Jackson Taylor Martino & Hedge; Alwyn Luckey; Maples & Lomax; Michael Papantonio; Motley Rice; Ratiner, Reyes & O'Shea; Richard Fountain; Richard Schwartz; Robles & Gonzalez; Tom Rhoden; Stephen Shackelford; Tom Scott; Stacie Foster Taylo, William Roberts Wilson, and others.

22

56.     Several asbestos bankruptcy trusts have banned **RTS** reports and courts in Washington and Florida have excluded **RTS** reports.  Judge Jack, in the federal silica MDL, found that the screening methods engaged in by **RTS** resulted in unreliable diagnoses manufactured for money rather than for any health care concern.

57.     From 1994 to 1995, **DR. SEGARRA** also worked with PFT Services, owned by Gerald Fitzgerald, with its principal place of business in Birmingham, Alabama.  PFT Services primarily worked for the law firm of Baron & Budd, among others.

58.     Between 1995 and 2002, **DR. SEGARRA** also worked with WDDS, which frequently worked for the LeBlanc Waddell, Cooper Mitch, Shelby Cartee, the Wallace & Graham law firm, and others.

59.     **DR. SEGARRA** was excluded as an unreliable expert witness in the State of Tennessee because **DR. SEGARRA**, while working with WDDS, based his diagnosis of asbestosis in the case "solely on his view of the x-ray film."

60.     In 2003, **DR. SEGARRA** worked with N&M, Inc. at screenings in Texas for attorney Jim Zadeh.  Judge Jack in the federal silica MDL1553 Ruling excoriated the operations of N&M, Inc., as well as **RTS**, finding the methods both companies used in generating medical evidence resulted in unreliable diagnoses they were not in accordance with accepted medical practice.

61.     From about 1999 to at least 2007, **DR. SEGARRA** worked with Holland Bieber. **DR. SEGARRA's** work with Holland Bieber is associated with the following law firms and attorneys:  Baron & Budd; Brent Coon & Associates; Environmental Litigation Group; Franklin, Cardwell & Jones; Heard, Robins, Cloud & Lubel; Hissey, Kientz; Lanier, Parker & Sullivan; McCurdy & McCurdy; Edward O. Moody; McPherson, Monk, Hughes, Bradley & Wimberley;

23

Breuger & McCullough; Heygood, Orr & Reyes; Michael Serling; Silber, Pearlman; Zamler, Meller & Shiffman and others.

62.    **DR. SEGARRA** is a medical director for Holland Bieber and directly supervises technicians performing PFTs and is responsible for all medical aspects of the screening process.

63.    **DR. SEGARRA** performed as many as 30 evaluations in a single day with Holland Bieber and averaged 15-18 per day. **DR. SEGARRA** generally screened with Holland Bieber once per month for two to three days per screening.

64.    In 2005, **DR. SEGARRA** testified that he has been doing "re-evaluations" (previously screened individuals with a positive x-ray) for the last five years, for the work he did primarily with Holland Bieber and PFT Services.

65.    **DR. SEGARRA** performed B reads in Ohio with InnerVisions, using x-rays that were administered by David Miller, a former subcontractor for PFL, and PFTs administered by William Spence, a former PFT technician employed by PFL.

66.    **DR. SEGARRA** knew or recklessly disregarded that the methods that Defendants employed, including his own, did not meet accepted medical practices and were unreliable, resulting in False Medical Reports and Diagnoses.

67.    **DR. SEGARRA** knew or could reasonably foresee that Defendants' False Medical Reports and Diagnoses would be used to support claims against NSI and others.

**Defendant RTS**

68.    **RTS** directed and participated, directly and/or indirectly, in the illegal activities of the Segarra Enterprise, including providing claimant recruiting and screening services, and generating False Medical Reports and Diagnoses. **RTS** is a successor of another litigation screening company, Pulmonary Testing Services ("PTS"). PTS was owned by Jewel "Jerry"

24

Pitts. In or about June 1996, Owens Corning sued Jerry Pitts, PTS, and others, alleging fraud and violations of RICO for engaging in a scheme to generate false medical test results. The lawsuit was eventually settled. **FOSTER**, the owner of RTS, is a former employee of PTS. **FOSTER** performed public relations, marketing, and screening recruitment, before leaving PTS and starting **RTS** in late 1994. **FOSTER** had no formal medical training qualifying him to operate a screening business. Before working for PTS, **FOSTER** was a pipe fitter who was active in trade unions. **FOSTER** used his close ties with union officials to troll for potential claimants and bolster **RTS'** business.

69.    To continue the enterprise, **FOSTER** started **RTS** and brought **DR. SEGARRA** on board as medical director. **RTS** was a full-service asbestos (and silica) litigation screening operation based out of Mobile, Alabama, but it screened in at least 35 states without obtaining proper licensing and using unlicensed x-ray and PFT technicians, including Mississippi, Arizona, Florida, Kentucky, Iowa, Louisiana, Tennessee, Texas, Georgia, Oklahoma, Virginia, Minnesota, Missouri, Montana, Illinois, Indiana, Washington, Ohio, Oregon, Wisconsin and New Mexico. **RTS** provided x-rays, B reads, physical exams, pulmonary function tests and diagnostic reports for over 75 different law firms and attorneys. **RTS** screened over 40,000 individuals for asbestos (and silica) personal injury litigation and grossed over $23 million.

70.    The RTS "business plan" was developed by **FOSTER** with **DR. SEGARRA** and **FITZGERALD.** The "plan" was to recruit and screen at least 50 individuals per screening and generate positive diagnoses for a minimum of 20 individuals to obtain a 40% - 60% positive rate. Unlike PFL and PTS that reported most of the individuals screened as positive, RTS, **FOSTER**, **FITZGERALD** and **DR. SEGARRA** limited the positive rate to about 40% to 60% to avoid detection of their fraudulent scheme. **FOSTER, DR. SEGARRA** and **FITZGERALD** also

adjusted the business plan as necessary. Exhibit E, December 14, 1998 **FITZGERALD** letter to **FOSTER/RTS** regarding plan to develop a two-step plan of B read only screenings and then subsequent examinations and PFTs, much like what **DR. SEGARRA** eventually did with Holland Bieber.

71.     In 2006, **DR. SEGARRA** produced to the United States Congress his analysis of his own records for a period of about two and one-half years demonstrating that he had approximately a 40% positive rate while working for multiple attorneys and screening companies. **DR. SEGARRA** later produced these records during a civil litigation deposition in June 2006, but only after removing pages identifying law firms and attorneys for whom he worked and the amount of money he received.

72.     Holland Bieber produced electronic PFTs and other records in late 2007 that also demonstrated that **DR. SEGARRA** had approximately a 40% positive rate.

73.     Upon information and belief, **DR. SEGARRA's** and John Doe Defendants' records will demonstrate that **DR. SEGARRA** consistently achieved his targeted 40% to 60% positive rate regardless of the populations screened, the attorneys involved, the disease for which he screened, the location or work sites involved or the screening company involved.

74.     **RTS** worked exclusively with personal injury attorneys screening for asbestosis and silicosis claims, including Fitzgerald & Associates (controlled by Defendant **FITZGERALD**, who brokered claims to numerous law firms); Campbell, Cherry, Harrison, Davis & Dove; Barton & Williams; Ratiner, Reyes & O'Shea; Jackson, Taylor, Martino & Hedge; Tom Rhoden; the Nix Law Firm; Alwyn Luckey; Ness Motley (Motley Rice); Provost Umphrey; and Williams Bailey, among others.

75.  **RTS** used medically untrained personnel to administer PFTs, obtain asbestos exposure histories, smoking and medical histories and only reported the results of its "testing" to its law firm and attorney customers rather than the individuals screened or their treating physicians.

76.  **RTS** paid physicians more money for positive results, encouraging **DR. SEGARRA**, **DR. BALLARD** and others to generate false positive diagnoses.  Additional physicians associated with **RTS** include Drs. Robert Altmeyer, Dominic Gaziano, James Krainson, Robert Mezey, Gregory Nayden, Walter Oaks, Alvin Schonfeld, Jose Roman and others.

77.  After Judge Jack found **RTS'** methods unreliable in the MDL1553 Ruling (Exhibit A), numerous asbestos bankruptcy trusts banned **RTS** reports:  the JM Trust (in or about September 2005); the Celotex and Eagle-Picher trusts (in or about October 2005); the Keene trust (in or about April 2006); the Babcock and Wilcox trusts (in or about July 2006), the Plibrico trust (in or about October 2006); and the Owens Corning, U.S. Gypsum, Armstrong and DII Industries trusts (in or about May 2008).

**Defendant FOSTER**

78.  Defendant **FOSTER** was the owner of **RTS**.  **FOSTER** used his position as owner of **RTS** to direct and participate in the illegal activities of the Segarra Enterprise.  As owner of **RTS**, **FOSTER** was responsible for virtually every aspect of **RTS'** screening activities, including marketing, recruiting, personnel hiring and training, accounting, and screening logistics and procedures.  **FOSTER** intentionally concealed Defendants' fraudulent scheme from NSI and others.

79.    **FOSTER** learned the screening business at PTS, where he was previously employed. While at PTS, **FOSTER** marketed PTS' services to law firms and attorneys promising at least a 75% positive rate. A former pipe fitter, **FOSTER** used his connections with trade union officials and his marketing experience from PTS in soliciting business for **RTS**.

80.    **FOSTER** denies that **RTS** provided healthcare and denies that the individuals **RTS** screened are patients or had any physician-patient relationship with **RTS** or the physicians that worked for **RTS**. In MDL875, the Court issued a "HIPAA Order" stating that **RTS** was hired by attorneys to generate diagnoses for litigation rather than medical purposes.

81.    Despite having no medical training or qualifications, **FOSTER** supervised, directed and oversaw the administration of x-rays and PFTs at **RTS**, including hiring and training technicians.

82.    **FOSTER**, together with **TAYLOR** and **FITZGERALD**, marketed screenings and recruited screening subjects for the Segarra Enterprise, which involved, among other things, the solicitation of personal injury law firms and attorneys who paid millions of dollars to Defendants for False Medical Reports and Diagnoses.

83.    Following Judge Jack's MDL1553 Ruling, **FOSTER** regularly asserts his Fifth Amendment rights not to incriminate himself when questioned about his litigation screening activities.

84.    **FOSTER** knew, or recklessly disregarded, that the methods that Defendants employed did not meet accepted medical practices and were unreliable, resulting in False Medical Reports and Diagnoses.

85.    **FOSTER** knew or could reasonably foresee that the False Medical Reports and Diagnoses that Defendants generated would be used to support claims against NSI and others.

## Defendant FITZGERALD

86.    FITZGERALD was at all times relevant to this Complaint a personal injury attorney who directed, managed and participated, directly and/or indirectly, in the illegal activities of the Segarra Enterprise, including directing the solicitation of local union members to undergo screenings with RTS, and possibly other screening companies, and to file personal injury claims supported by False Medical Reports and Diagnoses; paying for screenings while making it appear as though screenings were sponsored by trade unions and by concealing Defendants' fraudulent scheme from NSI and others. FITZGERALD also recruited physicians, such as Dr. Alvin Schonfeld, to perform work with RTS.

87.    FITZGERALD together with FOSTER and/or other Defendants attended union meetings and provided gifts and meals to union contacts to persuade them to have the union members attend screenings with RTS so Defendants could generate claimants using Defendants' False Medical Reports and Diagnoses for support of asbestos personal injury cases.

88.    FOSTER and/or TAYLOR approached and solicited union contacts on behalf of RTS and FITZGERALD to avoid ethical complications for FITZGERALD, an attorney prohibited from direct solicitation of clients. FOSTER had union contacts complete a "request" form prepared by FITZGERALD for the screening and portraying it as a union-sponsored event, when, in fact, it was designed by FOSTER and FITZGERALD and/or TAYLOR, RTS and/or other Defendants for their own benefit and the benefit of member of the Segarra Enterprise.

89.    In about 2001, RTS sued FITZGERALD to recover unpaid fees for screening services. FITZGERALD contended that he had a conditional payment arrangement with RTS, pursuant to which he was obligated to pay RTS only if he received settlement funds from the

now bankrupt asbestos defendant Babcock & Wilcox, based, however, on false asbestos personal injury claims supported by the False Medical Reports and Diagnoses generated by Defendants.

90.    **FITZGERALD** knew, or recklessly disregarded, that the methods that Defendants employed did not meet accepted medical practices and were unreliable, resulting in False Medical Reports and Diagnoses.

91.    **FITZGERALD** filed, caused to be filed, knew or could reasonably foresee, false asbestos personal injury claims supported by the False Medical Reports and Diagnoses generated by Defendants, against NSI and others.

**Defendant TAYLOR**

92.    **TAYLOR** directed and participated, directly and/or indirectly, in the illegal activities of the Segarra Enterprise through his marketing and solicitation of customers, personal injury law firms and attorneys, and individual screening subjects. **TAYLOR** oversaw and directed the screening process for the Segarra Enterprise, facilitated the submission of False Medical Reports and Diagnoses for the purpose of generating litigation claims, and concealed Defendants' fraudulent scheme from NSI and others.

93.    **TAYLOR** agreed with Defendants **DR. SEGARRA, FOSTER** and/or others to help market **RTS'** screening business to law firms and attorneys, recruit screening subjects, and participate in and direct the illegal activities of the Segarra Enterprise including, but not limited to, marketing specific positive rates which **TAYLOR** knew, or recklessly disregarded, were achieved through Defendants' assembly-line process of generating False Medical Reports and Diagnoses.

94.    **TAYLOR** managed travel arrangements, marketing and communicating with law firms, and recruitment of screening subjects for **RTS.**

95.    **TAYLOR** is **FOSTER's** son-in-law. **TAYLOR** also worked for N&M, Inc., another screening company owned and operated by former PTS employee, Heath Mason, the step-grandson of PTS owner, Jerry Pitts. **TAYLOR** is married to **FOSTER's** daughter, Stacie Foster Taylor, a personal injury attorney formerly employed by asbestos/silica litigation firms, including Campbell Cherry Harrison Davis & Dove and Motley Rice, among others. **TAYLOR's** wife paid and promoted **RTS** and N&M, Inc. and/or other screening companies, to screen claimants whom she herself represented in asbestos and silica litigation or whose claims she "brokered" to other law firms.

96.    **TAYLOR** knew, or recklessly disregarded, that the methods that Defendants employed did not meet accepted medical practices and were unreliable, resulting in False Medical Reports and Diagnoses.

97.    **TAYLOR** knew or could reasonably foresee that the False Medical Reports and Diagnoses that Defendants generated would be used for claims against NSI and others.

**Defendant DR. BALLARD**

98.    **DR. BALLARD** is a radiologist and certified B-reader from Birmingham, Alabama. **DR. BALLARD** directed and participated, directly and/or indirectly, in the illegal activities of the Segarra Enterprise, including supervising screening company personnel and operations, providing false B reads, providing false diagnoses of asbestos related disease, and concealing Defendants' fraudulent scheme from NSI and others. **DR. BALLARD** has not had an active hospital practice since 1998. **DR. BALLARD** performed litigation screening, diagnostic and B read services for **RTS**, as well as other screening companies and directly for over 75 different law firms and attorneys from at least February 1999 through May 2005, including Environmental Litigation Group, Morris Sakalarios & Blackwell, Norris Phelps, Ronald Parrish,

31

Fraze, Davidson, Nix, Patterson & Roach, and others.  **DR. BALLARD** performed several thousand B-reads per year.

99.     Although **DR. BALLARD** was not licensed to practice medicine in Arkansas, Louisiana or Mississippi, he traveled to those states with **RTS** to interpret x-rays and to generate B read reports and diagnoses.

100.    When diagnosing individuals for litigation purposes, **DR. BALLARD** simply accepted the information provided to him by the law firms and attorneys or screening companies with respect to exposure and medical histories, which were taken by individuals medically unqualified to do so.  **DR. BALLARD** did not conduct physical examinations.  Exhibit F, July 29, 2004 Letter from Frazer Davidson requesting diagnostic reports based on **DR. BALLARD's** previous B reads enclosing "an Exhibit A that this office has prepared based on information provided by the client."  Frazer Davidson further provided proposed language to include in his reports.

101.    Before **DR. BALLARD** interpreted an x-ray, he knew what disease the law firms wanted him to "find."  As Judge Jack found in the MDL1553 Ruling:

> Dr. Ballard testified that "either ... the testing service or the law firm" provided him with the work history for the clients.  This "work history" amounted to a simple statement from the lawyers or RTS that there "is *610 exposure history that's consistent with asbestosis."  This meant to Dr. Ballard that the lawyers and/or RTS "want[ed] [Dr. Ballard] to look for asbestosis."  Dr. Ballard acknowledged that this "could sway" his reading.

Exhibit A at 35-36, 398 F.Supp.2d at 609-610 (cites omitted).  Law firms and attorneys requested, often by letter, that **DR. BALLARD** read certain x-rays for asbestos-related disease only or silica only disease and even "mixed-dust" disease and informed **DR. BALLARD** of the asbestos exposure histories when requesting these specific interpretations.  Exhibit G, September 29, 2000 Letter from J. Ronald Parrish, Esq. requesting **DR. BALLARD** read 103 x-rays for

asbestos disease and advising him that the "clients have experienced exposure at multiple work sites." Exhibit H, May 1, 2001 Letter from the Farragut Law Firm requesting DR. BALLARD read x-rays for clients who "were previously diagnosed with asbestosis, but [the attorneys] are having trouble with the way the doctor worded the medical reports" and advising that "a complete work history sheet" is included for DR. BALLARD to "make note of the clients' asbestos exposure history in the medical reports." Exhibit I, July 8, 2002 Letter from the Law Office of Jim Zadeh requesting DR. BALLARD read three groups of x-rays:

Substantial silica exposure = 47 x-rays
Substantial silica & asbestos exposure = 19 x-rays; and
Substantial asbestos exposure = 12 x-rays

DR. BALLARD followed the directives of his customers and the screening companies' customers (the law firms and attorneys), without regard for the actual condition of claimants' lungs reflected on the x-rays, reporting only the diagnoses requested and even tailoring his reports as directed by the customers. Exhibit J, October 10, 2002 Letter from DR. BALLARD to Wallace & Graham, Attorneys At Law, stating "Per your request, these are being read for asbestosis only. If you office need b-readings for silicosis, then I will be happy to accommodate you."

102.    DR. BALLARD's practice of disregarding the actual condition of lungs depicted on x-ray films for the purpose of generating the predetermined outcome as requested often resulted in complete asbestosis/silicosis reversals in the same individuals as Judge Jack found in the MDL1553 Ruling.

103.    Following Judge Jack's MDL1553 Ruling, DR. BALLARD has refused to answer questions about his screening and litigation activities invoking his Fifth Amendment rights not to incriminate himself acknowledging that he was the subject of a grand jury

33

investigation by the United States Attorney's Office for the Southern District of New York.

Exhibit K, Opposition to Motion to Compel Regarding James W. Ballard, M.D., MDL1553, November 29, 2005.

104.    Numerous asbestos bankruptcy trusts banned **DR. BALLARD** reports:  the JM Trust (in or about September 2005); the Celotex and Eagle-Picher trusts (in or about October 2005); the Keene trust (in or about April 2006); the Babcock and Wilcox trusts (in or about July 2006), the Plibrico trust (in or about October 2006); and the Owens Corning, U.S. Gypsum, Armstrong and DII Industries trusts (in or about May 2008).

105.    **DR. BALLARD** knew, or recklessly disregarded, that the methods that Defendants employed did not meet accepted medical practices and were unreliable, resulting in False Medical Reports and Diagnoses.

106.    **DR. BALLARD** knew or could reasonably foresee that the False Medical Reports and Diagnoses that Defendants generated would be used for claims against NSI and others.

### Defendant DR. LUCAS

107.    **DR. LUCAS** is a radiologist and former B reader from Madison, Mississippi. **DR. LUCAS** directed and participated, directly and/or indirectly, in the illegal activities of the Segarra Enterprise, including supervising screening company personnel and operations, providing false B reads, performing physical examinations, and providing false diagnoses of asbestos related disease. **DR. LUCAS** was a choice B reader for many law firms and attorneys, including Morris, Sakalarios & Blackwell; Wallace & Graham; Foster & Sear; Taylor & Sire; Lanier, Parker & Sullivan; and others, and has performed tens of thousands of B reads and thousands of physical examinations for law firms and attorneys in asbestos litigation.

34

108.   **DR. LUCAS** also rendered diagnoses at the request of screening companies and/or law firms and attorneys.

109.   Although **DR. LUCAS** insisted he only performed litigation services for attorneys, he admitted that he accepted payment from screening companies and performed worked with N&M, Inc., PFL, PTS and InnerVisions.

110.   **RTS** produced NIOSH B read reports authored by **DR. LUCAS** for approximately 300 plaintiffs.  The diagnostic reports associated with these individuals were authored by other physicians, including **DR. SEGARRA** and Drs. Dominic Gaziano, Robert Altmeyer, Robert Mezey and James Krainson, relying upon **DR. LUCAS'** B reads.

111.   Between approximately September 1996 and December 1998, **DR. LUCAS** read over 13,000 x-rays for law firms and attorneys.

112.   **DR. LUCAS** testified that he only recorded what he thought was important when performing B reads for law firms and attorneys and did not record certain information (calcifications in thoracic aorta; degenerative changes in skeletal tissue) as it was unimportant to what he was being asked to report, claiming that while such information may be important to a physician treating the patient, it means nothing to the attorneys asking him to report specific findings.

113.   In reading x-rays for litigation, **DR. LUCAS** does not rule out any of the more than 150 other diseases which may cause interstitial fibrosis or similar markings on a chest x-ray. However, in his medical practice, he reads films for any and all diseases.  In rendering a "presumptive diagnosis" of asbestosis for litigation, **DR. LUCAS** does not rule out other causes for the conditions he observes.

35

114.    In his regular medical practice, **DR. LUCAS** does not prescribe x-rays. However, **DR. LUCAS** prescribed x-rays in his litigation work for attorneys wanting orders to have their clients x-rayed. The law firms and attorneys decided who would receive an x-ray. **DR. LUCAS** then issued a "blanket" x-ray order without limitation as to time, location or the number of individuals who could be screened. He performed no prior review of records or examination of the individuals before he issued the x-ray order. The State of Texas cited **DR. LUCAS** for issuing a blanket x-ray order to the Tomblin, Carnes & McCormack law firm.

115.    **DR. LUCAS** charged and made more money for positive B reads ($70 each) than for negative B reads (only $35 each).

116.    **DR. LUCAS** knew, or recklessly disregarded, that the techniques that Defendants employed did not meet accepted medical practices and were unreliable, resulting in False Medical Reports and Diagnoses.

117.    **DR. LUCAS** knew or could reasonably foresee that the False Medical Reports and Diagnoses that Defendants generated would be used for claims against NSI and others.

**B.    Methods and Means**

118.    Defendants have unlawfully, knowingly, intentionally or recklessly participated, directly or indirectly, in and/or directed the conduct of the affairs of the Segarra Enterprise through a pattern of racketeering activity through the methods and means set forth below.

119.    At all times relevant to this Complaint Defendants, in operating the Segarra Enterprise, engaged in systematic, deliberate and/or reckless departures from accepted medical standards in the evaluation and diagnosis of asbestos related diseases. They did so to manipulate exposure and medical histories, chest x-ray interpretations and PFTs for the purpose of manufacturing false diagnoses of asbestos (and silica) related disease, and thus produce False

36

Medical Reports and Diagnoses for the Defendants' law firm and attorney customers, including John Doe Defendant law firms, for asbestos (as silica) litigation and settlement of personal injury claims with the intent that NSI and others, including bankruptcy trusts, would rely on the False Medical Reports and Diagnoses and pay millions of dollars in settlements. As Judge Jack found in MDL 1553:

> [T]hese diagnoses were about litigation rather than health care. And yet this statement, while true, overestimates the motives of the people who engineered them. The word "litigation" implies (or should imply) the search for truth and the quest for justice. But it is apparent that truth and justice had very little to do with these diagnoses – otherwise more effort would have been devoted to ensuring they were accurate. Instead, these diagnoses were driven by neither health nor justice: they were manufactured for money. The record does not reveal who originally devised this scheme, but it is clear that the lawyers, doctors and screening companies were all willing participants.

Exhibit A at 53-54, 398 F.Supp.2d at 635.

### Marketing and Solicitation

120. Defendants used aggressive marketing and solicitation techniques for the Segarra Enterprise, spending millions of dollars to generate customers (personal injury law firms and attorneys) and recruit subjects to screen to generate claimants for their customers. Defendants sent solicitation materials, including marketing brochures, using the United States mails to various targeted law firms and attorneys, which contained false claims related to the quality of testing, certifications of screening personnel, and compliance with testing and regulatory standards.

121. For example, RTS mailed out brochures through the U.S. mails, that falsely stated RTS provided "complete medical evaluations by Board Certified, NIOSH (National Board (sic) of Occupational Safety and Health) approved Physicians, Radiologic Technologists, Respiratory Therapists and/or Technicians" and that "a board certified Respiratory Therapist/Technician will

perfc... a Pulmonary Function Test ... that are performed by the American Thoracic Society standards." See Exhibit L, RTS brochure.

122.    Defendants also directly solicited individuals.    One of the more successful solicitation ploys involved working certain local trade union members.    Specifically, **FOSTER** and/or **TAYLOR** and/or other **RTS** representatives attended union meetings providing gifts and meals to local union contacts to solicit screenings of the local's members.    **RTS** and **FITZGERALD** split these solicitation costs.    Exhibit M, **RTS** contract for testing, April 24, 2000.

123.    **FOSTER** and/or **TAYLOR** (RTS) approached and solicited local union contacts on **FITZGERALD**'s behalf.    However, to avoid ethical complications for **FITZGERALD**, **FOSTER** and/or **TAYLOR** had local union leaders complete a "request" form prepared by **FITZGERALD**.    This request form portrayed the screening as sponsor by the local union, when, in fact, it was designed by **FOSTER, TAYLOR, FITZGERALD** and/or other Defendants for their own benefit.    Exhibit N, March 4, 1999 letter to RTS with proposed and executed local union screening requests.    Exhibit O, local union notice letter to members with law firm sponsoring language.

124.    **FITZGERALD's** letter (Exhibit N) describes the union solicitation scheme:

As you know, it is permissible for a law firm to set up a health screening for members of a union, if the union itself asks for that assistance. I am enclosing a form letter asking for that assistance. Please have each union put the letter on its own letterhead and send it to me before any screening. Without such a letter in the file, one or more of the potential defendants might create unwanted problems.

I am also enclosing a notice letter that the unions should provide to their members. It differs slightly from the letter that has been previously used. We have deleted any language that would lead to the impression that the law firm is sponsoring the screening. The law firm is assisting the union in setting up the screening. The union itself is the sponsor.

38

125.    Additionally, Defendants used mass media, television commercials and radio advertisements to recruit individuals for screenings sponsored by law firms and attorneys and to generate claimants for Defendants' law firm and attorney customers. Exhibit P, **RTS** television commercial clip.

126.    Defendants' practice of soliciting thousands of personal injury lawsuit clients for their law firm and attorney customers violated Mississippi's statutory prohibition against champerty, which provides as follows:

> Champerty and maintenance; solicitation and stirring up of litigation prohibited.
>
> It shall be unlawful for any person, firm, partnership, corporation, group, organization, or association, either incorporated or unincorporated, either before or after proceedings commenced: (a) to promise, give, or offer, or to conspire or agree to promise, give, or offer, (b) to receive or accept, or to agree or conspire to receive or accept, (c) to solicit, request, or donate, any money, bank note, bank check, chose in action, personal services, or any other personal or real property, or any other thing of value, or any other assistance as an inducement to any person to commence or to prosecute further, or for the purpose of assisting such person to commence or prosecute further, any proceeding in any court or before any administrative board or other agency, regardless of jurisdiction; provided, however, this section shall not be construed to prohibit the constitutional right of regular employment of any attorney at law or solicitor in chancery, for either a fixed fee or upon a contingent basis, to represent such person, firm, partnership, corporation, group, organization, or association before any court or administrative agency.

Miss. Code Ann. § 97-9-11.

**The Screening Process**

127.    The screening process generally starts when a law firm or attorney who sponsors a screening hires a screening company such as **RTS** and the law firm or the screening company places an advertisement in a local newspaper, on the radio and/or on television, setting forth certain demographic information as the threshold requirement for the screening.

128.    Members of the public are directed to call the telephone number listed in the advertisement. The screening company staff, including Defendants, answered the phone and, as usually directed by its law firm customers, asked if callers were exposed to asbestos at targeted job sites and job titles approved by the law firms and attorneys for a specified range of employment dates. Those who indicated any, even nominal, exposure would be encouraged to attend a mass screening and arrange for an appointment to have chest x-rays taken.

129.    These potential claimants then travel to a motel, union hall, parking lot, or some other equally unsuitable site for screening in an assembly-line process.  When a potential plaintiff attended an **RTS** screening, he/she first spoke with **FOSTER, TAYLOR** or other **RTS** testing manager, who determined whether the individual met the sponsoring law firm's criteria for the screening.

130.    The potential claimant then speaks with a "sign-in girl," lacking any medical training or qualifications, who obtained the work exposure history to be used in generating a diagnosis.  The claimant then entered **RTS'** mobile trailer and was administered a chest x-ray. Exhibit Q, photo of **RTS** screening trailer.  Claimants were also administered PFTs in the mobile units, which were administered by employees or temporary contract workers with little, if any, formal medical training.  Following testing, a doctor administered a cursory physical examination and rendered a diagnosis.

131.    Defendants would tailor this process to the wishes of their customers, the personal injury law firms or attorneys.  Defendants would arrange and conduct the screenings, including the components of screening services used, the exposure requirements and the disease to be diagnosed to falsely substantiate whichever disease the customer requested.

132.   Most customers arranged for full screenings, performed in a single day, including exposure, smoking and medical histories, physical examinations, chest x-rays, B reads, PFTs and diagnostic reports.

133.   RTS charged **FITZGERALD** and/or other customers approximately $775 per individual screened for a complete screening, including an x-ray, B read, PFT, physical exam and diagnosis if the result was positive but only $175 per individual screened if the result was negative. Exhibit R, July 23, 2002 letter regarding RTS agreement with **FITZGERALD**.

134.   RTS also paid the physicians it hired, including **DR. SEGARRA, DR. BALLARD, DR. LUCAS** and/or other Defendants and John Doe Defendant doctors more for positive diagnoses than negatives. Exhibit S, invoice for Ohio March 14-16, 2000 screenings.

**Exposure and Medical Histories**

135.   Individuals who took exposure/occupational or medical (including smoking) histories, whether hired by a law firm or hired by a screening company like RTS and/or others, had no medical training and were not instructed by any medical professionals as to how to take an appropriate history.

136.   Defendants acquiesced to screening criteria established by their customers, the personal injury law firms and attorneys that usually involved targeted questions seeking cursory information about targeted job sites and exposure dates, rather than relying on any medical professionals and medically accepted standards.  Judge Jack found the histories generated through mass litigation screenings did not even merit such a label:

> [i]n these cases, the "histories" are so deficient as to not even merit the label. Some doctors pretend that this was not true, pointing to the cursory "A-sheet" and treating it as an appropriate history – in essence, refusing to acknowledge that the emperor has no clothes.

Exhibit A at 46, 398 F.Supp.2d at 624.

41

137.   Unlike legitimate medical screenings, where the recording of an exposure history is considered crucial and taken by trained medical staff to prevent errors in the interpretation of x-rays, and subsequent diagnoses, the asbestos screening companies, including **RTS** and/or others, typically hire persons who lack any qualifications or training to gather this vital information.   In fact, **FOSTER** is of the opinion that a six-year old child is capable of asking exposure questions.

**Administering X-Rays**

138.   X-rays administered to prospective claimants were rarely ordered or prescribed by a physician as required in every state.   Moreover, **RTS** had no regulatory authorization for a "healing arts" screening.   Defendants used unlicensed technicians to administer x-rays on individuals who had not been seen by a physician prior to the administration of an x-ray:

> Moreover, no medical professional actually ordered the x-rays; Mr. Foster testified that he viewed the client as "requesting" the x-ray for him-- or herself. This is despite the fact that, according to Dr. Ballard (an RTS B-reader), in normal medical practice, a doctor orders an x-ray before it is performed on a patient.

Exhibit A at 28, 398 F.Supp.2d at 598-99 (cites omitted).

139.   Occasionally, physicians, including Defendants, **DR. SEGARRA**, **DR. BALLARD**, **DR. LUCAS** and/or others, would issue "blanket" x-ray orders, for use by plaintiffs' law firms and attorneys without regard or limitation as to scope, time, location, or number of individuals.   Upon information and belief, this practice is prohibited in every state.

140.   Moreover, there was rarely, if ever, any medical supervision of the x-ray process during asbestos (or silica) litigation screenings despite requirements that the physician on site be responsible for all "medical" procedures. Defendants, including **DR. SEGARRA**, **DR. BALLARD**, **DR. LUCAS** and/or others, knew that the x-rays administered by **RTS** and/or other

John Doe screening companies were not for medical purposes but solely to generate "medical" evidence for asbestos (or silica) litigation.

### X-Ray Interpretations

141.    Clinical studies and medical literature consistently demonstrate that, in an asbestos exposed population, at most 15% of individuals on average demonstrate lung scarring on radiographs at an ILO profusion level of 1/0 or greater. Based on approximately 25,000 B reads from various B readers for individuals that RTS did not produce until mid-2006, approximately 14,000 (or 56%) were reported as consistent with a positive diagnosis of an asbestos-related disease. Further, over 90% of the individuals diagnosed as positive for asbestosis received an ILO profusion of 1/0 or 1/1. Such an impossibly high positive rate with an abnormal concentration at the ILO profusion rating of 1/0 and 1/1 can only result from fraudulent B reads.

142.    DR. SEGARRA, DR. BALLARD, DR. LUCAS and other John Doe Defendant B readers, each intentionally or recklessly interpreted chest x-rays falsely and created fraudulent reports of false positive findings to support diagnoses of asbestos-related disease. Examples of the Defendants' fraudulent x-ray interpretation practices are further described below.

### PFTs

143.    PFTs are comprised of several tests that measure flow and volume of air in and out of the lungs (spirometry testing); lung volumes (Total Lung Capacity or "TLC"); and the transfer of oxygen into the blood (diffusion capacity or "DLco" testing). Defendants used the Segarra Enterprise to generate false PFTs at RTS and/or other John Doe Defendant screening companies that purported to evidence pulmonary impairment that could be attributed to asbestosis. Such evidence of impairment could dramatically increase the value of the cases

43

(some) nes twice the value or more) to the Segarra Enterprise's law firm and attorney customers. "Impaired cases" helped motivate asbestos litigation defendants, including Plaintiff and bankruptcy trusts, to settle cases rather than risk trial. Impairment consistent with asbestosis can establish that chest x-ray abnormalities are caused by such exposure rather than another non-compensable cause.

144.    Upon information and belief, the majority of **RTS'** income, something in excess of $20 million, came from administering PFTs. Additionally, law firms and attorneys have made and continue to make millions of dollars from claims supported by **RTS'** fabricated PFTs purporting to confirm asbestos-related disease and evidence of impairment.

145.    Approximately 80% of about 17,000 electronic PFT records **RTS** produced in mid-2006 were identified as "impaired" by **RTS**. Most (90%) of these PFTs were performed on individuals whom Defendants in the Segarra Enterprise classified with ILO profusions of 1/0 or 1/1. In contrast, clinical studies of asbestos-exposed populations at the ILO profusion levels of 1/0 and 1/1 consistently have found on average no impairment.

146.    **RTS'** extraordinary impairment rate is driven by the high rate of impairment on its PFTs for diffusion capacity testing called "DLco." DLco PFTs require that the alveolar sample should not be in the dead space. The dead space (washout area) is the part of the respiratory system where gas exchange or diffusion does not occur. Sampling gas from the dead space results in contaminated samples which lead to false underestimation of true carbon monoxide uptake, resulting in a lower DLco value and a falsely higher rate of impairment.

147.    Of the approximately 17,000 PFTs **RTS** produced in MDL875 in mid-2006, about 6,000 (35%) reported a DLco value. The reported best DLco on these 6,000 tests fell below 80% of the expected normal range for individuals of the same age, height, weight and ethnicity (the

predi_ d value) or were "impaired" in about 5,300 (85%) cases, an unsupportable impairment rate.

148. **RTS** PFT technicians generally had no formal training to conduct DLco PFTs. Moreover, most technicians were not licensed or certified to conduct PFTs. **RTS, FOSTER, TAYLOR, DR. SEGARRA** and/or other Defendants hired inexperienced PFT technicians so Defendants' means of manipulating PFTs would not be detected.

149. In addition, each of the PFT machines that Defendants used to generate false medical documentation was equipped to render clearly visible error codes and quality messages that were triggered during PFTs and flashed across the computer screens of these machines. The Defendants' PFT machines were also capable of printing DLco sample bar graphs. Defendants intentionally omitted error codes and/or failed to print or produce pages containing error codes and DLco sample bar graphs for thousands of PFTs that Defendants conducted and supervised which violated well-established PFT requirements, and further fraudulently concealed Defendants' manipulation of PFTs.

### Physical Examinations

150. During the screening process, **DR. SEGARRA** or another on-site physician performed an abbreviated physical examination, taking only a few minutes per claimant. During this sole meeting with the prospective claimant, the doctor rarely asked the client about his or her exposure or medical history relying solely upon the information gathered by screening staff as provided on an "A-sheet." Exhibit T, **RTS** A-sheet example. After the abbreviated physical examination and positive x-ray interpretation, **DR. SEGARRA** and/or other Defendants, issued a diagnostic report sent to the law firm or attorney customer along with the x-ray films and various reports.

45

**Diagnostic Reports**

151. **DR. SEGARRA, DR. BALLARD, DR. LUCAS** and/or other Defendants intentionally or recklessly disregarded well-accepted diagnostic criteria for asbestos-related disease to generate false diagnostic reports for the Segarra Enterprise to supply to its law firm and attorney customers, and for monetary gain for themselves and the Segarra Enterprise.

152. Defendants' diagnoses generated for the Segarra Enterprise rested predominantly upon a positive B read. The exposure and medical histories were devoid of meaningful information, PFTs were manipulated to generate false evidence of impairment, and the physical examinations were perfunctory at best. Exhibit U, contains a typical diagnostic reports generated by Defendants.

153. In Defendants' mass screenings and/or mass B readings for the Segarra Enterprise, B readers, including **DR. SEGARRA, DR. BALLARD, DR. LUCAS** and/or other Defendants, had prior knowledge of the specific disease (asbestos-related disease or silicosis) for which the law firm customer wanted to file claims. Defendants were directed and instructed and agreed to "find" abnormalities on x-rays, as dictated to **RTS, FOSTER, TAYLOR, DR. SEGARRA, DR. BALLARD, DR. LUCAS** and/or others by the law firm customers. Exhibits F, G, H, I and J above.

**Attorney Referral and Payment For Screenings**

154. Following a positive diagnosis, if the individual was not already represented by counsel, **FOSTER, TAYLOR** and/or other Defendants advised the individual that he/she could choose any lawyer for representation in a potential claim, but specified that if the individual chose the designated sponsoring attorney or firm, the individual would not have to pay for the

screening. Attorneys or paralegals with the law firm paying for the screening were generally on site at the screening or at a nearby offsite location waiting to meet the individuals screened.

155.    RTS' agreement with **FITZGERALD** specifically required **FITZGERALD** to have "[p]ersonnel at test site to sign in clients and answer legal questions." Exhibit M, above, Contract for Testing, April 24, 2000.

156.    As a practical matter, the cost for a screening was prohibitive to the majority of individuals screened, resulting in nothing more than a façade that gave the false appearance of choice to agree to pursue a legal claim or lawsuit. Based on records **RTS** produced in mid-2006, upon information and belief, **RTS** did not bill any individuals for its services but only law firms or attorneys.

### Use of False Medical Evidence To Obtain Settlements

157.    Defendants, through the Segarra Enterprise, submitted or caused and could reasonably foresee the submission of the False Medical Reports and Diagnoses they generated for their personal injury law firm and attorney customers as support for thousands of asbestos-related personal injury claims against, and settlements from, Plaintiff and others to induce settlements from them.

158.    When law firms, including John Doe Defendants, specialize in representing individuals asserting personal injury claims based on exposure to asbestos, this practice of inundating the judicial system and Plaintiff, NSI, and others with claims for the purpose of extracting mass nuisance-value settlements worked effectively as NSI entered into settlement agreements as provided in Exhibit V, NSI list of settled claims, with identified plaintiffs' firms, dates and amounts paid detailed therein.

47

159.    In each of the cases identified on Exhibit V, Plaintiff paid a monetary settlement and/or attorney fees and other costs to defend and settle the cases, based in whole or in part upon the Defendants' False Medical Reports and Diagnoses submitted to Plaintiff or Plaintiff's agents pursuant to a settlement agreement entered into on the claimant's behalf by a personal injury law firm or individual attorney.  In these thousands of cases, Plaintiff paid settlements ranging from $50.00 up to $150,000.

160.    Once each law firm's or attorney's settlement submission, including False Medical Reports and Diagnoses, was accepted under the applicable settlement agreement, Plaintiff issued payment to the personal injury law firm or individual attorney.  These payments generated lucrative contingent fees for the law firms and attorneys.

### Examples of False X-Ray Reports and Exposure Histories

161.    Defendants' fraudulent x-ray interpretation practices included not only over reading of x-rays as positive of for evidence of asbestos (or silica) related abnormalities, but also a scheme of having B readers read the same film several years apart or a series of x-ray films over the course of time, a phenomenon now known as "re-treading."  See also, Exhibit A, MDL 553 Ruling.  First, a B reader would "find" irregular opacities and/or pleural plaques or thickening, consistent with asbestos-related disease.  Defendants then used this finding and generated a "diagnosis" of asbestosis or other nonmalignant asbestos-related disease with supporting False Medical Reports and Diagnoses.  Several years later, the same B reader would read the same x-ray film only having been told to find silicosis and would "find" rounded opacities and no plaques, consistent with silicosis.  Defendants then generated a "diagnosis" of silicosis with supporting False Medical Reports and Diagnoses.  Upon information and belief,

the predicate acts alleged in Exhibit V were the result of the same or similar "re-treading" scheme.

162.    An example of this scheme would be the claim of plaintiff Willie Jones. **DR. SEGARRA** diagnosed Mr. Jones with both asbestosis and silicosis or "mixed dust" (silicosis and asbestosis). Most telling is the manner in which **DR. SEGARRA's** B reads and subsequent diagnoses correspond with the disease the attorney paying **DR. SEGARRA** directed him to diagnose. Mr. Jones was x-rayed on at least four different occasions: March 14, 2002, September 9, 2002, February 27, 2003 and June 27, 2003. On the March 14, 2002 and February 27, 2003 x-rays, **DR. SEGARRA** reported only rounded opacities (P/Q) in the upper and middle zones and diagnosed Mr. Jones with only silicosis. **DR. SEGARRA** even stated there was "no radiographic evidence for pulmonary asbestosis" in his diagnostic report dated February 27, 2003. The attorney code used by **DR. SEGARRA** for these two reports indicates he was hired by the McCurdy & McCurdy law firm. Exhibit W, Willie Jones April 9, 2002 report regarding March 14, 2002 x-ray. Exhibit X, Willie Jones February 27, 2003 reports.

163.    On the x-ray dated September 9, 2002 (taken between the 3/14/02 and 2/27/03 x-rays) and the June 27, 2003 x-ray, **DR. SEGARRA** reported Mr. Jones had "mixed" (rounded and irregular) opacities (P/S) in all lung zones and diagnosed him with "mixed-dust" pneumocconiosis (silicosis and asbestosis). The attorney code on the September 9, 2002 reports was for attorney Jason Cansler of Brent Coon & Associates. The attorney code on the June 27, 2003 reports was for Heygood, Orr & Reyes. Mr. Jones then filed silicosis claims in *Conaway v. Aearo Co.*, No. 022928C, Smith County, Texas, filed by Brent Coon & Associates and in *Cleveland v. Air Liquide Amer. Corp.*, No. CC-03-18132-E, Dallas County Texas, filed by Heygood, Orr & Reyes. Mr. Jones also filed an asbestosis claim in *Moya v. AMF Inc.*, No. 03-

2543, Dallas County, Texas, filed by Brent Coon & Associates. Exhibit Y, Willie Jones October 25, 2002 reports regarding September 9, 2002 x-ray. Exhibit Z, Willie Jones June 27, 2003 reports. Exhibit AA, comparison chart of Willie Jones reports.

164.    An additional example of the "re-treading" of claimants is John Netter. On November 9, 2004, **DR. SEGARRA** interpreted x-rays of John Netter taken November 9, 2004 and reported that Mr. Netter had rounded opacities of size and shape P/Q in all lung zones with an ILO profusion of 1/0 and diagnosed him with pulmonary silicosis (mild chronic simple silicosis). The attorney code on the November 9, 2004 reports was for Brent Coon & Associates for screening performed in Laurel, Mississippi with Holland Bieber. Exhibit BB, John Netter silicosis records.

165.    On May 12, 2005, **DR. SEGARRA** interpreted x-rays for John Netter taken May 12, 2005 and reported that Mr. Netter had irregular, linear opacities of size and shape T/S in the lower lung zones with an ILO profusion of 1/0. **DR. SEGARRA** further stated in his report that there were "no rounded opacities in the upper lung zones and nothing to suggest the presence of silicosis." **DR. SEGARRA** diagnosed Mr. Netter with mild pulmonary asbestosis. The attorney code on the May 12, 2005 reports was for Brent Coon & Associates for screening performed in Jackson, Mississippi with Holland Bieber. Exhibit CC, John Netter asbestosis records.

166.    On or about November 26, 2000, **DR. BALLARD** performed a B read of x-rays for Mr. Lanier James taken May 3, 2000 and reported the x-rays showed irregular opacities, shape and size S/T in the mid and lower lung zones with an ILO profusion of 1/0 and bilateral *en face* pleural plaques, extent 2 and pleural thickening in the minor fissure. **DR. BALLARD**

stated Mr. James' x-rays were consistent with asbestosis. Exhibit DD, Lanier James asbestosis reports.

167.    On or about October 5, 2004, Plaintiff paid a settlement on Mr. James' claim in the amount of $237.

168.    On or about June 6, 2002, **DR. BALLARD** performed a B read of x-rays for Mr. Lanier James taken April 27, 2002 and reported the x-rays showed irregular and rounded opacities, shape and size S/P in all lung zones with an ILO profusion of 1/1 and no pleural plaques, but pleural thickening in the minor fissure. **DR. BALLARD** stated that Mr. James' x-rays were consistent with asbestosis/mixed-dust disease. **DR. BALLARD's** report states "Representing Silicosis Only!" on the face of the report. Exhibit EE, Lanier James asbestosis/mixed-dust reports.

169.    Lanier James' reports from 2002 with asbestosis/mixed-dust findings were produced in MDL1553 by attorney, Scott Hooper, in 2005. Plaintiff was not a party to and did not have access to Mr. James' 2002 reports until thereafter.

170.    Another example of this "re-treading" diagnosis scheme is Ms. Angelean Ball. On or about February 14, 2000, **DR. BALLARD** performed a B read of Ms. Ball's x-ray dated October 15, 1999 and reported the x-rays showed small irregular primary and secondary opacities, shape and size "S" and "T" respectively, with an ILO profusion of 1/0. **DR. BALLARD** also reported the x-ray demonstrated bilateral *en face* pleural plaques, extent 3. **DR. BALLARD** diagnosed Ms. Ball with only asbestosis. Exhibit FF, Angelean Ball asbestosis reports.

171.    On or about June 7, 2004, **DR. BALLARD** performed a B read on the same October 15, 1999 x-ray of Ms. Ball but reported the x-ray showed small rounded primary and

51

secondary opacities, shape and size "P" and "Q" respectively, with an ILO profusion of 1/0. Furthermore, **DR. BALLARD** stated in his diagnostic report that there "are no pleural plaques, pleural thickenings or pleural calcifications." **DR. BALLARD** diagnosed Ms. Ball with only silicosis. Exhibit GG, Angelean Ball silicosis reports.

172.    **DR. LUCAS** also participated in this "re-treading" scheme of inconsistent B reads as demonstrated in his Willie Kuhn reports. On or about July 5, 2000, **DR. LUCAS** performed a B read on a chest x-ray for Mr. Kuhn taken June 14, 2000 and reported irregular primary and secondary small opacities, size "S" and "T" respectively, with an ILO profusion of 1/0 and bilateral pleural plaques in profile, extent A1. **DR. LUCAS** concluded Mr. Kuhn's x-rays were consistent with asbestosis. Exhibit HH, Willie Kuhn asbestosis reports.

173.    On or about January 17, 2002, **DR. LUCAS** performed a B read on a chest x-rays for Willie Kuhn taken November 12, 2001 and reported irregular primary opacities, size "T," and rounded opacities, size "P" with an ILO profusion of 1/1 and bilateral pleural plaques in profile, extent A1. **DR. LUCAS** concluded that Mr. Kuhn's x-rays were consistent with mixed pneumoconiosis including silicosis and asbestosis. Exhibit II, Willie Kuhn mixed dust/silicosis reports.

174.    Also, on or about July 22, 1999, **DR. LUCAS** performed a B read on x-rays for Percy Barnes without a date taken identified. **DR. LUCAS** reported Mr. Barnes' x-rays showed irregular opacities, shape and size T/T in the mid and lower lung zones with an ILO profusion of 1/0. **DR. LUCAS** found Mr. Barnes' x-rays were consistent with asbestosis. Exhibit JJ, Percy Barnes asbestosis reports.

175.    On or about May 15, 2000, **DR. LUCAS** performed a B read on x-rays for Percy Barnes taken April 20, 2000. **DR. LUCAS** reported the x-rays showed rounded opacities,

shape and size Q/P in the upper and mid lung zones with an ILO profusion of 1/0. **DR. LUCAS** stated that Mr. Barnes' x-rays were consistent with silicosis. Exhibit KK, Percy Barnes silicosis reports.

176.    Upon information and belief, the predicate acts alleged herein include claims that were generated through this and similar schemes. Plaintiff settled and paid false claims in excess of $80 million in reliance on False Medical Reports and Diagnoses generated by Defendants using this and other schemes.

177.    Defendants withheld from Plaintiff in the asbestos litigation information of the silicosis diagnoses in hundreds or thousands of cases of alleged asbestosis with the intent to conceal the fraudulent scheme and further the purpose of the Segarra Enterprise.

178.    Additionally, Defendants generated false and inadequate exposure histories. **DR. SEGARRA, DR. BALLARD, DR. LUCAS** and/or other diagnosing physicians knowingly or recklessly relied on false, inadequate and/or inaccurate exposure histories generated by law firms and attorneys, and/or **RTS, WDDS** or other screening companies and their medically untrained personnel.

**C.    Defendants' Concealment of Their Fraudulent Conduct**

179.    Discovery of the fraud committed by the members of the Segarra Enterprise required the acquisition and then analysis of the records and screening practices of Defendants. **RTS** produced records in its possession, pursuant to subpoena and federal court order in approximately mid-2006 in the federal asbestos MDL875 litigation. Most other Defendants have produced little documentation, claiming either intentional or accidental destruction or non-retention of records, and still other Defendants, like **DR. SEGARRA, DR. BALLARD** and **DR. LUCAS** continue to refuse to produce documents in their possession. **DR. BALLARD** refuses

to produce records invoking his Fifth Amendment rights against self-incrimination. Exhibit K, above.

180.    The gross discrepancies between Defendants' positive x-ray and diagnostic rates, exposure history results, and pulmonary impairment rates, as compared to epidemiological and clinical studies of asbestos exposed populations, cannot be uncovered until production to asbestos litigation defendants, including NSI, of a large volume of records, primarily electronic PFT records, financial records and complete claimant files. Generally, the screening companies and physicians in asbestos litigation intentionally or recklessly do not retain copies of B reads, diagnostic reports and other screening records to avoid disclosure of information about their litigation screening activity and methods.

181.    RTS produced its records, which were still incomplete, in the federal asbestos MDL 875 litigation in mid-2006. Prior to this production, the defendants in the asbestos, including Plaintiff, had no reasonable means or opportunity for access to the necessary volume of records to expose Defendants' pattern and practice of generating False Medical Reports and Diagnoses. Defendants concealed their fraudulent activities by avoiding disclosure of records of screening activities, including medical, financial and business records and through affirmative actions, omissions and statements, including the following:

182.    Defendants positioned themselves to make production of many of the individual screening subjects' files impossible by delivering their entire screening files on individuals diagnosed with disease to the law firms and individual attorneys that hired them and/or other physicians, including Defendants. By delivering such files to law firm customers and associated physicians, and failing to maintain copies, in particular the files of screened subjects with "negative" x-ray B reads (ILO profusion 0/0 and 0/1), no diagnosis of asbestos

related disease, or non-asbestos related B reads, records and diagnostic reports, Defendants intentionally concealed the records and information from which their phenomenal false "positive" B read and diagnosing rates could be determined.

183.    Defendants also disposed of and/or intentionally failed to maintain copies of, their billing and payment records and other accounts receivable and payable records, to prevent Plaintiff and other asbestos tort defendants from discovering such records in the lawsuits filed based on False Medical Reports and Diagnoses Defendants generated through the Segarra Enterprise.

184.    Many attempts have been made in the asbestos and silica litigation to discover the fraudulent conduct of Defendants through depositions and production of documents pursuant to subpoena.  For example, **DR. SEGARRA** is under subpoena in MDL875 and has filed a motion to quash and is still refusing to produce his records.  **DR. SEGARRA** was required to produce documents to the United States Congress for its inquiry into silicosis litigation in mid-2006, but instead produced only a summary of data based on his own internal "audit" of records and refused to produce the actual records supporting his "audit."  In a Mississippi state silica litigation, *Daniel Fairley, Jr. v. Pulmosan Safety Equipment Co., et al*, No. CI-2004-00 I-S1 (Jackson Co., Miss. Cir. Ct.), **DR. SEGARRA** was subpoenaed to produce records and only produced partial records, and only after several attempts to quash the subpoena and appeal the Special Master's rulings recommending **DR. SEGARRA** be ordered to produce.

185.    In the federal asbestos MDL875, **DR. SEGARRA** filed a sworn affidavit stating that Holland Bieber does not perform screenings but is involved "exclusively" in re-evaluations.  Contrary to **DR. SEGARRA's** sworn assertions, records that Holland Bieber produced in MDL875 in late-2007 indicate that **DR. SEGARRA** was in fact the "previous"

screener or B reader for those individuals that Holland Bieber "re-evaluated" with diagnoses by **DR. SEGARRA.**

186.    **DR. SEGARRA** performed this "two-step" type screening to further conceal the fraud committed against NSI. **DR. SEGARRA** first performed a B read of x-ray films sent to him. Later, those individuals whose x-rays **DR. SEGARRA** reported positive for x-ray changes consistent with asbestosis, were sent to Holland Bieber for a full screening, including new x-rays, a physical examination, a PFT, and a diagnosis from **DR. SEGARRA.**

187.    Moreover, **DR. SEGARRA** intentionally omitted his association and work for PFL in his sworn affidavit submitted to the federal court in MDL875 to conceal from the Court and others his association with the discredited screening operation. **DR. SEGARRA** stated under oath that while at **RTS**, he "examined patients, took histories, interpreted x-rays and read pulmonary function studies." This statement directly contradicts earlier testimony by **DR. SEGARRA** that RTS and PFL personnel and **FOSTER's** testimony that **RTS** personnel took histories and that **DR. SEGARRA** only "assumed" the population had been pre-screened for exposure.

188.    **FOSTER** concealed the Defendants' fraudulent scheme by refusing to produce records other than specific plaintiffs at issue until ordered to do so by the federal asbestos MDL875 judge in mid-2006. **FOSTER** now refuses to answer questions about RTS' screening operations asserting his rights under the Fifth Amendment to the U.S. Constitution against self-incrimination. **FOSTER** did so in hearings before the United States House of Representatives Committee on Energy and Commerce on or about March 8, 2006, again in a civil litigation deposition in Indiana silicosis cases on or about August 28, 2006, in a civil litigation deposition

56

in the WR Grace bankruptcy proceedings on or about October 27, 2006 and again in Louisiana civil litigation for asbestos cases on or about October 24, 2007.

189.    **DR. SEGARRA** also stated under oath in his affidavit to the court in MDL875 that he only worked with N&M, Inc. to "re-evaluate" patients. However, nowhere in **DR. SEGARRA's** diagnostic reports associated with those screenings does **DR. SEGARRA** mention any prior evaluation or screening or diagnosis. Upon information and belief, there were no prior evaluations.

190.    **DR. BALLARD** likewise concealed Defendants' fraudulent scheme by refusing to answer questions about his screening activities and asserting his right under the Fifth Amendment to the U.S. Constitution against self-incrimination. **DR. BALLARD** did so in hearings before the United States House of Representatives Committee on Energy and Commerce on or about March 8, 2006, again in a deposition in the WR Grace bankruptcy estimation proceedings on or about December 15, 2005 and again in deposition in an Arkansas state asbestos litigation case on or about March 3, 2007.

191.    **DR. BALLARD** also abided by his law firm and attorney customers to "read no more than twenty [x-ray films] per day" to avoid detection of the high volume of B reads he performed. Exhibit LL, February 4, 2000 Letter from Ness, Motley, Loadholt, Richardson & Poole.

192.    **DR. SEGARRA, DR. LUCAS, FOSTER,** and/or other Defendants also gave false, vague and misleading testimony with the intent to conceal Defendants' fraudulent scheme. **DR. SEGARRA** falsely testified that he spends between sixty and ninety minutes diagnosing individuals; that he personally takes occupational and medical histories for individuals he screens; that he almost never relies on another B reader's interpretation of x-ray films, and that he

does not issue blanket x-ray orders. Furthermore, **DR. SEGARRA** testified in 2006 that the words "diagnosis" and "impression" in his reports are synonymous. Later during that same deposition, however, **DR. SEGARRA** testified that a diagnosis captioned as an "impression" is not really a "diagnosis." Additionally, the misleading nature of **DR. SEGARRA's** reports is revealed by his subtle terminology distinctions in his reports as he attempted to explain to attorney Alwyn Luckey that the phrase "interstitial changes consistent with mild pulmonary asbestosis in a subject *with* an appropriate environmental exposure history and an adequate latent period" is a diagnosis to a reasonable degree of medical probability versus the phrase " interstitial changes consistent with pulmonary asbestosis, *assuming* an appropriate environmental history and an adequate latent period" which is a conditional radiographic diagnosis. Exhibit MM, August 5, 2003 letter from **DR. SEGARRA** to Law Offices of Alwyn H. Luckey (italics added).

193.    Defendants concealed conflicting diagnoses in numerous cases by withholding reports, diagnoses and B reads for inconsistent conflicting diagnoses and instead submitted only the B reads and diagnoses which Defendants wanted Plaintiff to know about with the intent that Plaintiff would rely on the omission of conflicting reports and settle claims against it.

194.    The PFT equipment Defendants use has the capability to print "error codes" that inform operators and persons relying on the test reports whether the tests have been performed consistent with accepted quality standards, and DLco sample bar graphs that show whether sampling in the "dead space" occurred. Defendants deliberately printed, or caused to be printed, PFT reports without error codes and/or DLco sample bar graphs to prevent assessment of the extent of compliance or noncompliance with testing standards and prevent detection of manipulated tests.

195.    Defendants' further took advantage of the sheer volume of claims generated and filed, intentionally overwhelming the court system and asbestos defendants, including Plaintiff, to prevent discovery of Defendants' fraudulent practices. In the MDL1553 Ruling, Judge Jack described the impact of the volume of claims filed:

> The Court finds that filing and then persisting in the prosecution of silicosis claims while recklessly disregarding the fact that there is no reliable basis for believing that every Plaintiff has silicosis constitutes an unreasonable multiplication of the proceedings. When factoring in the obvious motivation--overwhelming the system to prevent examination of each individual claim and to extract mass settlements--the behavior becomes vexatious as well.

Exhibit A at 82, 398 F.Supp.2d at 676.

196.    Plaintiff has also been prevented from discovering the fraudulent practices of Defendants because of discovery limitations in case management orders applicable to mass consolidations of asbestos cases, and/or high volume dockets limiting discovery to small groups of cases, such that Plaintiff was unable, prior to the RTS production that occurred in mid-2006 in the asbestos MDL 875 and after and to which Plaintiff later obtained access, to obtain and analyze tens of thousands of records, still incomplete, generated by Defendants through the Segarra Enterprise which revealed the fraudulent practices described in this Complaint. Defendants intentionally concealed their fraudulent scheme by taking advantage of the limitations on discovery available to defendants in the asbestos and silica tort system.

197.    Defendants also intentionally took advantage of the ability of their law firm and attorney customers in the asbestos (and silica) litigation to leverage, for purposes of settlement, large numbers of screened non-malignancy cases set in trial groups with malignancy cases, whereby the risk and expense of proceeding to trial in malignancy cases compelled tort defendants to settle nonmalignancy cases supported by False Medical Reports and Diagnoses

59

when confronted with the personal injury attorneys' refusal to settle malignancy cases unless the nonmalignancy cases were settled as well.

198.    Due to the nature of the Defendants' fraud and misrepresentations, and the Defendants' concealment of their fraud and misrepresentations, Plaintiff did not discover the fraud and misrepresentations, and could not have reasonably been expected to do so, until at earliest after mid-2006. Plaintiff still does not know the full extent of Defendants' fraud and misrepresentations as Defendants continue to thwart efforts to discover the truth.

### D.    Injury to Plaintiff

199.    Defendants fraudulently recruited individuals to be screened and generated False Medical Reports and Diagnoses in the form of false and misleading records and reports, including medical and smoking histories, exposure and occupational histories, x-ray reports including B read reports, PFT reports and diagnostic reports. Defendants knew, intended or could reasonably foresee that the False Medical Reports and Diagnoses would be used as evidence by their law firm and attorney customers to support the filing and settlement of asbestos-related personal injury claims against Plaintiff and others through the Segarra Enterprise.

200.    Defendants' fraudulent scheme was designed to enrich Defendants and caused substantial injury to Plaintiff's business and property in excess of $80 million. The injuries that were proximately caused by Defendants' scheme include, but are not limited to:

a.    Payments by Plaintiff of millions of dollars to settle false claims based on the False Medical Reports and Diagnoses generated by the Defendants for its law firm and attorney customers, and the costs incurred in administering the settlements;

b.    Costs incurred of millions of dollars in the defense of the claims brought again Plaintiff based on the False Medical Reports and Diagnoses generated by the Defendants.

**COUNT ONE**
**VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1962 (c)**

201.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 200 of this Complaint as though fully set forth here.

202.    At all times relevant to this Complaint, Defendants, including John Doe Defendants, each satisfied the definition of a "person" as set forth in Title 18, United States Code, Sections 1961(3) and 1962(c).

203.    At all times relevant to this Complaint, Defendants, including John Doe Defendants, collectively constituted an "enterprise" (the Segarra Enterprise) within the meaning of that term as used in Title 18, United States Code, Sections 1961(4) and 1962(c).

204.    Each Defendant, including John Doe Defendants, participated, directly and/or indirectly, in the unlawful affairs of the Segarra Enterprise, which was engaged in and the activities of which affected interstate commerce, through a pattern of racketeering activity consisting of the acts of racketeering alleged below in Paragraph 205, in violation of Title 18, United States Code, Section 1962(c).

205.    In furtherance of the scheme to defraud as described herein, Defendants, including John Doe Defendants, engaged in a "pattern of racketeering activity" within the meaning of that phrase as used in Title 18, United States Code, Sections 1961(5) and 1962(c). Specifically, Defendants, including John Doe Defendants, committed the following acts of mail fraud and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343, to further the purpose of the Segarra Enterprise and for personal monetary gain, each of which constitutes a separate racketeering predicate act:

61

a.    In furtherance of the Segarra Enterprise, Defendants, including the John Doe Defendants, devised and executed a scheme and system of artifice to defraud, and obtain money and property by means of false and fraudulent pretenses, representations and promises, by intentionally generating False Medical Reports and Diagnoses to: (i) support false personal injury claims against Plaintiff; and (ii) induce settlements of such false claims on favorable monetary terms.

b.    The purpose of the Segarra Enterprise's scheme was to defraud Plaintiff of millions of dollars in personal injury settlements by generating bogus medical test results, false medical reports and false diagnoses for use in support of bogus asbestos-related claims against Plaintiff.

c.    The manner and means by which Defendants, including John Doe Defendants, accomplished and attempted to accomplish the Segarra Enterprise's scheme was by generating and enhancing the settlement value of bogus asbestos-related claims against Plaintiff through the production of Defendants' False Medical Reports and Diagnoses. These fraudulent records and reports, as detailed as to time and claimant in Exhibit V, were submitted through the U.S. mails, private couriers, and/or interstate wire transmissions with the intent that Plaintiff would accept them as legitimate medical evidence of asbestos-related disease caused by Plaintiff.

d.    Pursuant to and in furtherance of the scheme to defraud, Defendants, including John Doe Defendants, generated, and caused to be submitted to Plaintiff or Plaintiff's agent(s), False Medical Reports and Diagnoses as previously described, containing false medical information. Among the records and reports containing false information are the records and reports generated by **DR. SEGARRA, RTS, FOSTER,**

**TAYLOR, FITZGERALD, DR. BALLARD, DR. LUCAS** and/or other Defendants in thousands of cases, including the cases by and settled with the individuals listed on the attached Exhibit V. Exhibit V contains some, but not all, of the bogus asbestos cases Plaintiff settled that have caused injury to Plaintiff in one or more of the ways described in Paragraph 200 of this Complaint. The records and reports in each of these cases contain one or more separate false statements in furtherance of Defendants' scheme.

      e. Defendants, including John Doe Defendants, made or caused and could reasonably foresee the frequent use of the United States mails, private couriers and interstate wire services as part of the ordinary course of their conduct in furtherance of the Segarra Enterprise's fraudulent scheme. Specifically, Defendants, including John Doe Defendants, used or caused and could reasonably foresee the use of the U.S. mails, private couriers and interstate wire services for:

      i. mailing and/or interstate wire delivery of marketing and solicitation material to law firms and individual attorneys;

      ii. mailing and/or interstate wire services solicitation information to individuals to recruit potential claimants;

      iii. use of television and radio wire transmissions to recruit potential claimants;

      iv. mailing and/or courier and interstate wire delivery of correspondence, A-sheets, chest x-rays, B read reports, PFTs and diagnostic reports among the Defendants in the Segarra Enterprise and to their law firm and attorney customers;

v.   mailing and/or courier delivery of chest x-rays for review by B readers;

vi.   mailing and/or interstate wire delivery of bills and invoices for services rendered;

vii.   mailing and/or interstate wire delivery of payments from Defendants to their employees, agents and independent contract workers;

viii.   mailing and/or interstate wire delivery of payments by law firms to Defendants for services rendered;

ix.   mailing and/or courier or interstate wire delivery of False Medical Reports and Diagnoses sent to Plaintiff or Plaintiff's agents by personal injury law firms or individual attorneys; and

x.   mailing and/or courier or interstate wire delivery of settlement payments by and on behalf of Plaintiff to personal injury law firms and attorneys.

206.   Defendants' normal business practices included mailing, and/or interstate wire services of marketing and advertising material and information, records and reports, billing, and payments relating to the individuals set forth on Exhibit V hereto in at least one of the foregoing manners set forth in the preceding paragraph. Each of use of the mails and interstate wire services constitutes a separate violation of the mail and/or wire fraud statutes pursuant to Title 18, United States Code, Section 1341 and/or 1343.

207.   Plaintiff, NSI, entered into agreements to settle numerous claims based on False Medical Reports and Diagnoses, which agreements were entered into upon reasonable reliance on representations made by the law firm and attorney customers of Segarra Enterprise that the

claims were legitimate for which the settlements are detailed in Exhibit V with respect to date of settlement, law firm, and settlement amount.

208.   Plaintiff was injured in its business and property by reason of Defendants' violation of Title 18, United States Code, Sections 1962(c) and (d).

## COUNT TWO
## CONSPIRACY TO VIOLATE
## TITLE 18, UNITED STATES CODE, SECTION 1962 (c)

209.   Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 208 of this Complaint as though fully set forth here.

210.   Defendants, including John Doe Defendants, each of whom was associated with or employed by the Segarra Enterprise, unlawfully and willfully combined, conspired and agreed with each other, and unknown others, to violate Title 18, United States Code, Section 1962(c), by conducting, directing, and/or participating in, directly or indirectly, the affairs of the Segarra Enterprise, which was engaged in and the activities of which, affected interstate commerce, through a pattern of racketeering activity, by committing at least two predicate acts as described above, all in violation of Title 18, United States Code, Section 1962(d).

211.   It was part of the conspiracy that Defendants, including John Doe Defendants, agreed to commit two or more fraudulent and illegal racketeering acts, namely, acts of mail fraud and wire fraud, in violation of Title 18, United States Code, Section 1341 and 1343, and conducted and agreed to conduct the affairs of the Segarra Enterprise through a pattern of racketeering activity, in furtherance of and for the purpose of making money from repeated illegal activity, all in violation of Title 18, United States Code, Section 1962(d).

212.   Plaintiff, NSI, entered into agreements to settle numerous claims based on False Medical Reports and Diagnoses, which agreements were entered into upon reasonable reliance

on representations made by the law firm and attorney customers of Segarra Enterprise that the claims were legitimate for which the settlements are detailed in Exhibit V with respect to date of settlement, law firm, and settlement amount.

213.   Plaintiff was injured in its business and property by reason of Defendants' violations of Title 18, United States Code, Section 1962(d).

## COUNT THREE
## COMMON LAW FRAUD

214.   Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 213 of this Complaint as though fully set forth here.

215.   As described above, Defendants, including John Doe Defendants made false and fraudulent representations of fact, namely false and misleading records and reports, including medical and smoking histories, exposure and occupational histories, x-ray reports including B read reports, PFT reports and diagnostic reports, which were generated through fraudulent practices and procedures.

216.   At the time Defendants made such false and fraudulent representations, Defendants were aware of the falsity of the representations.

217.   Defendants made the misrepresentations with the intent to deceive both the individuals who were the subjects of the false records and reports, as well as companies such as Plaintiff.

218.   Plaintiff, NSI, entered into agreements to settle numerous claims based on False Medical Reports and Diagnoses, which agreements were entered into upon reasonable reliance on representations made by the law firm and attorney customers of Segarra Enterprise that the claims were legitimate for which the settlements are detailed in Exhibit V with respect to date of settlement, law firm, and settlement amount.

66

219.    The individuals who were the subject of the false records and reports relied upon the results of the records and reports in pursuing personal injury claims against Plaintiff, and Plaintiff relied, and had a right to rely, on these records and reports in connection with asbestos litigation of such claims, resulting in injury to Plaintiff, insofar as Plaintiff defended and settled these bogus asbestos-related claims, proximately caused by Defendants' fraud.

220.    In fact, asbestos personal injury attorneys, representing of thousands of claimants, either knowingly, recklessly or without knowledge of the falsity of the test results, medical reports and false diagnoses generated by Defendants, but relying on same, asserted bogus claims against Plaintiff and others alleging liability for asbestos-related personal injuries.

221.    Plaintiff reasonably relied upon what were then thought to be legitimate test results, medical reports and diagnoses provided to it by licensed attorneys in support of personal injury claims and purportedly authored by licensed medical doctors and other medical personnel or individuals supervised by medically trained and licensed personnel.

222.    In reliance on the representations of claimants and the claims asserted for asbestos-related personal injuries against Plaintiff supported by the False Medical Reports and Diagnoses, Plaintiff entered into settlement agreements with various claimants and the asbestos personal injury attorneys who represented them for payment of bogus personal injury claims.

223.    Defendants' conduct was wanton, reckless, oppressive, and constituted a willful disregard of Plaintiff's rights.

## COUNT FOUR
## NEGLIGENT MISREPRESENTATION

224.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 223 of this Complaint as though fully set forth here.

67

225. As described above, Defendants, including John Doe Defendants, have made false representations of material fact, namely false and misleading records and reports, including medical and smoking histories, exposure and occupational histories, x-ray reports including B read reports, PFT reports and diagnostic reports, as a result of practices and procedures that violated applicable and well-established standards governing the evaluation and diagnosis of asbestos-related disease. Defendants made such false representations and generated False Medical Reports and Diagnoses because of their failure to exercise due care in the course of rendering professional services, including intentional or reckless disregard of well-established standards and requirements for the diagnosis of asbestos-related disease, the interpretation of x-rays, and the administration of PFTs.

226. Defendants knew and intended that these false records and reports would be provided to asbestos litigation defendants like Plaintiff as well as to the individuals who were the subjects of the records and reports. As such, Defendants undertook and were under a duty to provide true and accurate medical information, including medical and smoking histories, exposure and occupational histories, x-ray reports including B read reports, PFT reports and diagnostic reports, to Plaintiff and to the individuals who were the subjects of these records and reports.

227. Defendants knew and intended that Plaintiff and other asbestos litigation defendants would rely and act on the False Medical Reports and Diagnoses. Defendants also knew and intended that the individuals who were the subjects of the False Medical Reports and Diagnoses would rely and act on those False Medical Reports and Diagnoses.

228. Plaintiff and other asbestos (and silica) litigation defendants, as well as the individual subjects of the False Medical Reports and Diagnoses, reasonably relied on these False

Medical Reports and Diagnoses in connection with asbestos (and silica) litigation of these claims. Plaintiff's reasonable reliance on the False Medical Reports and Diagnoses directly resulted in injury to Plaintiff in the defense and settlement of asbestos-related claims which was proximately caused by Defendants' misrepresentations. The individuals who were the subjects of the False Medical Reports and Diagnoses relied upon the records and reports in pursuing asbestos-related claims against Plaintiff, resulting in injury to Plaintiff which was proximately caused by Defendants' misrepresentations.

## COUNT FIVE
## AIDING AND ABETTING FRAUD

229.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 228 of this Complaint as though fully set forth here.

230.    Each of the Defendants, including John Doe Defendants, knew that the other Defendants' and John Doe Defendants' conduct was in violation of duties owed to Plaintiff and others not to commit fraud and misrepresentation in the generation of False Medical Reports and Diagnoses and gave substantial assistance and encouragement to such other Defendants and John Doe Defendants in their acts.

231.    The aiding and abetting of fraud and misrepresentation by the individual Defendants proximately caused injury to Plaintiff in the defense and settlement of asbestos-related claims.

232.    Defendants' conduct was wanton, reckless, oppressive, and constituted a willful disregard of Plaintiff's rights.

69

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, National Service Industries, Inc. respectfully requests a jury

trial and respectfully requests the following relief against all Defendants, jointly, severally, and

collectively as follows:

a.  An award to Plaintiff, National Service Industries, Inc., of its actual damages,

including prejudgment interest, trebled pursuant to Title 18, United States Code,

Section 1964(c);

b.  An award to Plaintiff, National Service Industries, Inc., of full reimbursement of

its costs and expenses relating to this action, including reasonable attorneys' fees,

as provided in Title 18, United States Code, Section 1964(c); and

c.  Such other relief, including punitive damages, as the Court deems appropriate and

the law provides.

THIS, the 15th day of February, 2009.

RESPECTFULLY SUBMITTED:

NATIONAL SERVICE INDUSTRIES, INC.
f/d/b/a NORTH BROTHERS, INC., PLAINTIFF


MARCY B. CROFT
ATTORNEY FOR PLAINTIFF

MARCY B. CROFT, MS. BAR NO. 10864
WALTER G. WATKINS, JR., MS. BAR NO. 6988
ASHLEY E. CALHOUN, MS. BAR NO. 101303
FORMAN PERRY WATKINS KRUTZ & TARDY LLP
200 SOUTH LAMAR STREET, SUITE 100
JACKSON, MISSISSIPPI 39201
TELEPHONE:    (601) 960-8600
FACSIMILE:     (601) 960-8613

70

OF COUNSEL:
DAVID M. SETTER (Pro Hac)
JOHN M. SEEBOHM (Pro Hac)
JEANETTE S. EIRICH (Pro Hac)
FORMAN PERRY WATKINS KRUTZ & TARDY LLP
1775 SHERMAN STREET, SUITE 1900
DENVER, COLORADO 80203
TELEPHONE:        (303) 837-6400
FACSIMILE:        (303) 318-9669